## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **GERALDINE NICHOLAS, INDIVIDALLY AND AS ADMINISTRATRIX OF THE ESTATE OF JAMES NICHOLAS** | § § § § § | |
| **Plaintiff,** | § § | **CIVIL ACTION NO. H-07-00657** |
| **v.** | § § | |
| **M.W. KELLOGG COMPANY, KELLOGG, BROWN & ROOT, KBR, INC. AND HALLIBURTON** | § § § § | |

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ED FISHER
Attorney-in-Charge
State Bar No. 24012624
490 Park Street
P.O. Box 4905
Beaumont, Texas 77704
(409) 835-6000 (Telephone)
(409) 813-8682 (Facsimile)

Counsel for Plaintiff Geraldine Nicholas,
Individually and as Administratrix of the
Estate of James Nicholas

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................1

STATEMENT OF THE ISSUE.......................................................................................2

BACKGROUND ............................................................................................................3

ARGUMENT ..................................................................................................................6

I.     Plaintiff's Denial of Benefits Claim is Not Barred by the Statute of Limitations ..........................................................................................................6

    A. The One-year Statute of Limitations Contained in the Plan is Unreasonable under the Circumstances of this Case ..............................................................6

    B. Defendants are Estopped from Raising the One-Year Defense........................8

    C. Plaintiff's Claims were Timely Filed under 29 U.S.C. § 1113 ........................8

    D. Defendants are Estopped from Raising any Statute of Limitations Defense...11

II.     The KBP Plan Administrator Abused its Discretion in Denying Mr. Nicholas' Request for Reinstatement to the KBR Group Life Insurance Plan ................11

    A. The 24-Month Period Contained in the Plan is Inapplicable to Mr. Nicholas.11

    B. The Severance Agreement and February 19, 1998 Letter is the Controlling Agreement With Respect to Mr. Nicholas......................................................12

    C. The Plan Administrator's Decision was Arbitrary and Capricious ................14

    D. The Severance Agreement and the February 19, 1998 Letter Promised Mr. Nicholas Continuing Participation in a Group Life Plan .................................15

III.     Genuine Issues of Material Fact Exist on Plaintiff's Breach of Fiduciary Claim17

IV.     Plaintiff's Remaining Common-Law Claims bear a Genuine Issue of Material Fact ................................................................................................................20

CONCLUSION ............................................................................................................22

CERTIFICATE OF SERVICE .....................................................................................22

TABLE OF AUTHORITIES

**Cases**

*LaRue v. DeWolff, Boberg & Associates, Inc.,*
___ U.S. ___, 2008 WL 440748 (U.S. Feb. 20, 2008). ..........................................19

*Black & Decker Disability Plan v. Nord,*
538 U.S. 822 (2003). ...............................................................................................15

*Varity Corp. v. Howe,*
516 U.S. 489 (1996). ...............................................................................................20

*Central States, Southeast and Southwest Areas Pension Fund v .Central Transport, Inc.,*
472 U.S. 559 (1985). ...............................................................................................18

*Massachusetts Mut. Life Ins. Co. v. Russell,*
473 U.S. 134 (1985).  ........................................................................................18, 20

*Dye v. Assocs. First Capital Corporation Long-Term Disability Plan,*
243 Fed. Appx. 808 (5th Cir. 2007).  .......................................................................6

*Harris Methodist Fort Worth v. Sales Support Servs. Inv. Employee Health Care Plan,*
426 F.3d 330 (5th Cir. 2005).  ...................................................................................6

*Mello v. Sara Lee Corp.,*
431 F.3d 440 (5th Cir. 2005).  .................................................................................21

*Calvert v. Firstar Fin., Inc.,*
409 F.3d 286 (6th Cir. 2005).  .................................................................................14

*Gaither v. Aetna Life Insurance Co.,*
394 F.3d 792 (10th Cir. 2004).  ...............................................................................14

*Mullins v. Pfizer, Inc.,*
23 F.3d 663 (2d Cir. 1994). .....................................................................................19

*Bixler v. Central Pa. Teamsters Health & Welfare Fund,*
12 F.3d 1292 (3d Cir. 1993). ...................................................................................19

*Fischer v. Philadelphia Elec. Co.,*
994 F.2d 130 (3d Cir. [Pa.] 1993). ..........................................................................19

*Anweiler v. American Elec. Power Serv. Corp.,*
3 F.3d 986 (7th Cir. 1993).  .....................................................................................19

*Gluck v. Unisys Corp.,*
    960 F.2d 1168 (3rd Cir. 1992). ............................................................9

*Gabner v. Metropolitan Life Ins. Co.,*
    938 F. Supp. 1295 (E.D. Tex 1996). ...................................................17

*In re AEP ERISA Litigation,*
    327 F. Supp. 2d 812 (S.D. Ohio 2004). ..............................................19

*Clarke v. Ford Motor Co.,*
    220 F.R.D. 568 (E.D. Wis. 2004). .......................................................10

*Bertram v. NuTone, Inc.,*
    107 F. Supp. 2d 957 (S.D. Ohio 2000). ..............................................21

*In re Fruehauf Trailer Corp.,*
    250 B.R. 168 (D. Del. 2000). ..............................................................10

*International Broth. Of Painters and Allied Trades Union and Industry Pension Fund v. Duval,*
    925 F. Supp. 815 (D.D.C. 1996). ........................................................17

*Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund,*
    12 F.3d 1292 (C.A. 3d [Pa.] 1993). ....................................................18

*Haberern v. Kaupp Vascular Surgeons, Ltd. Defined Benefit Plan and Trust Agreement,*
    822 F. Supp.  247 (E.D. Pa. 1993), motion denied, 1993 U.S. Dist. Lexis 18224 (E.D. Pa.)...............................................................................................9

*Martin v. National Bank of Alaska,*
    828 F.Supp. 1427 (D. Alaska 1992). ...................................................18

*Fortune v. Medical Associates of Woodhull, P.C.,*
    803 F. Supp. 636 (E.D.N.Y. 1992). .....................................................19

*Mitchell v. Great-West Life Assur. Co.,*
    802 F. Supp. 406 (W.D. Okla. 1991). .................................................12

*Armistead v. Vernitron Corp.,*
    944 F.2d 1287, (6th Ct. App. [Tenn.] 1991). .......................................13

*Spencer v. Central States, Southeast and Southwest Areas Pension Fund,*
    778 F. Supp. 985 (N.D. Ill. 1991). ......................................................18

*Vogel v. Independence Federal Sav. Bank,*
    728 F. Supp. 1210 (D. Md. 1990). ......................................................13

*Toland v. McCarthy,*
     499 F. Supp. 1183 (D.C. Mass 1980).  ...................................................18

**Statutes**

29 U.S.C. 502.............................................................................................1

29 U.S.C. 1001(b).  ....................................................................................1

29 U.S.C.A. § 1113.  ...................................................................................9


**Secondary Sources**

Restatement of Contracts (Second) § 201(1). ...............................................15

## Introduction and Summary of Arguments

This is an action arising, in part, under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, 29 U.S.C. § 502(a), for benefits that were wrongfully denied under the plan. James E. Nicholas was an employee of M.W. Kellogg Company ("M.W. Kellogg") since September 1990, until he was diagnosed with mesothelioma in early 1998 as a result of occupational exposure to asbestos. On February 19, 1998, Defendants outlined a benefits plan that would allow Mr. Nicholas to participate in Halliburton's group life insurance plan while he was on disability leave as a result of the mesothelioma. On December 24, 1998, in consideration for the release of his mesothelioma claims, M.W. Kellogg entered a letter agreement with Mr. Nicholas drafted by Defendants' then-agent James R. Wilhite. This agreement promised that in exchange for the Mr. Nicholas's release of his asbestos claims and other causes of action, M.W. Kellogg would continue to provide life insurance and other benefits. Plaintiff is Mr. Nicholas's widow and was a beneficiary of the life insurance coverage.

On January 2, 2003, Defendants terminated Mr. Nicholas and abruptly sent a COBRA notification informing him that he was not entitled to benefits. He immediately contacted Defendant's H.R. department and was reassured that the termination was in error and that the problem would be remedied. Defendants represented that the termination was erroneous and that the situation would be fixed.

The plan administrator reinstated Mr. Nicholas's coverage under the medical and dental plans on November 1, 2003. Mr. Nicholas then reminded KBR that his life insurance coverage needed also to be reinstated pursuant to the 1998 agreement signed by

1

a KBR agent.  The plan administrator wrote Mr. Nicholas a letter months later in March 2004 denying this request, and another letter to Mr. Nicholas's attorney in October 2004 denying this request.

Mr. Nicholas died of mesothelioma on December 20, 2006.  Plaintiff filed the present suit on January 17, 2007.  Defendant and its lawyers have continually refused to comply with the agreement they asked Mr. Nicholas to sign in 1998.  As demonstrated in this Response, Plaintiff's claims are not barred by the statute of limitations.  Further, Defendant's Plan Administrator abused its discretion in denying Mr. Nicholas's request for reinstatement to the KBR Group Life Insurance Plan. The 1998 agreements are the binding and controlling agreements governing Mr. Nicholas's benefits, and the Plan Administrator's decision was arbitrary and capricious. Further, genuine issues of material fact exist on Plaintiff's breach of fiduciary claims.   Finally, Plaintiff's remaining common-law claims bear a genuine issue of material fact, precluding summary judgment.

Because a genuine issue of material fact exists, Defendants are not entitled to judgment as a matter of law.  Thus, Plaintiffs respectfully request that the Court deny the Defendants' Motion for Summary Judgment.

## **Statement of the Issue**

Whether Defendants are entitled to summary judgment on Plaintiff's claims of denial of benefits under ERISA, breach of fiduciary duty under ERISA, estoppel, misrepresentation, and fraud under state law.   The district court must resolve all reasonable doubts about the facts in favor of the nonmovant. *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 456 (5th Cir. 2005).  It is the movant – here, Defendants – must prove that there is no genuine issue about any material fact and that it is entitled to

judgment as a matter of law.  Fed. R. Civ. Pro. 56(c);  *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995);  *Campbell v. Hewitt, Coleman & Assocs.*, 21 F.3d 52, 55 (4th Cir. 1994).

### Background

James E. Nicholas was an employee of M.W. Kellogg Company ("M.W. Kellogg") since September 1990.  *Deposition of James E. Nicholas*, at 12 (Mar. 30, 1999).  Mr. Nicholas was diagnosed with mesothelioma in early 1998 as a result of occupational exposure to asbestos. *Deposition of James E. Nicholas*, at 15-18 (Mar. 30, 1999). As Mr. Nicholas's cancer progressed, it became clear to Mr. Nicholas that it was literally a life or death matter to maintain his health and life insurance and other benefits. *See Deposition of Geraldine Nicholas*, 54:16 – 55:4 (September 18, 2007). It became equally clear to Defendants that he also possessed potential claims against any entity responsible for his exposure to asbestos that caused the disease, including the Kellogg entities.  See Deposition of James R. Wilhite, 27:3-28:10 (December 18, 2007).

On February 19, 1998, Tashi Theismann, an agent of Defendants, sent to Mr. Nicholas a letter outlining his benefits arrangement.  See Exhibit A.  This letter stated in pertinent part: "If your application for Long-Term Disability benefits is pending or approved, your Basic Life Insurance will continue to be paid by the Company and your Supplemental Employee Life Insurance will remain in effect as long as you continue to make monthly payments." *Id.*

On December 24, 1998, in consideration for the release of his mesothelioma claims, M.W. Kellogg entered a letter agreement with Mr. Nicholas drafted by Defendants' then-agent James R. Wilhite. *See Exhibit B.*  This agreement promised that

in exchange for the Mr. Nicholas's release of his asbestos claims and other causes of

action, M.W. Kellogg would continue to provide life insurance and other benefits. *See*

*Exhibit B*. This agreement further provided the following:

> "Your company-provided benefits will continue in 1999,
> based on the choices you have recently selected during the
> annual enrollment process.
>
> ...Should you decide at any time to voluntarily terminate
> your employment with the company, your company-
> provided benefits coverage will end on the last day of the
> month in which you terminate.
>
> ...No attempted modification or waiver of any of the
> provisions of this Agreement shall be binding on either
> party unless in writing and signed by both Kellogg and
> you."
>
> See Exhibit B, ¶¶ 6, 7, 16.

The understanding of both parties to the agreement was that this agreement

guaranteed benefits coverage, including life insurance, for Mr. Nicholas throughout the

remainder of his life.  See Deposition of James R. Wilhite, attached hereto as Exhibit H,

21:6-17 ("We weren't terminating him; but we waned to make sure he didn't lose out on

any benefits that he would have had had he not been out on disability"); 31:2-17; 32:19-

23 ("Nothing about the agreement that [I] had with Mr. Nicholas allowed for Kellogg to

just terminate him and get rid of all the benefits that he was getting [.]");  34:2-6

("...[T]he intent was that he have life insurance as a benefit during the time he's

disabled; and when he passed away, there would be a life insurance payment.  I mean,

that was the plan.  That was the intent.");  55:1-13 (Mr. Nicholas would have been

allowed to continue the life insurance plan "as long as he kept renewing his coverage and

making the payments."); 79:8-17 (December 18, 2007).

Mr. Nicholas went on a medical leave of absence as a result of his mesothelioma in late 1998, but continued to receive his benefits at active employee rates pursuant to the December 24, 1998 letter contract. In fact, on November 23, 2002, Mr. Nicholas received a "Confirmation of Enrollment" which indicated that he was enrolled in the benefit plan for the year 2003 and would receive $50,000 base life insurance plus an additional six times (6x) his annual salary in optional life insurance.

On January 2, 2003, Mr. Nicholas was terminated without notice and abruptly sent a COBRA notification informing him that he was not entitled to benefits. *See Exhibit C to Defendant's Motion,* attached hereto as Exhibit I. He immediately contacted Defendant's H.R. department and was reassured that the termination was in error and that the problem would be remedied. *See Deposition of Geraldine Nicholas,* 47:11-17, attached hereto as Exhibit J.

On October 16, 2003, the plan administrator reinstated Mr. Nicholas's coverage under the medical and dental plans. See Exhibit C. Mr. Nicholas then reminded KBR that his life insurance coverage needed also to be reinstated pursuant to his 1998 agreement signed by a KBR agent. See Exhibit C to Defendant's Motion, ¶ 5, attached hereto as Exhibit K. The plan administrator wrote Mr. Nicholas a letter on March 11, 2004 denying this request, and providing purported reasons for the denial. See Exhibit D. However, despite the blame Defendants placed on the life insurance companies, Mr. Nicholas never received a conversion notice or any documentation from the life insurance companies informing him of any right to continue coverage after termination. *Deposition of Geraldine Nicholas,* 47:3-10. Mr. Nicholas's attorney at the time inquired into the

matter also, and Defendants' legal counsel corresponded with that attorney on October 7, 2004.  See Exhibits E and G.

Mr. Nicholas died of mesothelioma on December 20, 2006.  Upon the failure of KBR to comply with the life insurance coverage, Plaintiff was forced to file the present suit on January 17, 2007.  Defendant and its lawyers have continually refused to comply with the agreement they asked Mr. Nicholas to sign in 1998.  As demonstrated in this Response, Plaintiff is entitled to the life insurance benefits promised to Mr. Nicholas in the 1998 communications between Defendants and Mr. Nicholas.

Because a genuine issue of material fact exists, Defendants are not entitled to judgment as a matter of law.  Thus, Plaintiffs respectfully request that the Court deny the Defendants' Motion for Summary Judgment.

## Argument

### I.   Plaintiff's Denial of Benefits Claim is Not Barred by the Statute of Limitations

#### A.  The One-year Statute of Limitations Contained in the Plan is Unreasonable under the Circumstances of this Case

ERISA does not provide a SOL for denial of benefits lawsuits.  In the absence of such a statute, courts apply the most analogous state statute of limitations.  *Dye v. Assocs. First Capital Corporation Long-Term Disability Plan*, 243 Fed. Appx. 808, 809 (5th Cir. 2007).  The *Dye* court noted that the most analogous state statute of limitations to an ERISA denial is the four-year limitation governing suits on contracts, but also acknowledged that "[w]here a plan designates a reasonable, shorter time period…that lesser limitations schedule governs."  *Harris Methodist Fort Worth v. Sales Support*

*Servs. Inv. Employee Health Care Plan*, 426 F.3d 330, 333 (5th Cir. 2005).  The *Dye* court specifically stated that the mere fact that lesser time periods have been held reasonable "does not automatically mean that [the period in question] *is* reasonable"; "[r]ather, we must look to other factors to determine whether" the period is reasonable in a particular case. *Dye*, 243 Fed. Appx. at 809.  In that case, the period was reasonable because the plan gave a notice specifying a 120-day period, the plan required prompt notification to the employee of a decision on appeal, and did not begin to run until after the disposition of the internal appeal process. *Id.* at 810.

In the present case, the one-year period is unreasonable.  First, unlike the *Dye* plan, the more specific letter agreement in the December 24, 1998 does not contain any notice of the 1-year period.  Second, this plan does not require prompt notification, and in fact, the plan administrators did not in fact give prompt notice to Mr. Nicholas of their denial.  Mr. Robert Hayter's affidavit attached to Defendant's Motion for Summary Judgement states that Mr. Nicholas's benefits were denied as of January 2, 2003.  See Exhibit F.  This affidavit further admits that Mr. Nicholas requested reinstatement of <u>all</u> his benefits in mid-2003. See Exhibit F.  Yet, it was October 16, 2003 before Defendants sent any response at all to Mr. Nicholas.  See Exhibit C.  Even that response did not mention any denial of his life insurance, but merely acknowledged that he would be provided his dental and medical insurance because "**based on the copy of a February 19, 1998 letter from the M.W. Kellogg Company ("MWK"),** it would appear that [Mr. Nicholas was] eligible to continue to participate." See Exhibit C.  This phrase clearly acknowledges that Defendants believed that the February 19, 1998 letter had legal effect such that Mr. Nicholas was eligible for benefits.

7

When Mr. Nicholas became aware that his life insurance was not included in Defendants' reinstatement of his benefits, he requested that this apparent misunderstanding be corrected. Again, Defendants waited until March 11, 2004 to finally inform him of their denial of his request and the purported reasons behind it. See Exhibit D. This letter informed Mr. Nicholas that he could pursue the KBR Dispute Resolution Process. See id. After a September 30, 2004 letter from Plaintiff's attorney, Robert Hayter, Senior Counsel for Halliburton, finally provided a denial of his claim from the legal department. See Exhibits E and G. The lack of prompt notice in this case, as opposed to the *Dye* case, illustrates that the one-year time period is unreasonable.

### B.    Defendants are Estopped from Raising the One-Year Defense

Even if this court were to hold that the one-year statute of limitations is reasonable, Defendants are estopped from raising the statute of limitations defense. Defendants apparently waited months between the mid-2003 claim by Mr. Nicholas to the October 16, 2003 reply they finally sent. Even such reply did not provide a denial of Mr. Nicholas's life insurance benefits nor the basis for such denial. It was March 2004, almost a year after Mr. Nicholas's first inquiry into his benefits, that the Defendants provided any notice of a denial of his life insurance benefits. It was October 7, 2004, over a year after Mr. Nicholas's first inquiry into his benefits, that Defendant's legal department first provided a detailed denial of his benefits. In the face of such delay, Defendants are estopped to claim that a one-year limit is reasonable.

### C.    Plaintiff's Claims were Timely Filed under 29 U.S.C. § 1113

Generally, the limitations period for a breach of fiduciary suit is the shorter of 6 years from the date of the last action constituting a part of the breach of 3 years from the date the plaintiff first gains actual knowledge of the breach. 29 U.S.C.A. § 1113. In the case of fraud or concealment, a more generous limitation period applies – an action may be commenced up to 6 years after the date of the discovery of the breach. 29 U.S.C.A. § 1113. In the present case, Plaintiff's breach of fiduciary claims were timely filed.

While Plaintiff's estoppel claims are plainly not barred by the statue of limitations, neither are Plaintiff's breach of fiduciary duty claims. On October 7, 2004, Defendant's agent Mr. Hayter finally wrote to Bryan Blevins, then-Plaintiff's attorney, to state that KBR refused to reinstate Mr. Nicholas's life insurance policy. Even by the most restrictive three-year statute of limitation pursuant to section 1113 of Chapter 29 of the United States Code, Plaintiff's breach of fiduciary claim would have been barred on October 7, 2007, a deadline that Plaintiff easily met by its January 17, 2007 filing.

Under section 1113 of Chapter 29 of the United States Code, to prove that a plaintiff had actual knowledge of the breach of fiduciary duty or violation of ERISA, a Defendant must prove that the plaintiff had actual knowledge of all material facts necessary to understand that the claim existed. *See generally Haberern v. Kaupp Vascular Surgeons, Ltd. Defined Benefit Plan and Trust Agreement*, 822 F. Supp. 247 (E.D. Pa. 993), motion denied, 1993 U.S. Dist. Lexis 18224 (E.D. Pa.); *Gluck v. Unisys Corp.*, 960 F.2d 1168 (C.A.3[rd] Pa. 1992). Such material facts include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm. *Id.* The Defendant in an ERISA action must make a showing of when plaintiff acquired actual knowledge of the alleged violations, in order for ERISA's three-year limitations

period to apply, and if defendant cannot make such showing, the court will not dismiss ERISA claims as barred by the statute of limitations. *See generally In re Fruehauf Trailer Corp.*, 250 B.R. 168 (D. Del. 2000).

One court has held that when a prolonged period has elapsed for investigation of the claim, that the statute of limitations on an ERISA breach of fiduciary duty claim on the date the appeals process is completed, not during the pendency as the employee and his attorney attempt to rectify the situation without resorting to litigation. *Clarke v. Ford Motor Co.*, 220 F.R.D. 568 (E.D. Wis. 2004), vacated on other grounds, 228 F.R.D. 631 (2004). In that case, the court held the statute on the claim began to run on date the appeals process was completed, not nearly three years earlier when plaintiff's attorney wrote to the plan and stated that, by failing to notify participant of his eligibility for benefits, it had not acted in good faith. *Id.* at 575. The court held that neither that letter nor plan's subsequent correspondence with plaintiff's counsel, rejecting plaintiff's position but advising her that she could appeal to the next level of its administrative process, could be reasonably characterized as a clear and unequivocal repudiation by the plan of its alleged duty to pay the benefits in question. *Id.*

Similarly, in this case, Mr. Nicholas and his attorney engaged in prolonged correspondence with Defendants, receiving no answer at all regarding his life insurance claim on October 16, 2003 and awaiting months for a reply to Mr. Nicholas's reminder that his life insurance was also covered by the 1998 agreement. In such a situation, it is clear that the date from which the statute must run, if at all, on the breach of fiduciary claim is October 7, 2004, the date of the letter to Mr. Nicholas's attorney. See Exhibit E.

Plaintiff filed well within 3 years of that date, and as such timely filed its breach of fiduciary duty claim.

Even if this court were to refuse to follow the holding in *Clarke*, the earliest date that Mr. Nicholas had notice that his life insurance benefits were terminated and the reasons for such termination was on March 11, 2004, when Defendants first even mentioned a denial of his life insurance benefits. Plaintiff met even this statute under the statutory three-year limitations by its January 17, 2007 filing. Thus, Plaintiff's Petition has met the statute of limitations for all claims brought under its pleadings.

### D.   Defendants are Estopped from Raising any Statute of Limitations Defense

Defendants may not raise any Statute of Limitations Defense based on purported Plan terms to Plaintiff's claims because the December 24, 1998 Letter Agreement clearly states that: "No attempted modification or waiver of any of the provisions of this Agreement shall be binding on either party unless in writing and signed by both Kellogg and you."   See Exhibit B, ¶ 16. Defendants have produced no agreement signed by Kellogg and Mr. Nicholas subsequent to this February 19, 1998 Letter Agreement that places any statute of limitations other than which exists at common law or statute on Plaintiff's claims. Thus, any purported modifications through Plan terms are ineffectual.

### II.   The KBP Plan Administrator Abused its Discretion in Denying Mr. Nicholas' Request for Reinstatement to the KBR Group Life Insurance Plan

### A.  The 24-Month Period Contained in the Plan is Inapplicable to Mr. Nicholas

The 24-month period under which an employee could remain on disability and keep his benefits under the KBR Plan is inapplicable to Mr. Nicholas. The December 24, 1998 Letter Agreement clearly states that: "No attempted modification or waiver of any of the provisions of this Agreement shall be binding on either party unless in writing and signed by both Kellogg and you." See Exhibit B, ¶ 16. Defendants have produced no agreement signed by Kellogg and Mr. Nicholas subsequent to this February 19, 1998 Letter Agreement that places any limitations on how long he could remain on disability and keep the benefits promised to him. In fact, the only reference to termination of those benefits regards voluntary termination by Mr. Nicholas's own choice in paragraph 7: "Should you decide at any time to voluntarily terminate your employment with the company, your company-provided benefits coverage will end on the last day of the month in which you terminate." Thus, any purported modifications through Plan terms are ineffectual, and the 24-month period is simply inapplicable.

### B.  The Severance Agreement and the February 19, 1998 Agreement is the Controlling Agreement With Respect to Mr. Nicholas

An insurer will not be permitted to make oral and written representations that are relied on by employees, and then to hide behind ERISA to enforce compliance with terms that were never approved or assented to. *Mitchell v. Great-West Life Assur. Co.*, 802 F. Supp. 406, 410 (W.D. Okla. 1991). Yet, Defendants have the audacity to do just that; make written representations to their employees and then hide behind ERISA to state that the letter drafted by Defendants was not formally amended consistent with the amendment procedures of ERISA. In contrast, the December 24, 1998 document does comport with the requirement of a written instrument for ERISA purposes. Alternatively

if the court holds that it does not constitute a proper amendment to the Plan, Defendants are estopped from claiming that their own document – drafted by Defendant's agents and presented to Mr. Nicholas – does not comport with the requirements of ERISA.

The December 24, 1998 letter agreement clearly met the requirements for an amendment or modification of an ERISA plan. The modification was in writing, and if it were not attached to the Summary of Benefits, that is the mistake of Defendants and their agents, not Mr. Nicholas.

Even where oral representations rather than a written contract serve as the modification to an ERISA plan, a federal court has held that ERISA's requirement of a writing did not preclude an equitable estoppel bar where an insurance plan was involved and the actuarial soundness of the fund from which the benefits would come was not an issue. *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298-99 (6th Cir. [Tenn.] 1991). In *Armisted*, an employer denied retirement insurance benefits after making contrary *oral* representations to potential retirees. *Id.* at 1298, 1299. Despite ERISA's requirement that the benefit plan be in writing, the court held that the doctrine of equitable estoppel barred the employer from denying the insurance benefits because the purpose of ERISA's writing requirement would not be frustrated by application of estoppel principles where an insurance benefit plan rather than pension plan was involved, and actuarial soundness of fund from which benefits would come was not an issue. *Id.* at 1299-1300. In a similar case, another federal court held that where the case's question was the less complex question of whether an individual person is covered by a plan, rather than the terms of the plan, that the employee could maintain a claim for promissory estoppel. *Vogel v. Independence Federal Sav. Bank.*, 728 F. Supp. 1210, 1231 (D. Md. 1990). Similar to

*Armisted* and *Vogel*, this case contains the simple question of whether Mr. Nicholas was covered by the plan; however, unlike *Armisted* and *Vogel*, which both allowed a promissory estoppel claim on the basis of oral representations, Mr. Nicholas has a written and unambiguous document drafted by the Defendants themselves. In the face of such a contract, promissory estoppel clearly applies.

### C. The Plan Administrator's Decision was Arbitrary and Capricious

Defendant contends in its Motion that Mr. Nicholas presented only two pages of the February 19, 1998 Letter Agreement to the Plan Administrator, and that as such, the plan administrator's decision was not arbitrary or capricious. A plan administrator's reliance on a "pure paper" review is a factor to support a ruling that a denial of benefits was arbitrary and capricious." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005). Plainly, "if plan administrators believe that more information is needed to make a reasoned decision, they must ask for it;" in fact, "[t]here is nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters." *Gaither v. Aetna Life Insurance Co.*, 394 F.3d 792, 807-808 (10th Cir. 2004) (reversing a district court's finding that Aetna's decision was not arbitrary and capricious). The *Gaither* court rejected the insurance company's assertion that: "it plays a role like that of a judge in a purely adversarial proceeding, where the parties bear almost all of the responsibility for compiling the record, and the judge bears little or no responsibility to seek clarification when the evidence suggests the possibility of a legitimate claim." *Id.* Rather, "[a]n ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter." *Id.* Additionally, plan

administrators may not arbitrarily refuse to credit a claimant's reliable evidence. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823 (2003).

Defendants have identified no investigation that they pursued into this matter. In the initial letters to Mr. Nicholas regarding his benefits, there did not appear to be any contest that they requested any more information from Mr. Nicholas to make their decision other than the two pages of which Defendants' Motion for Summary Judgment now complains. See Exhibits C, D, and E. It was not until Plaintiff's attorney wrote an inquiring letter that Defendants suddenly asserted that "Mr. Nicholas has not provided KBR with a copy of the entire letter and KBR has been unable to locate a copy" and that "the authenticity of the letter may become an issue if this matter is pursued." See Exhibits E and G. Defendants have not even provided any explanation to this date for why Defendants did not have a copy of this Letter Agreement in their own file; why they did not request a full copy if they disputed the authenticity or needed more information; or why they apparently did not contact Mr. Wilhite, the drafter of the letter, before questioning its authenticity. It is plain that Defendants did not meet their fiduciary duty to pursue a good faith investigation into Mr. Nicholas's inquiry; instead, Defendants arbitrarily and capriciously refused to consider the evidence of the February 19, 1998 Letter Agreement and of the unambiguous testimony of the parties to the Agreement.

### D. The Severance Agreement and the February 19, 1998 Letter Promised Mr. Nicholas Continuing Participation in a Group Life Plan

Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning. Restatement of Contracts (Second) § 201(1). The mutual understanding of the parties prevails even where the

contractual term has been defined differently by statute or administrative regulation. *Id.* at cmt. C. Here, both parties to the agreement had the same understanding as to what the 1998 Agreement meant, and that understanding must govern.

The parties to this agreement were James R. Wilhite as an authorized agent for Defendants and Mr. Nicholas. Mr. Nicholas believed that the agreement guaranteed him life insurance benefits as long as he paid the required benefits until he was released from disability, died or turned 65 years old.   Deposition of Geraldine Nicholas, 54:6 – 55:4, 121:14-24. Mr. Wilhite, the drafter of the December 24, 1998 letter and involved in the correspondence for the February 19, 1998 letter, made it abundantly clear in his deposition that the intent of the agreement was to make sure Mr. Nicholas would be entitled to his benefits until he was released from disability, died, or turned 65 years old. See Deposition of James R. Wilhite, 21:6-17 ("We weren't terminating  him; but we wanted to make sure he didn't lose out on any benefits that he would have had had he not been out on disability"); 31:2-17; 32:19-23 ("Nothing about the agreement that [I] had with Mr. Nicholas allowed for Kellogg to just terminate him and get rid of all the benefits that he was getting [.]");  34:2-6 ("…[T]he intent was that he have life insurance as a benefit during the time he's disabled; and when he passed away, there would be a life insurance payment.  I mean, that was the plan.  That was the intent.");  55:1-13 (Mr. Nicholas would have been allowed to continue the life insurance plan "as long as he kept renewing his coverage and making the payments."); 79:8-17 (December 18, 2007).

Mr. Wilhite, the drafter of the February 19, 1998 Letter Agreement emphasized:

> Q:     Irrespective of whether or not he's on the Kellogg plan or the Halliburton plan, the deal that was cut in [the February 19, 1998 letter] was to provide him life insurance up until the time he died?

A:      Correct.

Q:      It wasn't set to expire at any point?

A:      Correct.

Deposition of James R. Wilhite, 87:9-15 (December 18, 2007).

It is clear that despite Defendants' attempts to misconstrue the plain wording of the Letter Agreement, the parties to the agreement shared the intent that Mr. Nicholas be covered beyond the 24-month disability period.   The December 24, 1998 Letter Agreement clearly states that: "No attempted modification or waiver of any of the provisions of this Agreement shall be binding on either party unless in writing and signed by both Kellogg and you."    See Exhibit B, ¶ 16.  As Defendants have presented no evidence of any agreement signed by Mr. Nicholas that purports to change the terms of the February 19, 1998 Letter Agreement, the terms of that agreement clearly stand.

## III.     Genuine Issues of Material Fact Exist on Plaintiff's Breach of Fiduciary Claim

The duties of an ERISA fiduciary include the common law duty to loyalty which, in turn, requires fair and honest dealings with the beneficiary.    *See Gabner v. Metropolitan Life Ins. Co.*, 938 F. Supp. 1295 (E.D. Tex 1996).  A fiduciary's duty under ERISA is broader than mere plan management; the fiduciary is charged with the duty of undivided loyalty, not just responsibility for sound stock-picking and proper bookkeeping. *See International Broth. Of Painters and Allied Trades Union and Industry Pension Fund v. Duval*, 925 F. Supp. 815 (D.D.C. 1996).  The fiduciary duties articulated in ERSA section governing duties of ERISA fiduciary is not exhaustive; rather, Congress relied upon general scope of trustees' and other fiduciaries' authority and responsibility.

17

*Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1299 (C.A. 3d [Pa.] 1993). Fiduciary duties established by ERISA should be broadly construed. *Martin v. National Bank of Alaska*, 828 F.Supp. 1427, 1436 (D. Alaska 1992).

Consistent with this required broad construction, courts have held that the fiduciary duties imposed by ERISA on plan administrators run directly to the beneficiaries, not just to the plan itself. *See generally Spencer v. Central States, Southeast and Southwest Areas Pension Fund*, 778 F. Supp. 985 (N.D. Ill. 1991); *Toland v. McCarthy*, 499 F. Supp. 1183 (D.C. Mass 1980). The United States Supreme Court itself has recognized that Congress intended through section 1104 of Chapter 29 of the United States Code to codify the strict duty to loyalty that traditionally applied to trustees in their conduct toward trust beneficiaries. *Central States, Southeast and Southwest Areas Pension Fund v .Central Transport, Inc.*, 472 U.S. 559, 570-571 (1985). The text of this section demonstrates that under ERISA, as under common law, a fiduciary's duty runs directly to individual participants and beneficiaries. *See Massachusetts Mut. Life Ins. Co. v. Russell*, 472 U.S. 134, 142 (1985) ("It is of course true that the fiduciary obligations of plan administrators are to serve the interest of participants and beneficiaries."). When a breach of this duty causes harm to individual participants or beneficiaries, the breach is "appropriate[ly]" subject to a claim by the individuals for equitable relief under section 502.

Further, the text of ERISA demonstrates Congress's desire to redress individual harm caused by fiduciary misconduct in section 1001: "to protect...the interests of participants in employee benefit plans and their beneficiaries...by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and

by providing for appropriate remedies, sanctions, and ready access to the Federal courts."
29 U.S.C. 1001(b).

Congress codified a strict duty of loyalty under ERISA, and fiduciaries' violations
of that duty will in some instances inflict distinct injuries on participants or beneficiaries
without affecting the plan as a whole. *See Bixler v. Central Pa. Teamsters Health &
Welfare Fund*, 12 F.3d 1292, 1298 (3d Cir. 1993). In instances of misrepresentation to
plan participants, the harm caused by the fiduciary's breach is particularly likely to be
individualized. *See Mullins v. Pfizer, Inc.*, 23 F.3d 663 (2d Cir. 1994); *Anweiler v.
American Elec. Power Serv. Corp.*, 3 F.3d 986 (7th Cir. 1993).

An employer's misrepresentation of an employee's rights under an ERISA plan
may constitute a breach of fiduciary duty. *Fortune v. Medical Associates of Woodhull,
P.C.*, 803 F. Supp. 636, 641 (E.D.N.Y. 1992). A plan administrator may not make
affirmative material misrepresentations to plan participants about changes to employee
benefits plans. *Fischer v. Philadelphia Elec. Co.*, 994 F.2d 130, 135 (C.A.3 [Pa.] 1993),
cert denied 510 U.S. 1020. Further, under ERISA, a fiduciary breaches his duty by
providing plan participants with materially misleading information, regardless of whether
the fiduciary's statements or omissions were made negligently or intentionally. *In re
AEP ERISA Litigation*, 327 F. Supp. 2d 812, 819 (S.D. Ohio 2004).

Defendants contend in their Motion that Plaintiff cannot recover any remedies at
all, and that the injury here is solely to the plan. To the contrary, the United States
Supreme Court has recently held on February 20, 2008, that section 502(a)(2) authorizes
recovery for fiduciary breaches that impair the value of plan assets in a participant's
individual account. *LaRue v. DeWolff, Boberg & Associates, Inc.*, ___ U.S. ___, 2008

WL 440748 (U.S. Feb. 20, 2008).  As in this case, the plaintiff sought "equitable relief" pursuant to 29 U.S.C. § 502(a)(3), and the court held that he was entitled individually to recovery on his plan.  *Id.* at \*3.  Contrary to Defendant's assertion in its Motion, *LaRue* did determine a benefits determination that was particular to a single defendant; in *LaRue*, the Court held that a man could recover benefits because where his employer had not followed his directions to make certain changes to the investments in his individual account.  *Id.* at \*2.  The court held that the principal statutory duties imposed on fiduciaries by section 409(a) "relate to the proper management, administration, and investment of fund assets," with an eye toward ensuing that the "benefits authorized by the plan" are ultimately paid to participants and beneficiaries.  *LaRue*, 2008 WL at \*5, citing *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985).

The United States Supreme Court had even earlier held in *Varity Corp. v. Howe*, 516 U.S. 489 (1996), that section 502(a)(3) authorizes awards or relief to individuals.  In *Varity Corp.*, the employer made promises to employees that "when [they] transfer[ed] to [a different pension plan], pay levels and benefit programmed will remain unchanged." *Id.* at 499.  The employer subsequently changed those levels, and the employee-plaintiff brought suit pursuant to section 503(2) to recover the value of those benefits.  *Id. at* 492. The court also held that making intentional representations about the future of plan benefits is an act of plan administration such that an employer is the fiduciary responsible for such breaches.  *Id.* at 503.

## IV.    Plaintiff's Remaining Common-Law Claims bear a Genuine Issue of Material Fact

ERISA estoppel requires only (1) a material misrepresentation; (2) reasonable and detrimental reliance on the misrepresentations; and (3) extraordinary circumstances.

*Mello v. Sara Lee Corp.*, 431 F.3d 440, 444-45 (5th Cir. 2005). Defendant attempts to have its cake and eat it too, claiming that 1.) the statements regarding life insurance coverage in the December 24, 1998 letter were not representations such that Mr. Nicholas could rely on them; and 2.) that the same statements were not misrepresentations either such that Mr. Nicholas could bring an equitable estoppel claim. *See Defendants' Motion for Summary Judgment*, n. 5 (Feb. 22, 2008).

For example, in *Bertram v. NuTone, Inc.*, 107 F. Supp. 2d 957 (S.D. Ohio 2000), the defendant-employer was equitably estopped from terminating an early retiree's medical benefits while continuing such benefits for active employees. *Id.* The employer had made a promise to retirees that they would have the same health coverage as active employees and that the only changes made would be same as for active employees. *Id.* at 961. The court found that the employer intended that the retirees act on promises or retirees reasonably believed employer so intended. *Id.* at 972-73. Further, the retirees did not know and should not have known that their health coverage could be terminated. *Id.* The court held that the plaintiffs met the standards for equitable estoppel under ERISA. *Id.*

Similarly in this case, Defendants are equitably estopped from terminating Mr. Nicholas's benefits. Defendants made a promise to Mr. Nicholas in the December 24, 1998 letter that he would have the same coverage as he did as an active employee. Defendants intended that Mr. Nicholas act on that promise and release his claims against Defendants. Mr. Nicholas did not know that his life insurance coverage could be terminated; in fact, Defendant's own agent did not imagine this. Deposition of James R.

Wilhite, 87:9-15 (December 18, 2007).   Thus, Plaintiff has met the standards for equitable estoppel under ERISA.

## **Conclusion**

Defendants are not entitled to summary judgment on any of Plaintiff's claims. Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

ED FISHER
Attorney-in-Charge
State Bar No. 24012624
490 Park Street
P.O. Box 4905
Beaumont, Texas 77704
(409) 835-6000 (Telephone)
(409) 813-8682 (Facsimile)

Counsel for Plaintiff Geraldine Nicholas,
Individually and as Administratrix of the
Estate of James Nicholas

## **CERTIFICATE OF SERVICE**

This is to certify that on March 14, 2008, a true and correct copy of this pleading has been served on Defendant's counsel via Notice of Electronic Filing and Regular Mail.

/s/ Ed Fisher
ED FISHER

# EXHIBIT A

  

# The M.W. Kellogg Company
### Engineers of Quality

Tashi Theismann
Employee Benefits
713-753-4326

February 19, 1998

Mr. James E. Nicholas
1807 Seven Maples Drive
Kingwood, Texas 77345

Reference: Benefits Summary

Dear Jim,

The purpose of this letter is to outline your benefit options while you are away from work.

### Salary Continuation

Since you are away from work due to an illness, you are eligible for continued income under the Company's Salary Continuation Policy. Under the policy, you are entitled to received continued pay during your illness for up to 26 weeks. For each year of service you will receive one week at full pay and for the remaining weeks (up to 26) you will receive half pay. Based on your equated service date, you are eligible for up to 8 weeks of full pay and 18 weeks of half pay. I understand that you, Jim Wilhite and Brian Evans have discussed the possibility of your working either part-time, or from home, during this period. In that case, the period of full pay can be extended as determined by Mr. Evans.

While you are on Salary Continuation, your FlexPlan benefits will remain in effect, with no change. You are currently enrolled in the following coverage:

| Plan | Coverage | Bi-Weekly Cost |
|---|---|---|
| Kellogg Medical Plan | Employee + Spouse + 2 Children | $69.75 |
| Dental Plan | Employee + Spouse + 2 Children | $20.25 |
| Vision Plan | Employee + Spouse + 2 Children | $16.60 |
| Long-Term Disability | Employee Only | $10.19 |
| Employee Life Insurance | Coverage Amount $379,000 | $52.84 |
| Accidental Death and Dismemberment | Employee $500,000 | $8.08 |
| | Spouse $200,000 | |
| | Children $50,000 | |
| Spouse's Life Insurance | Coverage Amount $50,000 | $1.15 |
| Children's Life Insurance | Coverage Amount $5,000 | $0.28 |
| Health Care Flexible Spending Account | $2499.90 Annually | $96.15 |

**Total Bi-Weekly Contributions:** $275.29

601 Jefferson Avenue • Houston, Texas 77002-7990
Mail Address: P.O. Box 4557 • Houston, Texas 77210-4557
Form 10272-01 (4/93)    Telephone: (713)753-2000 • Telex: 166385 • Telecopy: (713)753-5353



EXHIBIT
1

Mr. James E. Nicholas
February 19, 1998
Page 2

           The M.W. Kellogg Company

Deductions for your FlexPlan benefits will continue to come from your paycheck.

While you are on Salary Continuation, your Saving and Investment Plan participation will also remain in effect. Please note, however, that the Savings and Investment Plan deductions are a percentage of pay; therefore your Savings and Investment Plan contributions will reduce if you move from full-pay to half-pay status. If you wish to modify your Savings and Investment Plan contribution percentage, you may do so at any time by contacting me, or Employee Services at (713) 753-5555. For your convenience, I have included an Enrollment Change form along with this letter.

## Long-Term Disability Plan

If you continue to be disabled and unable to perform the duties of your job beyond your Salary Continuation period, benefits may be payable under the Long-Term Disability Plan. Aetna Life and Casualty is the claim administrator for the Long-Term Disability Plan. A Long-Term Disability application will be mailed to you after you have been on Salary Continuation for 18 weeks. The Long-Term Disability Plan protects a portion of your income if you are unable to work due to illness or injury. The Plan pays a monthly income benefit equal to a percentage of your monthly base salary, reduced by any other disability income benefits, such as Social Security. You have elected Supplemental Long Term Disability Coverage. If approved for Long-Term Disability benefits, you will receive a monthly benefit amount of approximately $4,560 (not including any offset amounts).

The benefits provided under the Long-Term Disability Plan are a supplement to certain other disability income to which you are or may become entitled, such as Federal Social Security. The provisions of the Long-Term Disability Plan require you to apply for Social Security benefits which may be due you. The application for Social Security benefits is included along with the Long-Term Disability application. If you are approved for Social Security or any other disability benefits, your Long-Term Disability Plan benefit will be offset by those amounts. More information regarding the Long-Term Disability plan can be found in Benefit Reports, pages 42-49.

If you are approved for Long-Term Disability by Aetna, you also will be eligible to receive a distribution of your Savings and Investment Plan account. Your account balance as of 12 February 1998 was $125,072.93.

## Continuing FlexPlan Coverage if Long-Term Disability Application is Pending or Approved

If your application for Long-Term Disability is pending at the time Salary Continuation ends, you will be entitled to continue the coverage listed below until your application is either approved or denied.

| Plan | Coverage | Monthly Cost |
|---|---|---|
| Kellogg Medical Plan | Employee + Spouse + 2 Children | $151.13 |
| Dental Plan | Employee + Spouse + 2 Children | $43.88 |
| Vision Plan | Employee + Spouse + 2 Children | $35.97 |
| Health Care FSA | Annual Amount - $2499.90    TBD | |
| Employee Life Insurance | Basic Coverage - $50,000 | Company Paid |
| | Supplemental - $329,000 | $114.49 |
| **Total Monthly Cost** | | **$345.47** |

*Please note that there is no provision for continuation of Accidental Death and Dismemberment Insurance or Dependent Life Insurance once Salary Continuation ends.*

2

Mr. James E. Nicholas
February 19, 1998
Page 3

             The M.W. Kellogg Company

If your application for Long-Term Disability benefits is pending or approved, your Basic Life Insurance will continue to be paid for by the Company and your Supplemental Employee Life Insurance will remain in effect so long as you continue to make monthly payments, as detailed on the previous page, for the coverage. Spouse's Life Insurance and Children's Life Insurance will terminate on the last day of the month in which your Salary Continuation ends. Reference page 53 of Benefit Reports for information on conversion of coverage.

A notification of the end of your salary continuation will be mailed to you. If you are approved to receive disability income benefits at the time your Salary Continuation ends, you will be entitled to continue the coverage listed above, until the date your disability ends or you reach age 65. You may choose the coverage options you wish to continue and are not required to continue all options listed. The cost of this continued coverage is the same as the cost you are paying as an active employee and has been converted to a monthly amount above. You are not required to continue all coverages listed above. Your payments will be submitted on an *after-tax* basis by personal check or money order to The M.W. Kellogg Company. If the cost increases for active employees, your cost will also increase.

<u>Continuing FlexPlan Coverage if Long-Term Disability Application is Denied</u>

If your Long-Term Disability application is denied, and you choose not to return to work, you will be entitled to continue the coverage listed below under the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).

| Plan | Coverage | Monthly Cost |
|------|----------|--------------|
| Kellogg Medical Plan | Employee + Spouse + 2 Children | $497.93 |
| Dental Plan | Employee + Spouse + 2 Children | $57.36 |
| Vision Plan | Employee + Spouse + 2 Children | $36.72 |
| Health Care FSA | Annual Amount – $2499.90    TBD | |
| **Total Monthly Cost** | | **$592.01** |

If you are not approved for Long-Term Disability benefits and you do not return to work, the Employee Life Insurance Plan has a portability feature that allows you to maintain all or a portion (minimum $10,000) of your Supplemental Employee Life Insurance coverage, through the age of 84, when you retire or your employment ends for any other reason. Basic coverage is not portable and must be converted if you wish to continue.

To be eligible to port your Supplemental coverage, you must have continued to make the monthly contributions for your Supplemental Employee Life Insurance while your Long-Term Disability application was pending in order to have the option to port any Supplemental Life Insurance coverage upon termination. If you choose to port your Supplemental coverage, you must notify Employee Benefits and complete the enrollment process within 31 days of your Long-Term Disability denial from Aetna. The amount of coverage which may be continued is subject to the reduction schedule listed on page 53 of Benefit Reports.

Finally, Jim indicated that you had inquired about a second surgical opinion. The Kellogg Plan will reimburse the cost of a second surgical opinion. I have enclosed a form for you to take to the provider giving the second opinion. This form should be complete and submitted to UNICARE for reimbursement. Unfortunately, the cost of travel required for the opinion is not eligible for reimbursement under the plan. My understanding is that Jim has obtained agreement from Mr. Evans to have the company reimburse reasonable travel cost that are not covered under the Kellogg Plan.

FORM 10272-02 (4/93)

3

Mr. James E. Nicholas
February 19, 1998
Page 4



The M.W. Kellogg Company

I realize that this is a great deal of information and would like you to contact Jim Wilhite or myself in the event that you have any questions. Jim can be reached at (713) 753-2222 and I can be reached at (713) 753-4326.

Sincerely,

Tashi Theismann
Supervisor, Health and Welfare

Enclosures

cc: J. Wilhite w/o attachments

4

# EXHIBIT B



# The M.W. Kellogg Company

*Engineers of Quality*

J.R. Wilhite
Manager, Human Resources
(713) 753-2222

December 24, 1998

Mr. James E. Nicholas
1807 Seven Maples Dr.
Kingwood, TX  773454

Dear Jim:

I would like to summarize in this letter agreement ("Agreement") the terms of our discussions   related to your pending departure from The M.W Kellogg Company ("Kellogg").

1.   We have agreed that you will remain on the active payroll, as a regular, full-time employee until you begin short term disability as referenced in paragraph 6 or through  January 1, 1999, whichever is later.

2.   During the remainder of 1998, you will not be required to continue your job responsibilities on a regular basis.

3.   In lieu of outplacement counseling, which would normally be  available to you, we will make a payment to you in the amount of $5,000, in addition to the payment mentioned in paragraph 5 below, to reimburse the cost of financial planning.

4.   We have agreed that you will be eligible to receive regular incentive compensation, along with the Kellogg Award (if paid), for fiscal year 1998, in accordance with the standard practice.

5.   On January 1, 1999  you will be paid a one time, lump sum payment in an amount equal to your current annual base salary and incentive compensation.

6.  Your company-provided benefits will continue in 1999, based on the choices you have recently selected during the annual enrollment process. Since you will begin your long-term absence on December 28, 1998, your Short Term Disability benefit coverage will be based on the existing Kellogg policy for long-term illness, up to a total absence of 26 weeks, if necessary.  Long Term Disability insurance benefits would begin after the completion of the Short Term Disability period.

7.  Should you decide at any time to voluntarily terminate your employment with the company, your company-provided benefits coverage will end on the last day of the month in which you terminate.  You will then be eligible to continue some of your benefits through COBRA, for a period of up to 18 months. You will be responsible for enrollment in the plan and for making the required premium payments. Kellogg  assumes no responsibility in that regard.  A more detailed letter will cover the details of your benefits after termination, as well as the mechanics for dealing with your 401(k) funds, credit union, etc.

8.  It is recognized that, under applicable laws and regulations, Kellogg may be required to withhold taxes and the like from payments identified in this letter agreement.  Kellogg will make the required

601 Jefferson Avenue  •  Houston, Texas 77002-7990
Mail Address: P.O. Box 4557  •  Houston, Texas 77210-4557
Telephone: 713 753-2000  •  Fax: 713 753-5353  •  www.mwk.com
A *DRESSER* Company

EXHIBIT
*a*

The M.W. Kellogg Company

withholdings and actually pay you the amounts stated above, less such withholdings.

9.  In consideration of the payments and other benefits described in this letter, you agree to discharge and release Kellogg and its successors, assigns, representatives, agents, officers, directors, stockholders, affiliates, and employees, from any claims, demands, and/or causes of action whatsoever, presently known or unknown, that are based on facts occurring during your employment with Kellogg, including, but not limited to, the following: (a) any statutory claims, including those under the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, the Civil Rights Acts of 1964 and 1991, the Employee Retirement Income Security Act, Section 451 of the Texas Labor Code, and/or the Texas Commission on Human Rights Act, (b) any tort and/or contract claims, or (c) any and all other claims, matters or actions related to your employment and/or affiliation with, or termination and separation from Kellogg. Nothing in this paragraph shall be deemed to release any rights or obligations created in this Agreement.

10. Kellogg shall indemnify and hold you harmless, including the payment of attorney's fees and expenses, and costs of court, for any claim and/or lawsuit instituted individually against you, the basis of which is an act or omission by you in accordance with Kellogg policy and procedure, which occurred during and arose out of the course and scope of your employment with Kellogg.

11. This Agreement is not any admission by either you or Kellogg of any wrongdoing or liability.

12. You agree that you shall not, without the express written consent of Kellogg, directly or indirectly communicate or divulge to, or use for your own benefit or the benefit of any other person, firm, association corporation or entity, any of Kellogg's trade secrets, proprietary data, or other confidential information, which trade secrets, proprietary data or other confidential information were communicated to you or otherwise learned or acquired by you during your employment relationship with Kellogg. Such trade secrets, proprietary data or other confidential information include, but are not limited to, trade secrets, know-how, writings or other works of authorship, technology, computer programs, financial information, accounting information, marketing plans, pricing information, customer lists and/or data, prospect lists and/or data, business plans or methods, and the like, which relate in any manner to the actual or anticipated business of Kellogg.

13. You agree that, effective with the date of cessation of your full-time responsibilities, you resign all officerships, directorships and other titles and/or positions you hold in Kellogg and/or its affiliates or successors. Nothing in this paragraph shall be deemed to release any rights or obligations created in this Agreement.

14. You agree that you shall not disclose, or cause to be disclosed, the terms of this Agreement, or the fact that this Agreement exists, except to your attorneys, accountants and/or tax advisors, or to the extent otherwise required by law.

15. The execution, validity, interpretation and performance of this Agreement shall be determined and governed exclusively by the laws of the State of Texas, without reference to the principles of conflict of laws.

16. This Agreement represents the complete agreement between Kellogg and you concerning the subject matter in this Agreement and supersedes all prior agreements or understandings, written or oral. No attempted modification or waiver of any of the provisions of this Agreement shall be binding on either party unless in writing and signed by both Kellogg and you. Each of the sections contained in this

2



Agreement, and the invalidity and/or nonenforceability of any section shall not invalidate or render nonenforceable any other section contained in this Agreement.

17. Any dispute regarding the terms, performance or nonperformance, and/or interpretation of this Agreement shall be resolved, if it cannot be resolved amicably, by arbitration under the exclusive jurisdiction of the American Arbitration Association in Houston, Texas.

18. It is understood that for a period of seven (7) days following the execution of this Agreement, you may revoke the Agreement, and the Agreement will not become effective until the revocation period has expired.

19. This Agreement has been entered into voluntarily and not as the result of coercion, duress, or undue influence. You acknowledge that you have read and fully understand the terms of the Agreement and have been advised to consult with an attorney of your choosing before executing the Agreement. Additionally, you acknowledge that you have been given at least twenty-one (21) days to consider the Agreement.

If the foregoing accurately reflects the understandings between you and Kellogg, please so indicate by signing the enclosed duplicate of this letter in the place provided below and returning it to me.

Sincerely yours,

James R. Wilhite

ACCEPTED AND AGREED:

James Nicholas

Date: _Dec 24, 1998_

# EXHIBIT C

AUG-26-04 06:34 PM   J· ES E NICHOLAS        709  38557        P.05

*Attachment # 7*
*page 1 of 2*

**KBR** | 4100 Clinton Drive (77020-6237) • Post Office Box 3 • Houston, TX 77001-0003

October 16, 2003

Mr. James E. Nicholas
19 Winter Place
St. John's, NF A1B 1J5
Canada

Re: *Request for Disabled Retiree Status*

Dear Mr. Nicholas:

Your request was forwarded to my attention as I am Director of Benefits for Kellogg Brown & Root, Inc. ("KBR"). All benefit programs provided by KBR are administered by the Halliburton Company Benefits Committee (the "Committee") subject to its interpretation. The Committee has delegated its discretion in these matters to me. I apologize for the delay in responding to your request, but it takes time to accumulate all the information necessary for a decision of this type. KBR's benefit programs are subject to U.S. law which requires that we follow their written terms and conditions.

Based on the copy of a February 19, 1998 letter from the M.W. Kellogg Company ("MWK"), it would appear that you are eligible to continue to participate in our active medical and dental programs at active employee rates as a disabled retiree until your disability ends or you attain age 65. This coverage will be made available to you, not as an exception to the current disabled retiree policy, but as a former MWK disabled retiree who is eligible for such coverage under the current terms and conditions of such policy and the KBR programs.

Your medical and dental coverage at active employee rates will be reinstated as of November 1, 2003, and you will be responsible for paying your share of the cost for as long as you are eligible for such coverage. Please note that the cost of such coverage is likely to increase for future plan years and that KBR reserves its right to change, amend or terminate such benefit programs at any time for any reason for all similarly situated individuals.

KELLOGG BROWN & ROOT, INC.
A HALLIBURTON COMPANY

15

*Nicholas*
Exhibit No.  8

AUG-26-04 06:34 PM  J  ES E NICHOLAS          709  00557          P.06

#7
page 2 of 2

Your status as a disabled retiree is subject to periodic verification by KBR and if your disability ends you are expected to notify KBR of that change. Your participation as a disabled retiree would then end and you would be eligible for continuation coverage under COBRA at COBRA rates at your sole expense. You may keep the money that KBR has paid you for reimbursement of your COBRA premiums for medical and dental coverage for January 2003 through October 2003.

If you have any questions after November 1, 2003, please contact the KBR Benefits Center at 1-800-459-4788 or if calling from outside the U.S. at 847-883-1027 (not a toll-free number). You may also access the Your Benefits Resources web site by going to http://resources.hewitt.com/kbr.

Very truly yours,

Martin Bichler

cc:    Jim Wagner, KBR HR

Page 2

16

AUG-26-04 06:35 PM   J   ES E NICHOLAS         709  88557           P.07

*Attachment #8*

**James E. Nicholas**

**From:**    James E. Nicholas [james.nicholas@nf.sympatico.ca]
**Sent:**    Tuesday, January 27, 2004 1:09 PM
**To:**      Wagner, Jim (KBR)
**Subject:** NICHOLAS – REINSTATEMENT OF LIFE INSURANCE

Dear Jim:

We have not talked since the start of the new year so let me wish you a Happy New Year.

I was wondering if you could give me your latest take on the reinstatement of my life insurance? It appears that all other benefits have been reinstated. The life insurance, both company sponsored (1 times salary) and additional insurance (7 time) have not been reinstated as far as I can tell.

I look forward to hearing from you as to the status of the coverage.

Thank you for looking into this for me.

Regards

Jim Nicholas

2/2/2004

*Nicholas*
Exhibit No.   9

# EXHIBIT D

AUG-26-04 06:35 PM   J  ES E NICHOLAS              709 S00557              P.08

*Attachment # 9*

**KBR** | 4100 CLINTON DRIVE (77020-6237) • POST OFFICE BOX 3 • HOUSTON, TX 77001-0002

March 11, 2004

Mr. James E. Nicholas
19 Winter Place
St. John's, NF A1B 1J5
Canada

Re:    *Request for Life Insurance Coverage*

Dear Mr. Nicholas:

Jim Wagner told me that you have requested a continuation of the group life insurance coverage you had during your medical leave of absence. I am not in a position to grant your request. Under the terms of the group life insurance contract with John Hancock Life Insurance Company, a continuation of coverage is not available on a group basis through the KBR group life insurance plan when an employee terminates employment due to illness or disability. Once an employee's status changes from "medical leave of absence" to "terminated employee" or "disabled retiree," the group life insurance coverage terminates at the end of the month in which the change occurs. None of KBR's disabled retirees participate in the KBR group life insurance plan on a group basis. When your benefits terminated at the end of 2002, John Hancock Life Insurance Company should have sent you a conversion notice giving you the option of applying for an individual life insurance policy at individual rates. It is then solely up to John Hancock to accept or deny your application. You may contact John Hancock directly at P.O. Box 111, Boston, MA 02117, or call 1-800-601-7687. The contract number is 28337.

As explained in my letter, dated October 16, 2003, as a disabled retiree under the KBR disability retirement policy you may continue your medical and dental coverage for active employees at active employee rates until your disability ends or your attain age 65, provided you pay for the coverage. I am sorry that I cannot grant your request. Any claim you may wish to assert against KBR is subject to the KBR Dispute Resolution Program, which includes binding arbitration as its final step. You may request information on DRP by calling 1-800-947-7658.

Very truly yours,

Martin Eichler

cc:    Jim Wagner, KBR HR

KELLOGG BROWN & ROOT, INC.
A HALLIBURTON COMPANY

18

*Nicholas*
Exhibit No.   12

# EXHIBIT E

# HALLIBURTON

4100 CLINTON DRIVE (77020-6237) • POST OFFICE BOX 3 • HOUSTON, TX 77001-0003
Phone 713-753-4539 Fax 713-753-4040 E-mail robert.hayter@halliburton.com

October 7, 2004

**Robert L. Hayter**
Senior Counsel
Law Department

**SENT VIA FIRST CLASS MAIL**

OCT 1 3 2004

Mr. Bryan O. Blevins, Jr.
Provost * Umphrey Law Firm LLP
390 Park
Beaumont, TX 77701

> *Re:   James E. Nicholas*

Dear Mr. Blevins:

Your letter of September 30, 2004, to Jim Wagner and Martin Eichler at Kellogg Brown & Root was forwarded to my attention as I am Senior Counsel to Halliburton Company and its affiliates, including Kellogg Brown & Root, Inc. (KBR) for employee benefit matters.  For reasons that I will explain, I believe that KBR has provided Mr. Nicholas with all the benefits that he may be entitled to under the circumstances.

Mr. Nicholas provided KBR with a copy of two pages from a 1998 letter that appears to have been issued by someone at MW Kellogg (MWK).  It is impossible to tell who sent him the letter because at a minimum the first page and the signature page were not provided.  It appears that Mr. Nicholas was allowed to go on a medical leave of absence in 1998 while working for MWK as described in the two pages he provided.  It also appears that Mr. Nicholas was allowed the option of maintaining certain employee benefits, including group life insurance, until age 65 if continuously disabled.  To my knowledge, Mr. Nicholas has not provided KBR with a copy of the entire letter and KBR has been unable to locate a copy.  Therefore, the authenticity of the letter may become an issue if this matter is pursued.

I note that the two pages provided do not state that the benefits cannot be changed or terminated.  Generally, a letter like this does not preempt the provisions of the applicable benefits plans mentioned in the letter and it has been customary for plan sponsors to reserve their rights to make changes (or terminate plans entirely) in various plan documents issued over the years.  There are many cases where employees have been given letters describing benefits for future periods of time that were later changed or eliminated entirely.  In those situations, courts have ruled that such letters do not obligate the plan sponsor to do any more than what is stated in the applicable plan document, which also includes the plan sponsor's right to change or terminate the plan.  Although KBR has no present intention of doing so, it has reserved the right to change or terminate benefits for all covered individuals, including disabled retirees such as Mr. Nicholas.

*Nicholas*
Exhibit No. *13*

After Mr. Nicholas's benefits were terminated, he provided KBR with pages 2 and 3 of the 1998 letter purported to be from someone at MWK. KBR decided to allow him to reinstate his medical and dental coverage at active employee rates until the earlier of (1) the date his disability ends, (2) the date of his 65th birthday, or (3) the date he stops paying for the coverage because they wanted to give him the benefit of the doubt on the letter and because it was possible for KBR to do so.

The group life insurance could not be reinstated because John Hancock would not permit coverage of a disabled individual for more than 24 months and Mr. Nicholas had exceeded that period of time having been on a leave of absence for at least four years. KBR changed group life insurance carriers for the 2003 plan year and the new carrier, UnumProvident, agreed to offer a conversion option to those individuals who would be losing coverage with John Hancock due to the 24-month provision. UnumProvident sent conversion notices to all affected individuals. A conversion notice was mailed to Mr. Nicholas on November 5, 2002, and he apparently decided not to apply for continued coverage. Therefore, KBR did make arrangements for Mr. Nicholas to have the option of continuing his life insurance coverage through UnumProvident. Any claim Mr. Nicholas might have relating to continuation coverage of his life insurance should be directed to either John Hancock or UnumProvident, but not KBR.

KBR did what it could to assist Mr. Nicholas within the limits of its benefits plans and the rules that govern their eligibility. If Mr. Nicholas can produce a copy of the entire letter to support his claim, KBR will consider it and determine if they want to take any further action, although legally they are not required to do so. Mr. Nicholas has also indicated to Mr. Wagner that there may be an issue about his disability status with Hartford because Hartford has been investigating his condition. Mr. Nicholas must contact KBR immediately if his status changes because that would affect his ability to continue medical benefits at active employee rates.

Feel free to contact me directly if you have any questions. If Mr. Nicholas wants to pursue any claims against KBR he must do so under the Dispute Resolution Program (DRP), which includes binding arbitration as its final step. I have enclosed a copy of the DRP for your reference, which may be contacted at 1-800-947-7658.

Very truly yours,

Robert L. Hayter

Enclosure

cc:   Martin Eichler, KBR  (w/o enclosure)

cc:   Jim Wagner, KBR      (w/o enclosure)

2

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GERALDINE NICHOLAS,                    §
INDIVIDUALLY AND AS                    §
ADMINISTRATRIX OF THE ESTATE           §
OF JAMES NICHOLAS,                     §
                                       §
            Plaintiff§Case 4:07-cv-00657§    Document 19-6    Filed 02/22/2008    Page 1 of 5
                                       §
v.                                     §    CIVIL ACTION NO. H-07-00657
                                       §
M.W. KELLOGG COMPANY,                  §
KELLOGG, BROWN & ROOT,                 §
KBR, INC., AND HALLIBURTON,            §
                                       §
            Defendants.                §

## DECLARATION OF ROBERT HAYTER

Pursuant to 28 U.S.C. § 1746, I declare as follows:

1.      I, Robert Hayter, am over the age of twenty-one and competent to make this Declaration, and I have personal knowledge of the truth of its contents.

2.      From August 1999 to January 2005, I was in-house counsel for Halliburton Co. specializing in employee benefits and executive compensation matters. Based on this role, I have knowledge of the welfare benefits plans offered by Halliburton and its subsidiaries and of certain actions taken by the plan administrator of the Halliburton welfare benefits plans.

3.      Following the Dresser-Halliburton merger and until January 1, 2003, eligible KBR employees were covered by the Halliburton Welfare Benefits Plan. On January 1, 2003, eligible employees in KBR's engineering, technical, and administrative job classifications (which included James E. Nicholas, a former M.W. Kellogg employee) became covered by the KBR Welfare Benefits Plan (the "KBR Plan").

1

4.      In the Fall of 2002, just prior to the rollout of the KBR Plan, I and others within Halliburton observed that there were employees who had been on medical leaves of absence for more than twenty-four months but who nonetheless continued to participate in the Halliburton Plan at active employee rates.  James E. Nicholas was one of these employees.  Because the KBR Plan allowed participation at active employee rates for only twenty-four months of medical leave, Mr. Nicholas' continuing

participation in the KBR Plan was inconsistent with its terms.  On January 2, 2003, just after the KBR Plan took effect, KBR terminated Mr. Nicholas' coverage.

5.      In mid-2003, I learned that Mr. Nicholas had requested that he be reinstated as a participant under the KBR Plan.  The only document provided by Mr. Nicholas in connection with the request was two pages of what appeared to have originally been a four-page letter dated February 19, 1998 from a benefits specialist at M.W. Kellogg to Mr. Nicholas.  Attached to this Declaration as Attachment 1 is a true and correct copy of the two pages that Mr. Nicholas provided.  I learned that Mr. Nicholas interpreted the letter to have promised him participation in the M.W. Kellogg benefits plans at active employee rates until age 65 or his disability ended, and that Mr. Nicholas believed that this alleged promise entitled him to continued participation in the KBR Plan, as he was not yet 65 and said he was still disabled.  I relayed Mr. Nicholas' request, and the partial letter dated February 19, 1998, to Martin Eichler, KBR's Director of Benefits and the person to whom the Halliburton Benefits Committee (who was the Administrator of the KBR Plan) had delegated authority to make benefits determinations. I then worked with Mr. Eichler to reach a decision regarding the claim.

6.     Although it was clear to me and Mr. Eichler that the terms of the KBR Plan which allowed participation at active employee rates for only twenty-four months of medical leave disqualified Mr. Nicholas from continued participation in the Plan, and that the boilerplate statements about the M.W. Kellogg plan contained in the portion of the February 19, 1998 letter we had been provided had no legal effect on the terms of the

KBR Plan, we nonetheless agreed that we would reinstate Mr. Nicholas' coverage under the KBR group medical and dental plans at active employee rates because Mr. Nicholas was ill and it was not prohibitively expensive for KBR to keep him covered by those plans, consistent with his expectations.  We agreed that we were able to make this exception to the KBR Plan terms because the constituent medical and dental plans were self-funded by KBR (*i.e.*, no third-party insurer funded benefits) and the costs of Mr. Nicholas' continued coverage would be assumed solely by Mr. Nicholas and KBR.  Mr. Eichler memorialized this decision in a letter to Mr. Nicholas dated October 16, 2003.  A true and correct copy of that letter is attached to this Declaration as Attachment 2.

7.     Subsequently, Mr. Nicholas made a specific request to be reinstated to coverage under the KBR group life insurance plan as well.  Unlike the medical and dental plans, the group life plan was funded by a third-party insurer, not KBR.  KBR's contract with the insurer stated, as did the KBR Plan itself, that employees on medical leaves of absence would be covered for a maximum of twenty-four months.  A true and correct copy of that contract is attached to this Declaration as Attachment 3.  (See page "EMPLOYEE-3" of the contract.)  Thus, although Mr. Eichler and I had been able to assist Mr. Nicholas by making an exception to the KBR Plan terms with respect to the self-funded medical and dental coverage, we agreed that we were unable to make a

similar exception with respect to the group life insurance coverage.  Mr. Eichler explained this decision in a letter to Mr. Nicholas dated March 11, 2004.  A true and correct copy of that letter is attached to this Declaration as Attachment 4.

8.    On or shortly after October 1, 2004, Mr. Eichler forwarded to me a letter he had received from Bryan O. Blevins, a Provost Umphrey attorney representing Mr.

Nicholas.  A true and correct copy of that letter is attached to this Declaration as Attachment 5.  On behalf of Mr. Nicholas, Mr. Blevins made another request that Mr. Nicholas be permitted to participate in the KBR group life insurance plan.  On October 7, 2004, I responded to Mr. Blevins and described the reasons why KBR would not accommodate the request.  A true and correct copy of my October 7, 2004 letter is attached to this Declaration as Attachment 6.    After I sent the October 7, 2004 letter, I received no additional correspondence from Mr. Nicholas or anyone representing him.

9.    I am aware that the Plaintiff in this matter has produced a severance agreement between James Nicholas and M.W. Kellogg dated December 24, 1998.  The first time I had ever seen that document was during discovery in this case; neither Mr. Nicholas, his attorney, nor anyone else purporting to represent Mr. Nicholas or the Plaintiff forwarded that document to me at any time.

10.    Also attached to this Declaration are true and correct copies of the following documents:

•    The Summary Plan Description of the Halliburton Welfare Benefits Plan effective as of January 1, 2000 (see Attachment 7);

•    The Summary Plan Description of the KBR Welfare Benefits Plan effective as of January 1, 2003 (see Attachment 8);

- The KBR Welfare Benefits Plan effective January 1, 2003 (see Attachment 9).

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _19th_ day of February, 2008, in Houston, Texas.

_____
ROBERT HAYTER

# EXHIBIT G

# PROVOST ★ UMPHREY

## Law Firm, L. L. P.

### BRYAN O. BLEVINS, JR.
Attorney

Board Certified: Personal Injury Trial Law
Texas Board of Legal Specialization

Writer's Direct Fax #: 409-813-8610

September 30, 2004

**VIA OVERNIGHT MAIL**
Jim Wagner
Martin Eichler
Kellogg, Brown and Root
4100 Clinton Drive (77020-6237)
Post Office Box 3
Houston, Texas 77001-0003

In 1998, Jim Nicholas an employee of MW Kellogg was diagnosed with mesothelioma.
In February of that year, he entered into an agreement with MW Kellogg regarding his
disease, disability and employment including salary continuation, health benefits,
disability benefits and life insurance. At page three of that document, MW Kellogg
agreed to provide continuing medical, dental, vision health care and life insurance
benefits until the date Mr. Nicholas's disability ends or age 65 if he was approved to
receive disability income benefits. Mr. Nicholas was approved for such benefits and these
other benefits were confirmed and in effect until January of 2003. At that time, Kellogg
Brown and Root and Halliburton (KBR/H) terminated Mr. Nicholas with the resulting
loss of such benefits. After complaint and review of this matter, KBR/H as successor to
MW Kellogg Company determined that Mr. Nicholas was in fact eligible to continue to
participate in these benefits and reinstated all but the life insurance benefit as of
November 1, 2003. In March 2004, again after complaint and review, KBR/H refused to
reinstate the life insurance or provide an alternative to such coverage consistent with the
agreement of 1998.

It seems clear that Mr. Nicholas was terminated in error by KBR/H and that the resulting
disruption of his benefits has deprived him of an extremely valuable asset (life insurance)
given his continued treatment and suffering due to asbestos related mesothelioma.
Whether Mr. Nicholas was on medical leave, a terminated employee, a disabled retiree or

otherwise, the MW Kellogg Company and as such KBR/H had specific contractual
obligations to Mr. Nicholas. The Nicholas's have engaged me to review this matter on
their behalf. They very much appreciate the MW Kellogg Company, KBR and
Halliburton for all past consideration given to this matter but suffered today, a loss that
they have no way to correct given Mr. Nicholas's disease. We look forward to your
response.

Sincerely yours,

Bryan O. Blevins, Jr.

BOB/hcv

# EXHIBIT H

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2
    GERALDINE NICHOLAS,          )
 3  individually and as         )
    representative of the        )
 4  estate of JAMES             )
    NICHOLAS, deceased           )
 5                               )  CIVIL NO. 4:07-CV-00657
    VS.                          )
 6                               )
    W.M. KELLOG COMPANY,         )
 7  KELLOGG, BROWN & ROOT        )
    KBR, INC., AND               )
 8  HALLIBURTON                  )
    ********************************************************
 9
10
11          ORAL AND VIDEOTAPED DEPOSITION OF
12                   JAMES R. WILHITE
13                   December 18, 2007
14
15  ********************************************************
16      ORAL AND VIDEOTAPED DEPOSITION OF JAMES R. WILHITE,
17  produced as a witness at the instance of the plaintiff,
18  and duly sworn, was taken in the above styled and
19  numbered cause on December 18, 2007, from 10:12 A.M. to
20  12:18 P.M., before Melissa Girouard, CSR in and for the
21  State of Texas, reported by machine shorthand recording,
22  at the offices of Baker Hughes, 2929 Allen Parkway,
23  Suite 2100, Houston, Texas, pursuant to the Federal
24  Rules of Civil Procedure and the provisions stated on
25  the record or attached therein.
```

**Page 2**

```
 1              A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
 3    Mr. Edward Fisher
      Provost Umphrey
 4    490 Park Street
      Beaumont, Texas 77701
 5
 6  FOR THE DEFENDANT:
 7    Mr. Michael J. Muskat
      Muskat, Martinez & Mahony
 8    440 Louisiana Street, Suite 590
      Houston, Texas 77002
 9
10  THE VIDEOGRAPHER:
11    Mr. Chris Wilson
      Accurate Legal Video Services
12    550 Fannin, Suite 106
      Beaumont, Texas 77701
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                    INDEX
                                       PAGE
 2  Appearances                     2
 3  Stipulations                 4
 4
    JAMES R. WILHITE
 5  EXAMINATION BY MR. FISHER              4
 6  EXAMINATION BY MR. MUSKAT              34
 7  EXAMINATION BY MR. FISHER              75
 8  EXAMINATION BY MR. MUSKAT             84
 9  EXAMINATION BY MR. FISHER             87
10
11  Signature and Changes            88
12  Reporter's Certificate           90
13
14               EXHIBITS
    NO.   DESCRIPTION              PAGE
15  1     Letter dated February 19, 1998   11
16  2     Letter dated December 24, 1998   11
17  3     Business card                    12
18  4     Subpoena duces tecum             34
19  5     Compilation of documents         35
20  6     Email dated 12/4/98              70
21  7     Email dated 12/22/98             72
22
23
24
25
```

**Page 4**

```
 1              P R O C E E D I N G S
 2           THE REPORTER:  Would you state your
 3  agreements for the record, please.
 4           MR. FISHER:  By the rules.
 5           THE VIDEOGRAPHER:  We're on the record.
 6  This is Tape 1. Time is 10:12.
 7                JAMES R. WILHITE,
 8  having been first duly sworn, testified as follows:
 9                EXAMINATION
10  BY MR. FISHER:
11      Q.   Please state your name for the record.
12      A.   James R. Wilhite.
13      Q.   Mr. Wilhite, is this your first time to give a
14  deposition?
15      A.   No.
16      Q.   Okay.  My name is Ed Fisher; and I represent
17  Gerry Nicholas in a case that she has brought against
18  the defendants in this case, Kellogg Brown & Root,
19  Halliburton, in a case that involves the benefits,
20  specifically the life insurance benefits, of her
21  husband's -- of her husband, James Nicholas.
22           Do you have a general understanding of why
23  we're here today?
24      A.   Generally, yes.
25      Q.   Okay.  Have you and I ever spoken before?
```

**5**

1   A.   I don't think so.

2   Q.   All right.  I think you spoke with my office to

3   set up this deposition --

4   A.   Yes.

5 (10:13AM)   Q.   -- true?  Okay.

6   A.   Yes.

7   Q.   All right.  Just -- I don't know how many times

8   you've given a deposition, but we're just going to go

9   over the ground rules so that you feel comfortable with

10 (10:13AM)   it.

11   The first and most important thing is you've

12   sworn an oath to tell the truth, but you can't do that

13   unless you understand my question and you hear it.  So,

14   just make sure that you hear my -- that you hear my

15 (10:13AM)   question and you understand it before you answer it.

16   Okay?

17   A.   Sure.

18   Q.   Anytime you want to take a break, just let us

19   know.  We're happy to take a break.  We're sort of here

20 (10:13AM)   at your convenience today.  So, if you have to run out,

21   pop out, take care of something, just let us know; and

22   we'll -- and we're happy to go off the record.  All

23   right?

24   A.   Okay.

25 (10:14AM)   Q.   All right.  And just like you're doing, if

**6**

1   you'll give out loud, verbal answers, as opposed to nods

2   of the head or uh-huhs and huh-uhs, because it's

3   difficult for the court reporter to take that down.

4   Okay?

5 (10:14AM)   A.   Sure.

6   Q.   And we're not having a problem right now, but

7   we both need to watch out and make sure we don't talk

8   over one another.  If I accidentally cut you off in one

9   of your answers, just let me know you weren't finished

10 (10:14AM)   and I'll let you finish.  And just -- even though you'll

11   know what I'm asking before I'm finished asking you, if

12   you'll just let me finish my question because we're

13   going to type this up in booklet form; and it reads

14   better if I finish my question and then there's the

15 (10:14AM)   answer, as opposed to the answer in the middle.  Okay?

16   A.   Sure.

17   Q.   All right.  Tell us where we are today.

18   A.   Physically?

19   Q.   Yes, sir.

20 (10:14AM)   A.   This is 2929 Allen Parkway.  It's the

21   headquarters of Baker Hughes, Incorporated.

22   Q.   All right.  And are you an employee of Baker

23   Hughes?

24   A.   Yes, I am.

25 (10:14AM)   Q.   And what do you do for Baker Hughes?

**7**

1   A.   I'm currently the director of Global Human

2   Resources.

3   Q.   And just explain to us sort of the thumbnail

4   sketch version of what it is you do here on a day-to-day

5 (10:15AM)   basis.

6   A.   I oversee the human resources staff for Baker

7   Hughes primarily who are outside of the US.

8   Q.   All right.  And what does that entail you to do

9   on a day-to-day basis?

10 (10:15AM)   A.   I guide them through the implementation of HR

11   initiatives.  I coach them regarding any issues that

12   come up.  I help facilitate any solutions that they need

13   from this office or from any of our divisions.  I

14   referee disputes between the HR staff and the division

15 (10:15AM)   staff.

16   Q.   All right.  At one point you worked for The

17   MW Kellogg Company?

18   A.   Yes.

19   Q.   And what years did you work for MW Kellogg?

20 (10:16AM)   A.   April 9th of 1973 through some date in I guess

21   the end of December, 1998.  I'm not sure what the

22   precise date was when I moved over to Halliburton.

23   Q.   All right.  Now, the entire time you worked

24   there from '73 to '98, was it always called MW Kellogg?

25 (10:16AM)   A.   No.  There was a period in the late Seventies,

**8**

1   I think, when we were Pullman-Kellogg.  Our parent

2   company was Pullman Corporation.  Pullman was acquired

3   by -- I don't remember, in 1981; and it became The

4   MW Kellogg Company again.

5 (10:16AM)   Q.   Okay.

6   A.   And I think it -- the remainder of the time it

7   was The MW Kellogg Company.

8   Q.   All right.  Now, in 1998 --

9   A.   Wheelabrator-Frye acquired us in 1981.

10 (10:17AM)   Q.   Okay.  1981.

11   All right.  In 1998 what -- what was happening

12   from a corporate structure standpoint?  Who was buying

13   who?

14   A.   Well, in 1988 Dresser Industries acquired The

15 (10:17AM)   MW Kellogg Company from the successor companies after

16   the Wheelabrator-Frye acquisition in 1981 and Dresser

17   Industries acquired The MW Kellogg Company ten years

18   later in 1998.  Dresser and Halliburton merged; and as a

19   part of that merger, Kellogg became part of Halliburton.

20 (10:17AM)   Halliburton then made the decision to -- to blend

21   Kellogg and Brown & Root together.  And I -- I honestly

22   don't remember if it was right at that immediate time or

23   if it was later, but Kellogg became -- Kellogg --

24   Kellogg and Brown & Root became KBR --

25 (10:18AM)   Q.   Okay.

**9**

1    A. -- became Kellogg Brown & Root and then I think
2  later became KBR.
3    Q. All right. I want to focus on this 1998 time
4  frame when this merger is taking place, and let's focus
10:18AM 5  on what your job was at that time.
6    A. In 1998 I was the manager of human resources.
7  I was the -- leading the human resources function at MW
8  Kellogg Company. There were several conversations going
9  on about my role because the VP of human resources had
10:18AM 10  died in late '97, and in -- by early '98 it was clear
11  that we were going to be merging.
12      So, we didn't make any further changes to the
13  human resources function; and I led the human resources
14  function up until the merger.
10:19AM 15    Q. All right. Do you remember a man by the name
16  of James Nicholas?
17    A. Yes.
18    Q. All right. Tell us how it is you know him.
19    A. I was involved in hiring him. He was a -- he
10:19AM 20  was in the sales function. So, I had -- I had regular
21  dealings with him. He was there in the Houston office.
22  I got to know him, and I got to know his wife just
23  through social interaction at Christmas parties and
24  things -- functions like that.
10:19AM 25      And then I don't recall when exactly Jim became

**10**

1  ill but let's just say 1998 it became clear that he was
2  going to be going out on disability with, I think, lung
3  cancer, mesothelioma, I believe. And I remember the
4  word because it was on the news this morning about
10:20AM 5  asbestos.
6      But, so, we -- we spent some time working out
7  the details of, you know, he wanted to continue working;
8  but he also at some point became disabled. So, I don't
9  recall exactly the dates and the -- exactly, you know,
10:20AM 10  what -- the sequence of events.
11    Q. Okay. Do you know how long Mr. Nicholas had
12  worked at MW Kellogg?
13    A. I don't. It -- I'm going to say four or five
14  years, I think. I'm not -- I don't think it was very
10:20AM 15  long.
16    Q. All right. Was he a -- how would you describe
17  him as an employee?
18    A. Oh, I think he was very highly thought of. He
19  was -- most salesmen are outside of the office a lot.
10:20AM 20  And, so, he wasn't necessarily that well known among all
21  the people in the company other than at the higher
22  levels where he was highly thought of.
23    Q. All right. Do you feel like he was loyal to
24  the company?
10:21AM 25    A. Absolutely.

**11**

1    Q. Okay. Just as a general principle, do you feel
2  like when an employee spends a certain amount of time at
3  a company and they're loyal to that company, that the
4  company in return owes them that same loyalty?
10:21AM 5    A. Sure; and in particular that, I think, was one
6  of the -- the keys at The MW Kellogg Company. Kellogg
7  was extremely well known for taking care of its
8  employees.
9    Q. Was that -- you were sort of involved in the
10:21AM 10  transition during this merger phase, fair?
11    A. Yes.
12    Q. Okay. And was that a concern of the MW Kellogg
13  management, how Kellogg employees would be -- how
14  Kellogg employees would be treated once that merger was
10:21AM 15  effectuated?
16    A. Yes.
17    Q. All right. I'm going to hand you two documents
18  that we're going to be talking about a lot today, and
19  I'm just going to go in dated order. This is what we'll
10:22AM 20  mark as Exhibit No. 1.
21      (Exhibits 1 and 2 marked.)
22    Q. (BY MR. FISHER) And this is a letter from
23  Tashi -- I don't know if it's Theismann or Theismann.
24    A. Theismann.
10:22AM 25    Q. Theismann. Okay. And that's dated

**12**

1  February 19th of 1998. And then we have your letter of
2  December 24th, 1998.
3      And what we're going to do so you don't feel
4  rushed is we're going to go off the record now so that
10:22AM 5  you can read these and digest them.
6    A. Okay.
7    Q. Take as much time as you need, and then we're
8  going to discuss these in great detail.
9      THE VIDEOGRAPHER: Going off the record.
10:22AM 10  Time is 10:22.
11      (Off the record.)
12      (Exhibit 3 marked.)
13      THE VIDEOGRAPHER: Back on the record.
14  Time is 10:28.
10:28AM 15    Q. (BY MR. FISHER) Okay. Exhibit No. 1, who is
16  that document authored by?
17    A. Tashi Theismann.
18    Q. And who is she?
19    A. Tashi was the benefits supervisor in the
10:28AM 20  benefits department looking after health and welfare
21  benefits.
22    Q. All right. And was she an employee of yours, I
23  mean, as far as was she directly under you?
24    A. The benefits department reported to me. I
10:28AM 25  believe at the time the manager of benefits was out on

**13**

1  maternity leave and Tashi was acting manager of benefits
2  as well for the whole department.
3      Q.  Okay.  But the manager of benefits would report
4  to you?
5      A.  Manager of benefits reported to me.  Tashi
6  reported to the manager.
7      Q.  I got you.  And I guess but during this time
8  frame, since the manager was gone, Tashi was just
9  reporting directly to you?
10     A.  I don't recall exactly when the manager went
11 out on maternity leave.  I know her child was born in
12 April.  So -- but I -- and I know she was out, but this
13 letter would have been produced by Tashi under --
14 regardless because that was part of Tashi's job --
15     Q.  Okay.
16     A.  -- was to produce the benefits letter.
17     Q.  All right.  And that was my next question,
18 which is this is the type of -- the information
19 contained in this letter is within Tashi's scope of
20 employment?
21     A.  Yes.  I mean, there are some -- there are some
22 pieces in here that are customized obviously where they
23 talk about my name or somebody else's name; but whenever
24 an employee would go out either under a layoff situation
25 or a disability situation, we would give them a letter

**14**

1  detailing all of their benefits information as well as
2  who to call if they had questions and that type of
3  thing.
4      So, that's what this letter was for.
5      Q.  Okay.  And I see the -- if we look at the
6  enclosures, it says -- it says that you are CC'd on it
7  without any attachments.  Do you remember receiving a
8  copy of this?
9      A.  I don't.
10     Q.  All right.  Let's talk about this in general.
11 You know, we look at the -- if we look at the first
12 page, the current benefits he has are stated as he has a
13 medical plan, a dental plan, a vision plan, a long-term
14 disability plan, a life insurance plan, an accidental
15 death and dismemberment plan, spouse life insurance,
16 children's life insurance, and health care flexible
17 spending amount coverages.
18     Do those appear to be the coverages he has
19 intact at the time this letter is being written?
20     A.  Yes.
21     Q.  All right.  Now, let's -- let's talk generally
22 about your understanding of what it was -- what was
23 supposed to happen when Jim --
24     MR. FISHER:  Well, strike that.
25     Q.  (BY MR. FISHER)  Obviously we know that Jim

**15**

1  contracted mesothelioma, correct?
2      A.  That's my understanding.
3      Q.  Okay.  And he actually lived for an extremely
4  long time for someone who had mesothelioma.  Most people
5  live 18 months; he lived, what, 9 years with it?
6      A.  Correct, correct.
7      Q.  All right.  What was the general understanding
8  that you remember having with respect to Mr. Nicholas,
9  what benefits he was going to leave with?
10     A.  My understanding was he -- he left with the
11 same benefits every employee left.  I mean, I don't -- I
12 don't see anything in this letter or to my recollection
13 that was any different from any other individual going
14 out on disability.
15     Q.  All right.  So, what's in that letter in
16 Exhibit No. 1 is what we would consider -- what you
17 would consider the standard deal?
18     A.  Correct.
19     Q.  Okay.  And part of that standard deal is your
20 life insurance benefits?
21     A.  Correct.
22     Q.  All right.  Now, Mr. Nicholas is leaving under
23 somewhat different circumstances because we know he's
24 sick but that he's going to get sicker, fair?
25     A.  That's correct.  One of the peculiarities of

**16**

1  this situation, you see it's dated February 19th,
2  whereas this letter here, this second letter is dated
3  December 24; and in this letter it talks about that he
4  would be working from home.  So, his -- his short-term
5  disability period which this was intended to trigger
6  actually lasted beyond six months --
7      Q.  Right.
8      A.  -- because he was continuing to work on and off
9  during that -- the period of disability.  And the whole
10 idea of short-term disability is that you're treated
11 just like a full-time regular employee.  Nothing
12 changes.  You're still on the payroll, you still have
13 full benefits, you still have all of the right -- you're
14 still fully employed.
15     Q.  Okay.  Now let's go to the next page, page 2 of
16 this letter; and let's talk about -- there seems to be a
17 question about -- it seems to be contemplated that
18 long-term disability would need to be addressed in this
19 letter and in your letter, correct?
20     A.  We always would have addressed it, I -- I
21 believe, because we don't know when someone goes out on
22 short-term disability if they will be back or not.  So,
23 rather than require a second communication, we would
24 always put it all in one letter.
25     Q.  Okay.  And in this letter we see there's sort

**17**

1  of two scenarios:  one if your long-term disability is
2  approved and one if your long-term disability is not
3  approved?
4      A.  Correct.
10:34AM 5      Q.  All right.  And from -- and you understand, do
6  you not, that his long-term disability was approved?
7      A.  Correct.
8      Q.  All right.  So, sort of the -- the third page
9  of the letter, continuing flexplan coverage if long-term
10:34AM 10  disability application is denied, we don't need to worry
11  about that because that wasn't the case in his case?
12      A.  Correct.
13      Q.  Okay.  So, we'll go back to page 2.  Sorry.  I
14  don't mean to keep you switching pages.
10:34AM 15          And we see continuing flexplan coverage of
16  long-term disability application is pending or approved.
17      A.  I'm sorry.  Where are you?
18      Q.  I'm sorry.  It's kind of in the bottom third of
19  the page.
10:34AM 20      A.  Oh, yes, yes.
21      Q.  And one of the -- under the plan he still has
22  his medical, his dental, his vision, his health care
23  FSA; and one of the things is his employee life
24  insurance, correct?
10:34AM 25      A.  Yes.

**18**

1      Q.  All right.  And he has his basic coverage that
2  the company pays, and then he has supplemental coverage
3  that he pays.
4      A.  Yes.
10:34AM 5      Q.  All right.  Now, and that, again, you would
6  consider to be the standard deal?
7      A.  Yes.
8      Q.  Okay.  Now let's move on to your letter.  And
9  one more question before we get there.  Is there
10:35AM 10  anything in here -- I mean, this is basically the deal
11  as you understand it that Mr. Nicholas understood was
12  going to continue if he went -- progressed from employee
13  to short-term -- to a short-term disability employee to
14  long-term disability?  This was his deal?
10:35AM 15      A.  Yes.
16      Q.  All right.  Now we have your letter which comes
17  ten months later approximately; and what was the purpose
18  of this letter, if you can recall?
19      A.  At this point in time, even prior to
10:35AM 20  December 24th, which was at the very last second, we had
21  already been working with Halliburton and Brown & Root
22  on the merger, on the structure of the new organization.
23  New roles had been announced, and it was clear that
24  there were a number of executives who were not going to
10:36AM 25  be making the transition into the new organization in

**19**

1  1999.
2          So, I don't remember how many but there were
3  probably six to ten executive terminations that took
4  place in November/December time frame of 1998 and I was
5  preparing termination letters for those people.  And at
10:36AM 6  the time I was asked to do a letter for Jim even though,
7  you know, he was out on disability but -- so that there
8  would be no question as to, you know, what our agreement
9  with Jim was --
10:37AM 10      Q.  Okay.
11      A.  -- because he was an executive.  He was a sales
12  director or vice president or whatever.  I'm not sure.
13  I don't recall what his title actually was.
14      Q.  Did you say he was or was not an executive?
10:37AM 15      A.  He was considered an executive --
16      Q.  Okay.
17      A.  -- in terms of his -- you know, the way that we
18  would deal with him.
19      Q.  Now, was this letter, Exhibit No. 2, in any
10:37AM 20  way, shape, or form, since you're the one who authored
21  it, intended to change what was conveyed to Jim in
22  this -- in this Exhibit 1 letter?
23      A.  Not that I recall.  I --
24      Q.  All right.  Absolutely.  We're going to look at
10:37AM 25  it.  I just -- we only have -- I only have this copy to

**20**

1  look at.
2          MR. MUSKAT:  Why don't you take --
3      A.  The reason I say not that I recall is benefit
4  plans are benefit plans; and, so, termination letters
10:37AM 5  don't alter the nature of the plan unless you know, we
6  have some agreement with the benefit plan provider.  So,
7  I -- I don't believe we were intending to do anything
8  different in the -- in this letter.
9      Q.  (BY MR. FISHER)  All right.  Now, was this a
10:38AM 10  termination letter or this -- or was this just a you're
11  on long-term disability, here's -- we just want to
12  re-explain what we've already gone over in Exhibit
13  No. 1?
14      A.  That's a good question, and I -- and I'm -- I'm
10:38AM 15  not exactly -- I wouldn't call it a termination letter
16  except to the extent that we knew he was getting ready
17  to go on long-term disability.  I think the letter says
18  he was not yet on long-term disability but it -- that it
19  was pending.
10:38AM 20      Q.  Right.
21      A.  And, so, we wanted to just have a clear
22  understanding because if you see, for example, in
23  Paragraph 3, we're giving him $5,000 in lieu of
24  outplacement counseling.  Had he been one of the
10:38AM 25  terminated executives that had received the termination

**21**

1 letter, there were a whole series of severance payments
2 and outplacement benefits and things like that that
3 would have been given to him if we had just terminated
4 him.
10:39AM 5 Q. Right.
6 A. So, we weren't terminating him; but we wanted
7 to make sure he didn't lose out on any benefits that he
8 would have had had he not been out on disability.
9 Q. I got you.
10:39AM 10 A. Does that make sense?
11 Q. I understand.
12 A. So, it's a little bit of a hybrid.
13 Q. All right. But the -- but, you know, you bring
14 up the point that one of the purposes of the letter was
10:39AM 15 to make sure he's not going to lose out on any benefits
16 he would have been entitled to?
17 A. Correct. Like Paragraph 4, you will be
18 eligible to receive your incentive compensation for
19 fiscal year 1998 --
10:39AM 20 Q. Okay.
21 A. -- if there is any.
22 Q. All right. We're going to go through them one
23 by one.
24 A. Okay.
10:39AM 25 Q. No. 1 just says, "I would like to summarize in

**22**

1 this letter agreement the terms of our discussion
2 related to your pending departure from The MW Kellogg
3 Company. We have agreed that you will remain on the
4 active payroll as a regular, full-time employee until
10:39AM 5 you begin short-term disability as referenced in
6 Paragraph 6 or through January 1, 1999, whichever is
7 later."
8 So, at this point, based upon this, he's still,
9 at least technically, considered to be an active
10:40AM 10 employee, correct?
11 A. Correct.
12 Q. Okay. And for purposes of the payroll and
13 paperwork, he is going to -- he is going to continue to
14 be, on paper at least, a regular full-time employee
10:40AM 15 until he begins short-term disability?
16 A. Yes.
17 Q. Okay.
18 A. Our -- our disability plan was through our
19 payroll.
10:40AM 20 Q. I understand that.
21 A. Okay.
22 Q. Yes, sir.
23 A. Okay.
24 Q. "During the remainder of 1998 you will not be
10:40AM 25 required to continue your job responsibilities on a

**23**

1 regular basis."
2 So, essentially --
3 A. One more week.
4 Q. -- one more week. He can -- he can have the
10:40AM 5 week off where --
6 A. Right.
7 Q. -- he's still going to get paid.
8 A. Right.
9 Q. Okay. Just as a side note, do you have any
10:41AM 10 inclination of what his salary was in 1998 even
11 remotely?
12 A. I couldn't -- no.
13 Q. Okay. "In lieu of outplacement counseling,
14 which would normally be available to you, we will make a
10:41AM 15 payment to you in the amount of $5,000 in addition to
16 the payment mentioned in Paragraph 5 below to reimburse
17 the cost of financial planning."
18 I guess typically if somebody is leaving one
19 job for another or to find another, they might need
10:41AM 20 outplacement counseling; but Jim's situation was a
21 little different?
22 A. If they were leaving the company at our
23 request --
24 Q. Right.
10:41AM 25 A. -- we would give them outplacement counseling,

**24**

1 not if they were leaving on their own --
2 Q. Sure.
3 A. -- if they already had a job.
4 Q. But Jim's not going to need outplacement
10:41AM 5 counseling --
6 A. Correct.
7 Q. -- in the true sense of what that is; he's not
8 going out to try to find another job because he just got
9 fired?
10:41AM 10 A. We believed, based on our conversations with
11 him and our knowledge of just our intuition, that it
12 would be more appropriate for him to have financial
13 counseling than outplacement counseling.
14 Q. Sure. Okay. "We agree that you have been
10:42AM 15 eligible to receive regular incentive compensation,
16 along with the Kellogg award, if paid, for fiscal year
17 1998 in accordance with the standard practice."
18 And do I read that as if there's an executive
19 bonus he's going to be able to participate in it?
10:42AM 20 A. That's correct.
21 Q. Okay. "On January 1, 1999, you will be paid a
22 one time, lump sum payment in an amount equal to your
23 current annual base salary and incentive compensation."
24 And why was he entitled to receive that given
10:42AM 25 his situation?

25

1    A.   Well, that -- that is the equivalent of the
2   severance pay that would have been given to somebody in
3   his position had we terminated them as part of the
4   merger transaction.
5    Q.   Okay.
6    A.   So, it's just the same -- same concept.
7    Q.   All right.  "Your company benefits will
8   continue in 1999" -- and your company provided benefits
9   are all these benefits we see on Exhibit No. 1, correct?
10    A.   Correct.
11    Q.   Medical, dental, vision, health, life
12   insurance?
13    A.   Correct.
14    Q.   All right.  "Will continue in 1999 based on the
15   choices you have recently selected during the annual
16   enrollment process.  Since you will begin your long-term
17   absence on December 28th, 1999, your short-term" --
18    A.   1998.
19    Q.   I'm sorry, 1998.  Thank you.  "Your short-term
20   disability benefit will be based on existing Kellogg
21   policy for long-term illness up to a total absence of
22   26 weeks, if necessary.  The long-term disability
23   insurance benefits would begin after the completion of
24   the short-term disability period."
25    So, he's going to transition from -- he's going

26

1   to finish out the year.  Then he's going to go on
2   short-term disability for the 26 weeks, and then he's
3   going to go on the long-term disability?
4    A.   Correct.
5    Q.   All right.  "Should you decide at any time to
6   voluntarily terminate your employment with your company,
7   your company provided benefits coverage will end on the
8   last day of the month in which you terminate."
9    Do you have any appreciation that Mr. Nicholas
10   ever voluntarily terminated his employment?
11    A.   Well, I'm not aware of it.
12    Q.   Okay.  "You will then be eligible to continue
13   some of your benefits through COBRA for a period of up
14   to 18 months."
15    And that's a benefit that's available to anyone
16   who's got health insurance at any job; if they decide to
17   quit, they're eligible for COBRA for 18 months?
18    A.   That's correct.
19    Q.   All right.  "You will be responsible for
20   enrollment in the plan and for making the required
21   premium payments."
22    Once you enroll in COBRA, you have to make
23   arrangements to make premium payments which are, you
24   know, to cover your medical and other benefits, true?
25    A.   Correct.

27

1    Q.   All right.  All right.  Let's go on to No. 8.
2   Let's see, actually we don't need to go through No. 8.
3    All right.  Let's go to No. 9.  "In
4   consideration of the payments and other benefits
5   described in this letter, you agree to discharge and
6   release Kellogg and its successors, assigns,
7   representatives, agents, officers, directors,
8   stockholders, affiliates, and employees from any claims,
9   demands, and/or -- and/or causes of action whatsoever
10   presently known or unknown that are based on facts
11   occurring during your employment with Kellogg, including
12   but not limited to the following:  Any statutory claims
13   including those under age discrimination in the
14   Employment Act of 1967, the Americans with Disabilities
15   Act of 1990, the Civil Rights Act of 1964 and 1991, the
16   ERISA Act, Section 451 of the Texas Labor Code, and/or
17   the Texas Commission on Human Rights Act; (b), any tort
18   and/or contract claims; or (c) any and all other claims,
19   matters, or actions related to your employment and/or
20   affiliation with or termination and separation from
21   Kellogg.  Nothing in this paragraph shall be deemed to
22   release any rights or obligations created in this
23   agreement."
24    And essentially what I understand this
25   paragraph to mean is based upon what we're sort of

28

1   giving you, that you can continue with your benefits,
2   the money you're receiving, the eligibility to
3   participate in any bonuses, the lump sum payment,
4   severance payment, that we're giving you these things;
5   so, you're going to agree to Paragraph No. 9, which is
6   give up any rights you have to make any claims based
7   upon anything in Paragraph No. 9?
8    A.   That's correct.  It's primarily related back to
9   the severance payment, that -- that one year of salary
10   in Paragraph 5.
11    Q.   So, that is what you sort of consider to be the
12   consideration for No. 9, the severance payment?
13    A.   Correct.
14    Q.   Okay.  This is Kellogg -- No. 10 is, "Kellogg
15   shall indemnify and hold you harmless."
16    And what I understand is if he's sued as a --
17   individually because of work he did for Kellogg, they
18   will pay his attorney's fees and indemnify him?
19    A.   Correct.
20    Q.   Okay.  No. 12 seems to be like a
21   confidentiality clause that you're not to take what you
22   learned from your work here or any documents from here
23   or communicate them to anyone else?
24    A.   Correct.
25    Q.   That, again, is also a benefit that Kellogg is

---

**29**

1   receiving as a result of this agreement, that he not
2   divulge this?
3      A.   Correct.
4      Q.   All right.  Let's go to No. 16.  "This
10:47AM 5   agreement represents the complete agreement between
6   Kellogg and you concerning the subject matter in this
7   agreement and supersedes all prior agreements or
8   understandings, written or oral.  No attempted
9   modification or waiver of any of the provisions of this
10:47AM 10   agreement shall be binding on either party unless in
11   writing and signed by both Kellogg and you.  Each of the
12   sections contained in this agreement and the invalidity
13   or nonenforceability of any section shall not invalidate
14   or render nonenforceable any other section contained in
10:47AM 15   this agreement."
16         Would it be fair to say that --
17         MR. FISHER:  Well, strike that.
18      Q.   (BY MR. FISHER) Let's talk about the
19   arbitration clause.  "Any dispute regarding the terms,
10:48AM 20   performance or nonperformance, and/or interpretation of
21   this agreement shall be resolved, if it cannot be
22   resolved amicably, by arbitration under the exclusive
23   jurisdiction of the American Arbitration Association in
24   Houston, Texas."
10:48AM 25         That was an agreement you had with

---

**30**

1   Mr. Nicholas?
2      A.   I believe it was a standard paragraph of these
3   letters.
4      Q.   Okay.  Is there any -- I don't see in here any
10:48AM 5   language to the -- to the effect that you can waive
6   arbitration.  Do you remember any language to that
7   effect, or do you see anything in here that says that
8   Mr. Nicholas or Halliburton -- or MW Kellogg or whatever
9   entity is responsible now could waive arbitration?
10:49AM 10      A.   I don't.
11      Q.   All right.  So, based upon this agreement, it
12   is clearly the purpose of this agreement that any
13   disputes that arise out of this are going to have to be
14   dealt with in arbitration?
10:49AM 15      A.   That's my understanding.
16      Q.   All right.  "It is understood that for a period
17   of seven days following the execution of this agreement,
18   you may revoke the agreement and the agreement will not
19   become effective until the revocation period has
10:49AM 20   expired."
21         Did that ever occur?
22      A.   Not to my knowledge.
23      Q.   Okay.  And 19 is just we're not forcing you to
24   do this; you're over the age of 21, and you consent to
10:49AM 25   this agreement?

---

**31**

1      A.   Correct.
2      Q.   And, "If the foregoing accurately reflects the
3   understandings between you and Kellogg, please so
4   indicate by signing the enclosed duplicate of this
10:50AM 5   letter in the place provided below and returning it to
6   me."
7         He signed it; he did that, correct?
8      A.   Correct.
9      Q.   All right.  And you signed it as well, correct?
10:50AM 10      A.   Correct.
11      Q.   So, this is a contract between MW Kellogg and
12   Mr. Nicholas?
13      A.   Correct.
14      Q.   And a portion of that contract provides that
10:50AM 15   provided he continues to make his payments, he will be
16   entitled to life insurance benefits?
17      A.   Correct.
18      Q.   All right.  Now, what was the life insurance
19   benefit?  I've seen -- I've seen it a couple of
10:50AM 20   different ways, six times the annual salary, a
21   multiplier times the annual salary.  Are you aware of
22   that, or do we just need to look at the benefit plan?
23      A.   I think you'd have to look at the benefit
24   plan --
10:50AM 25      Q.   All right.

---

**32**

1      A.   -- because that's too long ago.
2      Q.   No problem.  I didn't know if you would be.
3         All right.  Obviously there was another event
4   that occurred since this agreement was signed wherein --
10:50AM 5   I don't know how you want to phrase it, but Jim was
6   terminated from employment.  Do you remember that?
7      A.   No.  It was after my time.
8      Q.   Okay.  Have you had any conversations with
9   anyone since that time frame where you learned that Jim
10:51AM 10   had been terminated and they had to get him back on the
11   health insurance plan?
12      A.   At some point -- and I don't recall when --
13   either Jim or his wife contacted me; and I said, "Well,
14   I can't really help you; but you should call the
10:51AM 15   benefits department."  I don't -- I don't recall.  I
16   remember at one time referring them to Gary Carlson --
17      Q.   Okay.
18      A.   -- who was there, but I don't recall the date.
19      Q.   Now, nothing about the agreement that you had
10:51AM 20   with Mr. Nicholas allowed for Kellogg to just terminate
21   him and get rid of all the benefits that he was getting
22   in Exhibit 1 and 2?
23      A.   No.
24      Q.   Okay.  So, that was not the agreement between
10:52AM 25   Kellogg and Mr. Nicholas, you can have all these things

---

**33**

1    unless we decide to terminate you whenever we want and
2    then you get none of it?
3        A.   That was not the plan.
4        Q.   Okay.  And nothing in Exhibit No. 2 says that
5    they're able to do that, does it, in your letter?
6        A.   I think it says the opposite.
7        Q.   Okay.  So, I mean, do you essentially
8    understand why we're here, that Mr. Nicholas -- I don't
9    know if it was a clerical error or it was done
10   intentionally.  Who knows.  No one was in the room when
11   it happened.  But essentially he got -- you know, some
12   key strokes were made on a computer and he was no longer
13   an employee and he was no longer eligible to receive any
14   of the benefits that were agreed upon in this letter.
15   They were able to get him back on and get him his
16   medical benefits, but they couldn't get him back on the
17   life insurance.  That is basically my understanding of
18   what occurred.
19       I -- the last question I have for you is that's
20   a breach of this agreement, right?  If he doesn't get
21   his life insurance benefits because of a clerical or a
22   technical error on behalf of MW Kellogg that
23   accidentally terminated him and he's not able to get
24   back on the life insurance plan, that's not part of this
25   agreement; he was entitled to those benefits and if he

**34**

1    didn't get them, he's owed them?
2        A.   Yes.  I mean, I would say that the intent was
3    that he have life insurance as a benefit during the --
4    the time he's disabled; and when he passed away, there
5    would be a life insurance payment.  I mean, that was the
6    plan.  That was the intent.
7            MR. FISHER:  Sir, I have no more questions
8    for you.  Thank you.
9            THE WITNESS:  Okay.  Thank you.
10           MR. MUSKAT:  Let's go off the record.
11           THE VIDEOGRAPHER:  Going off the record.
12   Time is 10:53.
13           (Recess from 10:53 a.m. to 10:58 a.m.)
14           THE VIDEOGRAPHER:  Back on the record.
15   Time is 10:58.
16              EXAMINATION
17   BY MR. MUSKAT:
18       Q.   Mr. Wilhite, I'll show you a document that
19   we'll have marked as Exhibit 4.
20              (Exhibit 4 marked.)
21       Q.   (BY MR. MUSKAT) And that's a subpoena that I
22   served on you --
23       A.   Yes.
24       Q.   -- last week.  Did you receive this?
25       A.   Yes.

**35**

1        Q.   Let's walk through the items that are listed in
2    here.  The No. 1 asks you to bring with you today all
3    documents, correspondence, or notes in your possession,
4    custody, or control referencing or relating to James
5    Nicholas, a former employee of MW Kellogg Company,
6    including but not limited to severance agreements,
7    including drafts; employment agreements, including
8    drafts; e-mail correspondence; and benefits-related
9    correspondence.
10       Do you have any such documents in your
11   possession?
12       A.   No, just what was sent to me as part of this.
13       Q.   Sent to you as part of this?  What do you mean
14   by that?
15       A.   Provost Umphrey sent me what we've just been
16   looking at.
17       Q.   Do you mind if we mark this as Exhibit 5?
18   We'll have copies made for you to keep.  Is that okay?
19       A.   Okay.  Fine.
20           MR. MUSKAT:  Mark that as Exhibit 5.
21           (Exhibit 5 marked.)
22       Q.   (BY MR. MUSKAT) And if I'm understanding you
23   correctly, the documents that we're going to have marked
24   as Exhibit 5 are the only documents in your possession
25   that are responsive to No. 1.

**36**

1        A.   That's correct.
2        Q.   No. 2 is all documents, correspondence, and
3    notes in your possession, custody, or control
4    referencing or relating to any conversations you have
5    had with Plaintiff Geraldine Nicholas and/or her
6    attorneys.
7        Do you have any responsive documents?
8        A.   I don't.
9        Q.   No. 3 is all documents, correspondence, or
10   notes in your possession, custody, or control provided
11   to you by Plaintiff Geraldine Nicholas and/or her
12   attorneys at any time.
13       I'm guessing Exhibit 5 counts.
14       A.   That would be it.
15       Q.   Okay.  That's all?
16       A.   Correct.
17       Q.   No. 4 is all documents in your possession,
18   custody, or control relating to or referencing any
19   MW Kellogg benefits plan, including but not limited to
20   Summary Plan Descriptions or MW Kellogg's "Benefit
21   Reports."
22       A.   I don't have any.
23       Q.   No. 5 is all correspondence between you and
24   Tashi Theismann, Michelle Gest, or Jim Wagner
25   referencing or relating to James Nicholas, Geraldine

**37**

1  Nicholas, or anything relating to this lawsuit.

2  A.  None.

3  Q.  You and I spoke one time in early 2007 by

4  phone; is that correct?

11:01AM 5  A.  I don't remember the date, but I remember the

6  conversation. I think I was traveling somewhere.

7  Q.  And we have never spoken since; is that right?

8  A.  I believe that's correct.

9  Q.  Have I ever forwarded you any documents to

11:01AM 10  review as part of this case?

11  A.  Not until this -- no. Like I said, this

12  letter, the subpoena.

13  Q.  Are you being compensated for your time here

14  today by Ms. Nicholas or her attorneys?

11:02AM 15  A.  No.

16  Q.  Have you received any compensation from them in

17  the past?

18  A.  No.

19  Q.  Do you have any agreement with them to receive

11:02AM 20  any compensation for time spent in this lawsuit?

21  A.  No.

22  Q.  As we sit here right now, do you have any

23  reason to believe that --

24  MR. MUSKAT:  Let me strike that and back

11:02AM 25  up.

**38**

1  Q.  (BY MR. MUSKAT) This case is set for trial in

2  April of 2008.

3  A.  Okay.

4  Q.  As we sit here right now, do you have any

11:02AM 5  reason to believe that you would be unable to be here in

6  town and testify live during that trial if necessary?

7  A.  I'm going to have a new job on January the 1st

8  with Baker Hughes. It's going to require a lot of

9  travel. I have traveled a lot in the past. I know that

11:02AM 10  during the first six months of the job I'm going to be

11  traveling extensively. So, that would -- I don't have

12  any trips scheduled for April; but I may.

13  Q.  And what is your new position going to be?

14  A.  I will be director of workforce administration.

11:03AM 15  I will be creating a shared services function for the

16  human resources function at Baker Hughes.

17  Q.  And pardon me if you gave this detail when you

18  were answering Mr. Fisher's questions, but what was your

19  job title in 1998 at MW Kellogg?

11:03AM 20  A.  I believe it was manager of human resources.

21  Q.  And who did you report to?

22  A.  1998?  I believe I reported to Tom Giles, who

23  was the general counsel.

24  Q.  Who --

11:03AM 25  A.  I had various reporting relationships following

**39**

1  the death of the VP of HR.  So ...

2  Q.  Which was in 1997?

3  A.  Late '97.

4  Q.  What was Gary Carlson's position with the

11:04AM 5  company in late '98, if you recall?

6  A.  I don't believe he was with the company in

7  1998. I think Gary was at Dresser.

8  Q.  Do you recall his position at Dresser in '98?

9  A.  I believe he was director of compensation or

11:04AM 10  perhaps compensation and benefits, but I'm not -- I

11  think it was director of compensation.

12  Q.  Tom Giles -- did I get the name right -- he was

13  the general counsel?

14  A.  Correct.

11:04AM 15  Q.  Was there any in-house counsel at MW Kellogg in

16  '98, that you recall, who specialized in -- in labor or

17  employment matters or benefit matters?

18  A.  Yes. I just don't remember the name.  Jim

19  Layman -- I met with Tom frequently.  I met with Jim

11:05AM 20  Layman frequently.  There was one -- there were a couple

21  of other attorneys; and if I can think of it, I'll tell

22  you.

23  Q.  What was Jim Layman's title?  Do you recall?

24  A.  He was assistant general counsel, I believe.

11:05AM 25  Q.  Do you know what his area of specialty was?

**40**

1  A.  Well, the primary specialty of all of them was

2  contract law.

3  Q.  Do you recall in that -- in 1998 consulting any

4  outside lawyers who were labor and employment or benefit

11:05AM 5  specialists?

6  A.  Our outside counsel for most employment matters

7  was Bracewell Patterson, Amy Halevy, and Tom -- I was

8  going to say Meno; but I'm not sure if that's the right

9  name but --

11:06AM 10  Q.  Tom Melo?

11  A.  Melo, Tom Melo.  And I think there was an ERISA

12  specialist whenever we got into the archiving parts of

13  benefits, but I don't recall that person's name.

14  Q.  I think you mentioned in your testimony with

11:06AM 15  Mr. Fisher that Ms. Gest and Ms. Theismann were in the

16  benefits group at MW Kellogg but they reported to you?

17  A.  Correct.

18  Q.  Was there any reporting relationship between

19  them and Gary Carlson at Dresser?

11:06AM 20  A.  No. We were -- we were a -- sort of a

21  stand-alone unit.  Our benefits were not part of Dresser

22  benefits.  When Dresser acquired us in 1988, the

23  agreement was that we would -- because we were in a

24  different industry -- we were in the engineering

11:06AM 25  construction industry and the rest of Dresser was really

**41**

1  in the upstream oil and gas industry -- that we would
2  stay separate. So, we were not involved in the Dresser
3  benefit plans or the compensation plans.
4  Q.  Are you an attorney?
11:07AM 5  A.  No.
6  Q.  Do you consider yourself to have any expertise
7  in employee benefits law?
8  A.  Not anymore.
9  Q.  At one time did you?
11:07AM 10  A.  I was fluent in the language, but I wasn't -- I
11  never considered myself an expert.
12  Q.  Have you ever taken any continuing legal
13  education classes in employee benefits law matters?
14  A.  No.
11:07AM 15  Q.  In 1998 if you had a question that related to
16  some type of employee benefits law issue, who would you
17  have consulted?
18  A.  I would have gone to Michelle Gest and
19  discussed the issue with her; and Michelle Gest would
11:08AM 20  likely have gone to the outside counsel for an
21  interpretation --
22  Q.  Probable --
23  A.  -- rather than me. It wouldn't have been me
24  asking the question.
11:08AM 25  Q.  And she would have, you think, probably gone to

**42**

1  the ERISA people at Bracewell?
2  A.  Correct, or -- or wherever; but yes.
3  Q.  What was your position -- let me ask it
4  differently. What was your job title after the merger
11:08AM 5  with Halliburton?
6  A.  When I moved over to Halliburton, I was
7  director of compensation and benefits and other things
8  that nobody wanted but I had a few other duties, but I
9  was -- my primary function was compensation and benefits
11:09AM 10  for Halliburton Americas.
11  Q.  Did you remain in that position until your
12  employment with Halliburton ended?
13  A.  Yes, although at some point -- and I don't
14  recall the date -- either late '99 or early 2000, I
11:09AM 15  traded off compensation and took on some other -- some
16  additional duties. I kept benefits but I had
17  international HR and the HRIS system reporting to me and
18  compensation was reporting directly to the VP, I think.
19  Q.  And when did your employment with Halliburton
11:09AM 20  end?
21  A.  August -- mid August, same day Dick Cheney
22  left. So, whatever date that was. I don't know. It
23  was on a Friday in mid August.
24  Q.  Coincidence?
11:10AM 25  A.  He heard I was leaving. So, he decided it was

**43**

1  time to go.
2  Q.  That's what I figured. And this was 2000?
3  A.  2000, correct.
4  Q.  And was your departure from Halliburton
11:10AM 5  voluntary?
6  A.  Yes.
7  Q.  And what was the next company you were employed
8  with after that?
9  A.  Baker Hughes.
11:10AM 10  Q.  Okay. In your -- your last position at
11  Halliburton, who were you reporting to, if you recall?
12  A.  Steve -- well, I'm sorry. The VP of HR just
13  prior to my departure was Steve someone but he was fired
14  a week or two before I left and Margaret Carrier became
11:11AM 15  the new VP of HR just a few days before I left. Steve
16  Russell.
17  Q.  Now, following James Nicholas's departure from
18  MW Kellogg, do you recall how many times you spoke with
19  him, if at all?
11:11AM 20  A.  At the most once or twice. As we said earlier,
21  I think everybody was surprised that he lasted as long
22  as he did. And my -- my -- I don't think I spoke to
23  him -- I didn't speak to him after he -- after he moved to
24  Canada in the early days, but then we completely lost
11:11AM 25  contact until a year or two ago.

**44**

1  Q.  And your recollection is speaking with him
2  directly a year or two ago?
3  A.  Actually I guess it was -- it was right about
4  the same time you called me, which was why I didn't call
11:12AM 5  you back.
6  Q.  Expound on that. Why didn't you call me back?
7  A.  Because I was being asked on the one hand to
8  help out Kellogg and on the other hand to help out
9  Nicholas, and I didn't think I could do both.
11:12AM 10  Q.  Did you think you could do one?
11  A.  I -- when I had to weigh the two issues -- the
12  issue was, you know, could I verify that what Kellogg's
13  deal with Nicholas was the deal that we had intended --
14  I decided the only way I could solve this one was to --
11:12AM 15  was to verify that.
16  Q.  Verify that -- restate that if you could. What
17  were you -- what were you seeking --
18  A.  To verify --
19  Q.  -- to verify by participating in this case?
11:13AM 20  A.  -- that the deal that Nicholas thought he had
21  was the deal he had.
22  Q.  So, you spoke with him, you think, one time
23  about a year ago or so; is that right?
24  A.  Early this year.
11:13AM 25  Q.  He passed away, my understanding is in December

45

1  of '06. So, I'm gathering you mean sometime shortly
2  before then.
3      A.  I -- I -- okay. You -- I don't know when he
4  passed away. I remember -- I do remember speaking to
11:13AM 5  him on the phone, and then his wife had to get on
6  because he couldn't talk. So, and then I didn't hear
7  any further from them for quite a while.
8      Q.  How many times have you spoken with his wife?
9      A.  With Gerry? Just a couple.
11:14AM 10     Q.  When's the last time you can recall?
11     A.  Well, the last time was maybe a month or two
12  ago just telling me that I was going to be hearing from
13  Provost.
14     Q.  On either occasion that you've spoken with
11:14AM 15  Ms. Nicholas, was there anybody else on the line during
16  the conversation?
17     A.  Not that I'm aware.
18     Q.  Have you spoken with Tashi Theismann about this
19  case?
11:14AM 20     A.  Yes.
21     Q.  Okay. When was that?
22     A.  Several months ago when it became clear that --
23  that there was going to be this -- this inquiry and I
24  just -- she and I have had off and on contact ever since
11:15AM 25  she left to go to work at Compaq, which is now HP, and,

46

1  so, I just used it as an excuse to call her up and say,
2  hey, you know, we used your name and, you know, you
3  might be hearing from somebody.
4      Q.  That's the only time you've spoken to her about
11:15AM 5  this case?
6      A.  Yes.
7      Q.  What about Michelle Gest?
8      A.  She works here; and, so, I have mentioned to
9  her that this case is going on.
11:15AM 10     Q.  Have y'all gotten together to share your
11  recollections about Jim Nicholas or the exhibits that we
12  talked about earlier or any of the issues we're
13  discussing in this deposition?
14     A.  I haven't physically seen Tashi or gotten
11:15AM 15  together with her or had any detail discussions with
16  Tashi. Michelle and I have talked. She doesn't
17  remember the situation. She remembers reading about it,
18  but she was out most of that period when -- when these
19  letters were written. So, she's aware of it.
11:16AM 20         The only conversations that Michelle and I have
21  had have been about benefit plans, you know, just
22  reminding me about the way our plans were constructed
23  because since that time we've had Brown & Root plans,
24  Halliburton plans, and Baker Hughes plans. And, so --
11:16AM 25  and each of them have been somewhat different.

47

1      Q.  And what was she specifically reminding you
2  about in terms of the MW Kellogg plan?
3      A.  That our plan basically was -- was what was
4  being looked at here this morning, that it provided all
11:16AM 5  of these benefits during disability.
6      Q.  And did y'all talk about there -- that being
7  different than subsequent generations of Halliburton or
8  KBR plans?
9      A.  No. We did a little bit because each plan is
11:17AM 10  slightly different, but that wasn't the real issue. The
11  issue was around -- the issue that we talked about was
12  did we ever terminate anybody's life insurance benefit,
13  and the answer was no. You know, once the -- once you
14  offer somebody life insurance, the way it ends is when
11:17AM 15  they die. And, so, we never would terminate it ahead of
16  time.
17     Q.  Under the MW Kellogg plan?
18     A.  Correct.
19     Q.  You're not speaking globally about all --
11:17AM 20     A.  No, no.
21     Q.  -- health and welfare plans, are you?
22     A.  No, no.
23     Q.  Have you ever spoken with Jim Wagner about this
24  case?
11:17AM 25     A.  No.

48

1      Q.  Ever heard of the name Jim Wagner?
2      A.  Oh, I've spoken with Jim Wagner but not about
3  this case.
4      Q.  From your Halliburton days?
11:17AM 5      A.  Yes. And we stay in contact. He's -- he's
6  moved around a few times, and we stay in touch.
7      Q.  Do you know where he is right now?
8      A.  I actually don't.
9      Q.  Do you know if he's still in HR?
11:18AM 10     A.  I believe he is. If I need to get in touch
11  with him, I know how to but I just don't know where -- I
12  would know who to call, but that -- I haven't spoken
13  directly with him in the last six or eight months.
14     Q.  Phil Tevis --
11:18AM 15     A.  Uh-huh.
16     Q.  -- have you ever spoken with him about this
17  matter?
18     A.  Yes. When -- when Jim and Gerry called, I --
19  as I said earlier in the first interview, they were
11:18AM 20  asking me for who can I -- who can they talk to and I
21  suggested Gary Carlson and they mentioned that they had
22  spoken to Phil Tevis because Jim's -- you know, Phil
23  Tevis was Jim's boss. And Phil was one of the people
24  like Gary who moved up to Dallas to work at Dresser, I
11:19AM 25  believe, at some point.

**49**

1      So, I recommended to them that they ask Phil to

2  contact Gary and that I felt like that if -- that if --

3  because they were -- I think they were having trouble

4  getting anybody to sort of return their calls. So, I

11:19AM  5  suggested that if they would contact Phil that that

6  might be the best way; and -- and I didn't feel

7  comfortable doing it.

8      Q.  So, you didn't talk to Phil directly?

9      A.  I -- no.

11:19AM 10      Q.  You just suggested that they talk to him

11  directly?

12      A.  I'm sorry.  Let me -- let me correct that.

13  Phil did call me and -- and I just said, "Look, here's

14  what I" -- you know, but I gave him the same message I

11:19AM 15  gave them which was, you know, if you're going to try to

16  help them, the person I recommend that you talk to is

17  Gary Carlson.  It was primarily because Gary was the

18  only person that I really knew there.

19      Q.  Have you talked to Gary Carlson --

11:19AM 20      A.  No.

21      Q.  -- about this case?

22      A.  I have not.

23      Q.  What about Ken Allen?

24      A.  I -- I had not until purely by coincidence I

11:20AM 25  ran into him at an art show at a reception and I just

**50**

1  mentioned to him that this was going on but I did not --

2  I didn't give him any information and I think it was

3  maybe literally a day or so later when Gerry called me

4  on this last phone call to tell me that I was going to

11:20AM  5  be deposed.

6      And I said, "Well, by the way, I did" -- you

7  know, she said, "By the way, do you know where Ken Allen

8  is?"

9      And I said, "Well, actually I have his card in

11:20AM 10  my hand," because he was the artist.  He's retired, and

11  he's -- he does artwork.  And, so, I gave her his

12  number; but I have no idea -- I didn't -- I didn't get

13  into the middle of it.  I was just referring her to him.

14      Q.  Is there anybody else who I haven't mentioned

11:20AM 15  who you've talked to about this case?

16      A.  Not to my recollection.

17      Q.  Let me shift gears and ask you a few more

18  questions about the Halliburton/Dresser merger, if I

19  could.  To the best of your memory, when was that

11:21AM 20  announced?

21      A.  Late spring, mid to late spring of '98, I

22  think.

23      Q.  And when did it actually close or occur?

24      A.  I don't know if it was, you know, 1, January,

11:21AM 25  or whether it was a date slightly earlier like maybe

**51**

1  December 15 or some -- I -- I don't recall but it was

2  the tail end of '98, but I don't -- I'm not sure which

3  exact date.

4      Q.  Do you recall the development of a Halliburton

11:21AM  5  benefits plan which I've heard referred to as a

6  harmonized plan --

7      A.  Yes.

8      Q.  I'll just finish my question.

9      A.  Okay.

11:21AM 10      Q.  -- that went into effect as of January 1st,

11  1999?

12      A.  Yes.

13      Q.  That -- that concept, that harmonized plan is

14  familiar to you?

11:22AM 15      A.  Yes.

16      Q.  Were you a part of creating that?

17      A.  Yes.

18      Q.  What was your role in -- in developing the

19  harmonized Halliburton plan?

11:22AM 20      A.  The Halliburton/Dresser merger brought about

21  ten companies together.  Halliburton had one common

22  plan, and Dresser had the rest more or less.  And, so,

23  the harmonization project was a lengthy project to lay

24  out all of the issues and try to reach a common ground.

11:22AM 25      So, I was one of the Kellogg representatives in

**52**

1  that part of the project.

2      Q.  And have I understood it correctly -- am I

3  correct in understanding that former MW Kellogg

4  employees would participate in the harmonized

11:23AM  5  Halliburton plan after the merger, or would they

6  retain -- or would they -- would they participate in

7  some other kind of benefits plan?

8      A.  I know that active employees like myself, to

9  the extent that we went over to Halliburton and any --

11:23AM 10  any other Dresser employees, were participating in the

11  harmonized plan.  I honestly don't recall -- we had so

12  many different deals and one of the issues that really

13  plagued us in 1999 were all of the grandfathered

14  situations and we had grandfathered plans that we

11:23AM 15  couldn't even count as a result of all of the Dresser

16  issues, including Kellogg.

17      And, so, we had enumerable cases where we had

18  to go and find the original plan to determine, you know,

19  what the -- what the benefit was, particularly on the

11:24AM 20  retirement side.

21      So, I don't -- I don't recall applying the

22  harmonization issue to people that had already left, you

23  know, who were out on retirement or disability or any of

24  those issues.  I -- I recall this being an absolute

11:24AM 25  nightmare to administer.

53

1    Q.  So, if I'm understanding you correctly, you're
2  saying with respect to employees who were retired at the
3  time of the merger or were out on some kind of
4  disability, you don't have a recollection --
5    A.  Essentially any terminated employee, any -- any
6  inactive employee who was no longer on the active
7  payroll.
8    Q.  The -- with respect to those employees, people
9  who were not on the active payroll, your memory is hazy
10  as to which plan they may have still continued to
11  participate in post merger; but your recollection is it
12  was not the harmonized Halliburton plan. Have I
13  understood you correctly?
14    A.  That is correct. That was my understanding, or
15  that's my recollection.
16    Q.  And your recollection was that the harmonized
17  Halliburton plan was applicable to active employees of
18  MW Kellogg as of the time of the closing of the merger?
19    A.  Well --
20    Q.  Have I understood that correctly?
21    A.  Active employees of Kellogg Brown & Root and
22  the new Halliburton company, yeah. MW Kellogg had
23  ceased to exist.
24    Q.  And the new company had absorbed --
25    A.  Right.

54

1    Q.  -- MW Kellogg employees?
2    A.  Correct.
3    Q.  If I could, Mr. Wilhite, let me ask you a
4  couple of questions that I think are related to
5  Exhibit 1, which is the letter dated February 19th of
6  '98.
7       The life insurance plan that's referenced in
8  this letter, do you recall whether that was an insured
9  program or a self-insured program?
10    A.  I don't specifically. I think it was insured.
11    Q.  Do you recall who the insurer was?
12    A.  No.
13    Q.  Is it possible it was John Hancock?
14    A.  That's the name that came into my mind when you
15  asked me the question, but I can't verify.
16    Q.  Now, I realize we don't have the life insurance
17  plan in front of us. So, my next question will be just
18  whether or not you recollect this.
19       Do you recollect that the terms of the MW
20  Kellogg life insurance plan that is referenced in this
21  letter allowed employees to continue to participate in
22  the life insurance plan until they reached age 65 or
23  until their disability ended?
24    A.  I don't specifically recall. That sounds
25  reasonable, but I'm not the person to -- to know.

55

1    Q.  Okay. If we assume, as this letter
2  contemplates, that James Nicholas was to go out on
3  long-term disability, what is your recollection as to
4  how the MW Kellogg life insurance plan would have
5  applied to him? Maybe another way to ask it is: For
6  how long would he have been able to continue to
7  participate in the life insurance plan if he was out on
8  long-term disability, if you recall, not having the
9  document in front of us?
10    A.  Well, if he were -- if he were required to make
11  payments, then as long as he kept renewing his coverage
12  and making the payments. If it was paid by the company,
13  then basically he had to do nothing.
14    Q.  And your recollection of the MW Kellogg plan is
15  that he could have done that all the way up until age
16  100 if he lived that long, that there was no cutoff of
17  any kind?
18    A.  I don't recall the age 65 issue that you are
19  asking me about. So, that's the only qualifier I'd put
20  on that.
21    Q.  It's possible you just don't recall that
22  there --
23    A.  Correct.
24    Q.  -- was some limitation of that kind?
25    A.  Correct.

56

1    Q.  Did I understand your testimony of Mr. Fisher
2  to be essentially that Exhibit 1 was based on a form
3  letter, obviously there are -- there are changes that
4  are made to make it specific to James Nicholas but that
5  there was some kind of shell that Tashi Theismann would
6  likely have been working with in constructing this
7  letter?
8    A.  Correct.
9    Q.  Okay. Now I'd like to ask you some questions
10  about Exhibit 2.
11       THE WITNESS: Do I need to give this to you
12  since it has a --
13       MR. FISHER: At the end of the deposition,
14  she'll collect all the exhibits.
15       THE WITNESS: Okay.
16       MR. FISHER: Yeah. So, just like that, if
17  you'll stack them.
18       THE WITNESS: Okay.
19    Q.  (BY MR. MUSKAT) Correct me if I'm wrong, but I
20  recall you telling Mr. Fisher that somebody asked you to
21  do this letter for James Nicholas.
22    A.  Correct.
23    Q.  Who was that, if you recall?
24    A.  Jack Stanley.
25    Q.  And who is Jack Stanley?



**57**

1   A. He was the chairman and CEO of MW Kellogg.

2   Q. Do you recall, as of the date of this letter,

3   December 24th, 1998, whether MW Kellogg employees who

4   were going to be absorbed into the new organization had

5   already gone through open enrollment to choose their

6   benefits under the harmonized Halliburton plan?

7   A. I don't recall specifically. I can assume that

8   they must have since it was December the 24th.

9   Q. Do you recall, as we sit here today, one way or

10  the other whether James Nicholas had gone through open

11  enrollment with respect to the harmonized Halliburton

12  plan?

13  A. I don't.

14  Q. It's possible, but you don't remember as we sit

15  here?

16  A. Correct. I would not have had -- I wouldn't

17  have had a reason to be knowing about any specific

18  individual signing up or not signing up.

19  Q. If I understood your earlier testimony

20  correctly, this letter agreement that is Exhibit 2 was

21  also created based on some kind of form agreement that

22  you were using?

23  A. Yes. We -- we had a relatively standard

24  agreement that was a template, but I did refer to this

25  one as a bit of a hybrid because of the special

**58**

1   circumstances of Jim's disability.

2   Q. If you recall, who created that template letter

3   agreement?

4   A. The legal department and I.

5   Q. Do you recall -- let me back up. Paragraph 6

6   and Paragraph 7, do you recall whether those paragraphs

7   were in the template agreement; or are those changes you

8   made that were unique to Jim Nicholas?

9   A. They would be changes purely based on the logic

10  that the other agreements were termination agreements

11  for people who were leaving the company and not having

12  any ongoing active benefits other than COBRA; and this

13  refers to his selections for annual enrollment, which

14  answers the other question.

15  Q. So, to take, for example, Paragraph 7, you

16  know, the first part of that says, "Should you decide at

17  any time to voluntarily terminate your employment with

18  the company," et cetera, et cetera.

19  A. Correct.

20  Q. Your recollection is that that's not from the

21  template agreement; that is something that was added for

22  James Nicholas's agreement?

23  A. Probably, with the exception that if -- if such

24  an agreement -- if a termination letter had been

25  provided to somebody, let's say in November, in

**59**

1   anticipation of them leaving on the 31st of December but

2   they voluntarily terminated on the 15th of December,

3   then that paragraph would apply. So, I can't say for

4   sure; but the paragraph is not necessarily unique.

5   Q. Do you recall whether at the time this

6   agreement was signed Mr. Nicholas had made any threats

7   or suggestions that he might sue the company based on

8   alleged exposure to asbestos?

9   A. No, not at all.

10  Q. In negotiating this letter agreement with

11  Mr. Nicholas, do you recall having any discussions with

12  him at all about the fact that this agreement would

13  require him to release any claims he might have based on

14  alleged exposure to asbestos?

15  A. No.

16  Q. Did his illness --

17  MR. MUSKAT: Strike that.

18  Q. (BY MR. MUSKAT) Do you recall anything in this

19  agreement that is unique or special that was added to

20  address the issue of his illness or any claims he might

21  have against the company based on that illness?

22  A. No, not at all.

23  Q. Now, when you were preparing this particular

24  agreement for James Nicholas, do you recall consulting

25  with any inside or outside attorneys to draft it?

**60**

1   A. I have to believe that I did. I can't -- I

2   really don't recall that much of the circumstances or

3   the day-to-day deliberations. I have to think that I

4   did meet with an attorney, and I believe the initials

5   here are an attorney's initials. They're not -- they're

6   not my initials, and they're not Jim Nicholas's

7   initials.

8   Q. Does that -- do those initials actually look

9   familiar to you?

10  A. I'm wondering if it's Jim Layman. I don't

11  know.

12  MR. FISHER: Too many Jims.

13  THE WITNESS: Right. It's a very common

14  name.

15  A. I -- I just -- we did have a practice of

16  wanting people's initials on these so that -- I don't

17  think it's Jack Stanley, but we did have a practice of

18  asking for other people's initials just so that there

19  was no question that somebody else had seen the letter.

20  Q. (BY MR. MUSKAT) And does this particular set of

21  initials look familiar to you or --

22  A. Well, no. It's too --

23  Q. If you could just let me --

24  A. -- long ago. I'm sorry.

25  Q. I'm just going to ask the whole question, if

61

1   you will and --
2       A.   Sorry.
3       Q.   My question was going to be:  Does this
4   particular set of initials actually look familiar to
5   you, or are you just speculating that that could be Jim
6   Layman or somebody else?
7       A.   I'm just speculating.
8       Q.   If I could point you to Paragraph 6, the first
9   sentence says, "Your company-provided benefits will
10  continue in 1999, based on the choices you have recently
11  selected during the annual enrollment process."
12           To me, that suggests that he -- that he likely
13  went through the open enrollment process for the
14  harmonized Halliburton plan.  Is that what it suggests
15  to you?
16           MR. FISHER:  Form.
17           You can answer.
18      A.   Yes, it does suggest that, which would have
19  occurred back in early November or late October when the
20  plan -- or mid November, whenever it was announced; so,
21  well in advance of this letter.
22      Q.   (BY MR. MUSKAT) And the second sentence in that
23  paragraph says, "Since you will begin your long-term
24  absence on December 28th, 1998, your short-term
25  disability benefit coverage will be based on the

62

1   existing Kellogg policy for long-term illness up to a
2   total absence of 26 weeks if necessary."  Then it says,
3   "Long-term disability insurance benefits would begin
4   after the completion of the short-term disability
5   period."
6           So, you reference the existing Kellogg policy
7   with respect to short-term disability benefits.  The way
8   I interpret that is -- the whole sentence there is that
9   because you're going to begin the absence before the
10  year ends, it is still the Kellogg short-term disability
11  policy that will apply to your STD.  Is that how you
12  interpret it as well?
13      A.   Yes.
14      Q.   And then after 26 weeks goes by and long-term
15  disability insurance benefits are necessary, there is no
16  reference to that -- to the long-term disability
17  insurance benefits being pursuant to the existing
18  Kellogg policy.  There's no reference to that in here,
19  right?
20      A.   There's none in the letter.
21      Q.   Do you recall thinking about the issue of,
22  well, once we pass 26 weeks and he then would be
23  entitled to long-term disability benefits, will that be
24  pursuant to the MW Kellogg plan or that will be under
25  the new Halliburton harmonized plan which he's gone

63

1   through open enrollment through?
2           MR. FISHER:  Form.
3       A.   I don't recall thinking about that.  My
4   assumption would be this -- this was all Kellogg, the
5   whole -- all of this agreement was Kellogg.
6       Q.   (BY MR. MUSKAT) Even if he had already enrolled
7   in the harmonized Halliburton life plan?
8       A.   Well, the fact that we did this letter on
9   December 24th means that sometime earlier some decisions
10  hadn't been made.  It also means that, you know, he had
11  been in and out of work during 1998.  So, when the plan
12  came out -- even people who were leaving the company may
13  not have known they were leaving the company until say
14  December the 1st or December the 23rd or 22nd.  So,
15  everybody on the payroll would have enrolled in
16  Halliburton benefits, regardless of what happened to
17  them the next day or the next week or month.
18      Q.   If it's your assumption that the long-term
19  disability insurance benefits would have been provided
20  pursuant to the MW Kellogg policy, why wasn't that noted
21  in the last sentence of Paragraph 6 here like you
22  note -- like you specifically mention the Kellogg policy
23  with respect to the short-term disability benefits?
24      A.   My flippant answer would be because I wrote the
25  letter, not -- not the lawyers; and I wasn't -- I wasn't

64

1   thinking about that level of detail.
2           MR. FISHER:  Welcome to a deposition.
3       A.   This is why our letters get longer and longer
4   and longer.  Our current termination letter is probably
5   ten pages long.  So ...
6       Q.   (BY MR. MUSKAT) At the time of the signing of
7   this agreement, he was considered an active employee,
8   correct?
9       A.   Yes.
10      Q.   Let's make the assumption that when you drafted
11  this letter -- let me -- let me -- let me phrase it a
12  different way.
13          Do you know, as we sit here today, whether the
14  MW Kellogg long-term disability policy or the life
15  insurance plan continued to encompass employees such as
16  James Nicholas following the merger?
17          MR. FISHER:  Form.
18      A.   I can't testify to that.  I don't know.
19      Q.   (BY MR. MUSKAT) Is it possible that that MW
20  Kellogg long-term disability policy and life insurance
21  plan ceased to exist with respect to former MW Kellogg
22  employees as of the date of the -- as of January 1st,
23  1999?
24          MR. FISHER:  Objection, form.
25      Q.   (BY MR. MUSKAT) Is that possible?

65

1    A.  I don't know.
2    Q.  You testified a little while ago that your
3  recollection of the MW Kellogg life plan was that it
4  would allow an employee to continue to participate as
11:42AM 5  long as he or the company made premiums even if he
6  wasn't working and he was on long-term disability.  Do
7  you recall that?
8    A.  Correct.
9    Q.  Do you recall whether the harmonized
11:42AM 10  Halliburton plan differed in any respect from that kind
11  of provision?  Maybe another way to ask it is:  Do you
12  recall if the harmonized Halliburton plan placed some
13  limitation on an employee's ability to continue to
14  participate in the life plan if he was disabled?
11:42AM 15    A.  I don't recall the details.  I just don't.
16    Q.  It's possible, but you don't recall?
17    A.  It's possible.  You know, we -- we talked
18  earlier about all of the grandfather plans; and I do
19  recall that one of the issues that we had as we tried
11:43AM 20  to -- as you get down to just a couple of people in a
21  plan and it really wasn't cost effective to have a
22  contract with a provider for a pension plan or a medical
23  plan or something else with only a few people in it, we
24  would go to another provider that we were already using
11:43AM 25  with a much larger part of the workforce and ask them to

66

1  take that plan as it stood but not change the content of
2  the plan.  So, you know, when you're asking me about
3  would it have been terminated or changed or whatever, my
4  recollection was we tried to preserve the benefits but
11:43AM 5  just consolidate the providers but not terminate the
6  benefits because it was just -- it was just something
7  that we didn't do and I'm talking about Halliburton,
8  when I -- when I was at Halliburton.
9    Q.  You're talking about a general practice --
11:44AM 10    A.  General practice.
11    Q.  -- when you were at Halliburton?
12    A.  General practice.
13    Q.  If a particular MW Kellogg employee was
14  grandfathered or a plan was grandfathered and the
11:44AM 15  employee would continue to participate in that
16  grandfathered plan, what kind of documentation would
17  exist to -- to make sure that that happened?
18    A.  Well, there would have been the personnel file,
19  there would have been agreements like this, there would
11:44AM 20  have been the plan document, the policy with the
21  provider.  I mean, all of those things.
22    Q.  The last couple of things you mentioned, so, am
23  I -- did I understand that correctly, you to say that
24  you would be able to go back and look at plan documents
11:44AM 25  which would set out what's being grandfathered and who's

67

1  being grandfathered as part of that plan?
2    A.  Somebody would, yes.
3    Q.  Paragraph 6, was the intent of this paragraph
4  to allow James Nicholas to continue to participate in
11:45AM 5  benefit plans; or was it -- or was the intent to make
6  him a promise that he would be able to participate in a
7  certain benefit plan regardless of whether -- regardless
8  of the terms of those plans or whether those plans would
9  exclude him?
11:46AM 10    MR. FISHER:  Form.
11    Q.  (BY MR. MUSKAT)  Do I need to reask that?
12    A.  You might want to, yeah.
13    Q.  Okay.  Okay.  Paragraph 6 starts out, "Your
14  company provided benefits will continue in 1999."  And
11:46AM 15  it's been my impression over the course of this
16  deposition that the purpose of Paragraph 6 was to simply
17  say to James Nicholas you're going to be able to
18  participate in these plans according to the terms of the
19  plans.
11:46AM 20    MR. FISHER:  I'll object to the form of
21  that question.
22    Q.  (BY MR. MUSKAT)  Is that -- is that wrong?  Or
23  was the -- or was the intent to say -- to potentially
24  supersede the terms of plans and say you get to
11:46AM 25  participate for the rest of your life regardless of what

68

1  a plan may exclude or say?
2    MR. FISHER:  Form.
3    A.  This paragraph, to my recollection, would have
4  been inserted simply because -- you know, as a -- as a
11:46AM 5  termination letter, we weren't terminating his
6  employment.  So, we inserted the paragraph just as a --
7  a re-endorsement of the fact that he was going to be on
8  disability and he was going to continue his benefits.
9  So, I don't think it was anything more than that.
11:47AM 10    Q.  (BY MR. MUSKAT)  If you assume with me -- and I
11  understand this is an assumption -- that the MW Kellogg
12  benefit plan or whatever benefit plan may have covered
13  him while he was on long-term disability contained some
14  exclusion whereby at some point in time he was no longer
11:47AM 15  eligible to participate in the life insurance plan, are
16  you suggesting that this paragraph was meant to
17  supersede any such exclusion; or is it simply -- is
18  it -- well, I'll just end the question there.
19    MR. FISHER:  I'll object to the form.
11:48AM 20    Q.  (BY MR. MUSKAT)  Another way to ask it was --
21  is:  Is this paragraph designed to ensure that he can
22  participate in a life insurance plan until -- for the
23  rest of his life regardless of what those life insurance
24  plans may say?
11:48AM 25    A.  I will assume that the paragraph was intended

69

1  to verify his continuing eligibility for the Kellogg
2  benefit as it stood --
3  Q.  As it stood?
4  A.  -- at the time.
5  THE VIDEOGRAPHER:  We've got five minutes
6  left on this tape?  ????
7  Q.  (BY MR. MUSKAT) Why does Paragraph 6 start by
8  saying, "Your company provided benefits will continue in
9  1999"?  I guess that could have been worded many
10  different ways, to say that they'll continue forever,
11  for example.  What's the significance of adding "to the
12  year 1999"?
13  A.  As I'm looking at it, I'm wondering the same
14  thing myself because it's a curious sentence; but I --
15  I -- I believe it would just be a carryover sentence
16  just because, you know, at the time, you know, he --
17  when he signed this, he was active, he was getting ready
18  to go on to STD, which I've said was basically a
19  different form of active employment.  So, I think that
20  was the intent was -- because, you know, he was also
21  contributing to say the thrift plan -- I mean, the
22  401(k) plan even during that period.  So, that was sort
23  of an umbrella sentence, I believe.
24  Q.  Did you anticipate that James Nicholas would
25  be -- would be paying the full premiums for life

70

1  insurance coverage after this agreement or just an
2  employee portion of the premiums for life insurance
3  coverage?
4  A.  I believe employee portion.
5  Q.  Is that because that's the deal that MW Kellogg
6  made with its active employees --
7  A.  Yes.
8  Q.  -- that they only pay a portion?
9  A.  Disability employees were covered under the
10  same payment criteria as active employees.
11  MR. MUSKAT:  Why don't we stop and let him
12  change the tape.
13  THE WITNESS:  Okay.
14  THE VIDEOGRAPHER:  Going off the record.
15  End of Tape 1.  Time is 11:51.
16  (Off the record)
17  (Exhibit 6 marked.)
18  THE VIDEOGRAPHER:  Back on the record.
19  Beginning of Tape 2.  Time is 11:53.
20  Q.  (BY MR. MUSKAT) Mr. Wilhite, we're looking at
21  Exhibit 6 or what we've just marked as Exhibit 6, which
22  is -- appears to be a printout of an e-mail that you
23  sent to James Nicholas on December 4th, 1998.  Do you
24  recall this particular e-mail?
25  A.  No.

71

1  Q.  I'd like to ask you a quick question about it
2  nonetheless.  Toward the top of the e-mail, there are
3  three full explanatory or preparatory paragraphs.  The
4  third paragraph says, "I have attempted to include the
5  details of your short-term disability options.
6  Intuitively it seems advantageous to go out under the
7  Kellogg plan before 31, December.  Mathematically it
8  appears to work out almost the same."
9  My question is:  To your recollection, you were
10  talking there about the Kellogg plan versus some other
11  option; is that right?
12  A.  Yeah.  I -- from the construction of this -- of
13  the paragraph, I think I'm comparing it to the -- the
14  new harmonized disability plan.
15  Q.  Does this paragraph suggest that had James
16  Nicholas wanted, he could have gone out under the
17  harmonized Halliburton short-term disability policy?
18  A.  Not necessarily.
19  Q.  Then, why are you discussing this issue in this
20  paragraph?
21  A.  Well, I don't -- I don't know, other than had
22  he signed up for the Halliburton plan, it might have
23  been a reasonable question to -- I don't -- you know,
24  people ask questions; and -- and my job is to answer
25  them.  The -- well, I think that's -- that's all I can

72

1  think of.
2  MR. MUSKAT:  Mark that as No. 7, please.
3  (Exhibit 7 marked.)
4  Q.  (BY MR. MUSKAT) If you'd take a look at No. 7,
5  Mr. Wilhite.  Take whatever time --
6  A.  Question 7?
7  Q.  I'm sorry.  Exhibit 7.  I'm sorry.
8  A.  Exhibit 7.
9  Q.  This document, and take whatever time you need
10  to -- to review it.  Just let me know when you're done.
11  A.  Okay.
12  Q.  You recall seeing this e-mail?
13  A.  Not really, no.
14  Q.  I've been told by Ms. Nicholas that the
15  handwriting on this document is likely Jim Nicholas's
16  handwriting which suggested to me that he had some kind
17  of a telephone conversation with you about this and took
18  notes.  That's just what it suggested to me.
19  Do you have any reason to -- to dispute that
20  you and he may have had a discussion about what was in
21  this e-mail?
22  A.  I don't have any reason to dispute that or it
23  could have been somebody in the benefits department, but
24  I think the one clue about talking to me would be
25  Question 3, which is not a benefits question.  So, it's

73

1 reasonable that it could have been me.
2 Q. If you'll note there about in the middle of the
3 page, there's something that says Question No. 6.
4 A. Yes.
11:58AM 5 Q. It says, "It is my understanding the company
6 provided benefits are the ones that we elected through
7 Halliburton just recently -- i.e., medical, dental,
8 vision, STD, LTD, life insurance, et cetera. Does that
9 jog your memory at all as to talking about this issue
11:58AM 10 with James Nicholas?
11 A. Not really.
12 Q. I'd like to go back to Exhibit 2 for a second,
13 which is the December 24th, 1998, letter and ask you
14 another question about what you intended in this
12:00PM 15 document.
16 I'm, again, going to ask you to make an
17 assumption. If you make the -- maybe more than one
18 assumption. If you make the assumption that after this
19 letter Jim Nicholas was paying premiums and enrolled in
12:00PM 20 the harmonized Halliburton life plan and if you further
21 make the assumption that that plan either said or was
22 later amended to say that if you had been on a medical
23 leave for more than 24 months, you are no longer
24 entitled to participate in our life insurance plan. Is
12:00PM 25 it your opinion or was it your intent in this letter to

74

1 nonetheless guarantee Jim Nicholas the ability to
2 participate in that plan?
3 A. In which plan?
4 Q. The harmonized Halliburton plan that we have
12:01PM 5 assumed either said or was amended to say that life
6 benefits end if you have been on a leave of absence for
7 more than 24 months.
8 A. Are you asking me was it my intent to allow him
9 to participate in the Halliburton plan?
12:01PM 10 Q. Was it your intent in this letter to guarantee
11 somehow that he would be able to continue to participate
12 in such a plan, even if the plan said or was amended to
13 say that you don't participate if you've been on a leave
14 for more than 24 months?
12:01PM 15 MR. FISHER: I'll object to the form.
16 A. I'm not sure I'm answering the question. I
17 believe our intent was to ensure him the benefits of the
18 Kellogg plan because we had no forward knowledge of how
19 the Halliburton plan would be administered; and we
12:01PM 20 weren't -- we were -- we -- in almost all of these
21 cases, you know, we wanted to ensure the benefit of the
22 Kellogg plan, administration as well as content.
23 Q. (BY MR. MUSKAT) And after signing this letter
24 with James Nicholas, am I correct that you didn't take
12:02PM 25 any steps to further investigate whether his life

75

1 coverage would be under the Kellogg plan and you did not
2 do anything to try to ensure that it would be the
3 MW Kellogg plan, as opposed to the harmonized
4 Halliburton plan that would cover him going forward?
12:02PM 5 A. I personally?
6 Q. Correct.
7 A. I did not.
8 Q. Do you know if anybody did?
9 A. I don't know.
12:03PM 10 MR. MUSKAT: Thank you, Mr. Wilhite.
11 THE WITNESS: Thank you.
12 EXAMINATION
13 BY MR. FISHER:
14 Q. Okay. I just have a few more follow-up
12:03PM 15 questions, Mr. Wilhite. No. 1, we -- based upon this
16 e-mail that you have here as Exhibit No. -- what number
17 did we mark this -- 7, okay, if we look in the middle
18 where that paragraph says, "In comparing the Kellogg STD
19 with the Halliburton STD," do you see that kind of in
12:03PM 20 the lower part of the middle?
21 A. Yes.
22 Q. "It appears that the Halliburton STD is
23 approximately $6,000 better than the Kellogg STD. Is
24 there any way to equalize these two plans since I would
12:04PM 25 like to be monitored by the Kellogg plan?"

76

1 Do you read that as an indication and to
2 refresh your recollection that he -- recollection that
3 he is going under the Kellogg plan?
4 A. Correct.
12:04PM 5 Q. All right. And then we -- obviously we notice
6 your letter. How much do you enjoy working on Christmas
7 Eve?
8 A. Well, I don't; but it's not unusual.
9 Q. It kind of seems, based upon the date of this
12:04PM 10 letter and the e-mail correspondence we see -- that we
11 see here, that 12/31 was the deadline to select the
12 Kellogg plan.
13 A. 12/31 Kellogg ceased to exist, yeah.
14 Q. Okay. So, if he doesn't do it by 12/31, then
12:04PM 15 he doesn't even have the option to go under the Kellogg
16 plan?
17 A. That seems reasonable.
18 Q. Okay. And y'all were trying to beat this
19 deadline?
12:04PM 20 A. We were, yeah, trying to execute all of these
21 agreements. There were -- there were others, other
22 terminations and departures; but on 1, January, or 2,
23 January, or whatever, I was going to be over at Clinton
24 Drive in the Halliburton office.
12:05PM 25 Q. Right.

77

1     A.   Right.

2     Q.   When we read here in Exhibit No. 2, No. 6,

3   "your company provided benefits," you're talking about

4   the benefits that he has currently?

12:05PM  5     A.   Correct.

6     Q.   Those benefits will continue; and those

7   benefits were Kellogg benefits, if we read the English

8   language here, correct?

9     A.   To my knowledge, it's -- as I said earlier,

12:05PM 10   it's a curious sentence.  I don't recall -- I don't

11   recall how we did the enrollment.

12     Q.   Okay.  However, based upon your -- your reading

13   of these e-mails, your reading of Exhibit No. 2, it's

14   your understanding that he chose and y'all agreed for

12:05PM 15   him to participate under the Kellogg benefit plan at

16   that time and in the future?

17     A.   Yes.  The difficult part of this is that

18   there's pieces of this that simply wouldn't have

19   existed, the retirement plan or it would have been the

12:06PM 20   Halliburton plan.  So -- so, the disability plan was

21   unique.

22     Q.   All right.  Well, let's limit it to -- oh, go

23   ahead.

24     A.   I was looking at that other letter from Tashi

12:06PM 25   Theismann with all the benefits.  I don't even recall

78

1   what benefits he had but --

2     Q.   Here you go.  Here's Exhibit No. 1.  That's the

3   full one.

4     A.   Yeah.  So, I just don't recall whether all of

12:07PM  5   these -- these plans would not have all necessarily

6   continued into 1999 as a Kellogg plan.  That's the only

7   point I'm making.

8     Q.   And which -- you're talking specifically about

9   the retirement portion of it?

12:07PM 10     A.   Or the medical perhaps or dental or vision.  I

11   mean, I just don't --

12     Q.   All right.

13     A.   In other words, people who were out had a

14   certain set of benefits and those benefits were not

12:07PM 15   going to be altered whether they were retired and in

16   retired medical, whether they were disability and in

17   disability, but those -- you know, their -- their

18   coverage wasn't going to be altered as result of this

19   merger.

12:07PM 20     Q.   I understand what you're saying.  So, it could

21   be administered by the new --

22     A.   Correct.

23     Q.   -- benefit provider --

24     A.   Correct.

12:07PM 25     Q.   -- but the terms of the plan and the benefits

79

1   of the plan would be grandfathered in?

2     A.   Correct.

3     Q.   Okay.  So, whatever was agreed to irrespective

4   of who was actually going to pay out or administer the

12:07PM  5   benefits provided in Exhibit No. 2, those benefits

6   enumerated in here were going to continue?

7     A.   That's my recollection.

8     Q.   Okay.  Now, certainly -- there was nothing in

9   this letter; but certainly it wasn't your interpretation

12:08PM 10   after reading this letter or your conversations with

11   Mr. Nicholas that at some date certain in the future he

12   would cease to have life insurance?

13     A.   Correct.

14     Q.   Okay.  So, the intent, the wording of this

12:08PM 15   document and the intent of this document was to provide

16   him life insurance provided he met his obligation of

17   making the premium payments?

18     A.   Correct.

19     Q.   If there's any plan documents that are missing

12:08PM 20   or if MW Kellogg failed to procure the benefit plans

21   that were agreed to in No. 2, those weren't

22   Mr. Nicholas's responsibilities, were they; those were

23   MW Kellogg's responsibilities or whoever was handling

24   that?

12:08PM 25          MR. MUSKAT:  Object to the form.

80

1     A.   Or whoever succeeded, right.

2     Q.   (BY MR. FISHER)  Okay.  But there was nothing

3   contemplated in Exhibit No. 2 that required Mr. Nicholas

4   to go procure these benefits?

12:09PM  5     A.   Correct.

6     Q.   All right.  And if MW Kellogg or whoever

7   succeeded the person in the position who was to handle

8   this, if they failed to obtain the appropriate benefits

9   for Mr. Nicholas, then that would have been their

12:09PM 10   responsibility?

11     A.   If --

12     Q.   Well, let's say you're the human resources

13   director of the company.

14     A.   Yes.  It would have been --

12:09PM 15     Q.   And you have an --

16     A.   -- the responsibility of the company.

17     Q.   Right.  And you have an employee who's hired

18   on; you're taking money out of their check or they're

19   paying you their monthly benefit money and you just

12:09PM 20   forget to buy them insurance.

21     A.   Right.

22     Q.   That's your fault and that's the company's

23   fault; that's not the employee's fault?

24     A.   Correct.

12:09PM 25     Q.   All right.  Last area of -- well, let me ask

81

1  you a couple of other things. You had the authority at
2  this time to make this agreement in Exhibit No. 2,
3  correct?
4      A. Did I have the authority to execute it?
12:10PM 5   Q. Yes, sir.
6      A. Yes.
7      Q. Okay. So, it's not like you're someone working
8  in accounting and you just decided, well, I'm going to
9  practice human resources today and go start cutting side
12:10PM 10  deals with employees about benefits? I mean, this was
11  your job; and you had the authority to do what you did
12  in No. 2.
13     A. It was my job. That was why we had those
14  initials on there; although, we don't know whose
12:10PM 15  initials they are, but the point of it was to -- that I
16  did have the authority, working with the legal
17  department and the benefits department, to -- to put all
18  this on paper.
19     Q. All right. And how long -- just as a general
12:10PM 20  statement, how long had you been working in this area
21  dealing with people's employees benefits throughout your
22  career up to this point to 1998? I mean, how many years
23  had you been in that field?
24     A. I -- I worked at Kellogg for 25 years; but the
12:11PM 25  benefits department came under me sometime in the late

82

1  Eighties or early Nineties. I don't remember.
2      Q. So, you think you'd been doing it, safe to say,
3  at least 7 to 8 years?
4      A. At the time this was executed?
12:11PM 5   Q. Yes, sir.
6      A. Yes.
7      Q. All right. And you'll certainly agree that
8  when you were talking with Mr. Nicholas, he certainly
9  assumed that you had the authority to make this deal?
12:11PM 10     A. Sure.
11     Q. All right. The last area of inquiry I have
12  then I'm done is do you remember the content or the
13  conversation you had with either counsel for the
14  defendant here or anyone from Kellogg Halliburton
12:11PM 15  asking -- I mean, what was it they were asking you, you
16  know, to do?
17     A. The only conversation I had was with -- was
18  with Mr. Muskat and that was just would I be willing to
19  review or verify the terms of Nicholas's termination or
12:12PM 20  benefits. I'm not exactly sure what -- wasn't a very
21  long conversation, and I -- my recollection was I was
22  traveling.
23     Q. Okay.
24     A. So, but that was the only conversation. I had
12:12PM 25  no contact with Halliburton.

83

1      Q. And ultimately you formed the opinion that it
2  was their -- did they just want you to review it, or did
3  they indicate to you that it was their position that he
4  wasn't entitled to a life insurance benefit and they
12:12PM 5  wanted you to confirm that?
6      A. I don't -- I don't know -- I don't know if
7  there was that much detail exchanged.
8      Q. But ultimately you made the decision that if
9  the question was was there a life insurance benefit and
12:12PM 10  I should call the Halliburton people back or was there
11  -- or, I mean, was there not a life --
12         MR. FISHER: Strike that.
13     Q. (BY MR. FISHER) Ultimately you made the
14  conclusion that if it was -- there was no life insurance
12:13PM 15  benefit you should call the Halliburton people back and
16  if you thought there was a life insurance benefit you
17  weren't going to be able to help them?
18     A. Who's them?
19     Q. Halliburton or --
12:13PM 20     A. Okay. Well, I had previously advised the
21  Nicholas family that they should call Halliburton. I
22  gave them the name of somebody at Halliburton that I
23  thought could help them; and the fact that this doesn't
24  seem to be going anywhere made me conclude that if I was
12:13PM 25  going to pick a side on this, I needed to pick a side

84

1  that was the Kellogg side, which was the Nicholas side.
2      Q. And you're not picking a side by virtue of
3  relationships or friendships; you're picking a side by
4  virtue of the truth and what actually happened?
12:13PM 5   A. Yeah. My name is on the letter.
6         MR. FISHER: Okay. Nothing further, sir.
7  Thank you.
8         THE WITNESS: Okay.
9             EXAMINATION
12:13PM 10 BY MR. MUSKAT:
11     Q. I have a few follow-up questions.
12     A. Okay.
13     Q. I'm sorry.
14     A. That's okay.
15     Q. I appreciate your patience.
16     A. I anticipated that.
17     Q. Try to go through this as quick as I can.
18         Opposing counsel asked you a question about a
19  paragraph on Exhibit 7, which is the December 22nd,
12:14PM 20  1998, e-mail, specifically this paragraph, the one that
21  says, "In comparing the Kellogg STD with the Halliburton
22  STD, it appears the Halliburton STD is approximately
23  $6,000 better than the Kellogg STD. Is there a way to
24  equalize these two plans since I would like to be
12:14PM 25  monitored by the Kellogg plan?"

JAMES R. WILHITE

---

**85**

```
 1          That paragraph -- I'm right, aren't I -- only
 2   refers to STD, doesn't it?  There's no mention of life
 3   insurance or LTD or any other benefit, is there?
 4       A.   The first sentence discusses STD.  The second
12:14PM 5   sentence, I think, is a generic statement about benefits
 6   in general because it's all -- it's all related to -- I
 7   mean, that whole Question 6 is related to benefits.  I
 8   can't answer -- I don't -- I don't know if he's -- I
 9   mean, I can't read what's in his mind there about is he
12:15PM 10   referring just to LTD and -- I mean, just to disability
11   or not.
12       Q.   You were asked a series of questions about the
13   date of this e-mail and the date of the ultimate letter
14   agreement and I recall you being asked something to the
12:15PM 15   effect of, you know, this had to be done by the end of
16   the year because if he didn't get this taken care of by
17   December 31st he wouldn't even have the option to go
18   under the MW Kellogg plan and I realize you've testified
19   that it was your intent that he be allowed to continue
12:15PM 20   to participate in the MW Kellogg life plan, but am I
21   correct that as we sit here right now we don't know
22   whether he even had that option or not because we don't
23   know whether the MW Kellogg plan was grandfathered or
24   grandfathered as to certain employees like James
12:16PM 25   Nicholas?
```

**86**

```
 1       A.   I'm sorry.  I'm not exactly sure what the
 2   question is.
 3       Q.   Okay.  We don't know, do we, as we sit here
 4   today, whether as of December 31st, 1998, James Nicholas
12:16PM 5   even had the option to continue to participate in the MW
 6   Kellogg life insurance plan --
 7       A.   Okay.
 8       Q.   -- because we don't know whether that plan was
 9   grandfathered as to him or anyone else; is that correct?
12:16PM 10       A.   I can't testify as to whether or not every
11   specific plan was grandfathered.  I seriously doubt that
12   the dental plan was grandfathered; but I certainly can
13   testify that during 1999 and 2000, the people in the
14   benefits department spent an inordinate amount of time
12:16PM 15   administering old grandfathered plans, not just
16   retirement plans but also old disability plans and
17   insurance plans, life insurance plans.  And, so, I don't
18   know the details of the plans and I don't know how --
19   what was in each plan in terms of how long it was to
12:17PM 20   apply, but I do know that there were a large number of
21   plans still on the -- being actively administered and we
22   had a whole library full of plan documents that was
23   enormous.
24       Q.   That's fair.  But as we sit here today, we
12:17PM 25   don't know whether the MW Kellogg life plan was one of
```

**87**

```
 1   those plans or, even if it was one of those plans,
 2   whether James Nicholas was eligible to be grandfathered
 3   under that plan; is that fair?
 4       A.   I can't -- I can't answer that.  I don't know.
12:17PM 5           MR. MUSKAT:  Nothing further.
 6           THE WITNESS:  Okay.
 7                   EXAMINATION
 8   BY MR. FISHER:
 9       Q.   Irrespective of whether or not he's on the
12:18PM 10   Kellogg plan or the Halliburton plan, the deal that was
11   cut in Exhibit No. 2 was to provide him life insurance
12   up until the time he died?
13       A.   Correct.
14       Q.   It wasn't set to expire at any point?
12:18PM 15       A.   Correct.
16           MR. FISHER:  Okay.  Nothing further.
17           THE VIDEOGRAPHER:  Is that it?  Going off
18   the record.  Time is 12:18.
19           (The deposition was concluded at 12:18 p.m.)
20
21
22
23
24
25
```

**88**

```
 1                CHANGES AND SIGNATURE
 2   WITNESS NAME:  JAMES R. WILHITE
 3   DATE OF DEPOSITION:  December 18, 2007
 4   PAGE LINE      CHANGE           REASON
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

89

1   I, JAMES R. WILHITE, have read the foregoing
deposition and hereby affix my signature that same is
2   true and correct, except as noted above.

3

4   _____

JAMES R. WILHITE
5

6

THE STATE OF _____)
7   COUNTY OF _____)

8   Before me, _____, on this day
personally appeared JAMES R. WILHITE, known to me (or
9   proved to me under oath or through
_____) (description of identity
10  card or other document) to be the person whose name is
subscribed to the foregoing instrument and acknowledged
11  to me that they executed the same for the purposes and
consideration therein expressed.

12  Given under my hand and seal of office this
13  _____ day of _____, _____.

14

15

16  _____
NOTARY PUBLIC IN AND FOR
17  THE STATE OF _____
COMMISSION EXPIRES: _____

18
19
20
21
22
23
24
25

90

1   IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
2

GERALDINE NICHOLAS,          )
3   individually and as          )
representative of the        )
4   estate of JAMES             )
NICHOLAS, deceased           )
5                               )   CIVIL NO. 4:07-CV-00657
VS.                          )
6                               )
W.M. KELLOG COMPANY,         )
7   KELLOGG, BROWN & ROOT       )
KBR, INC., AND              )
8   HALLIBURTON                 )
***********************************************
9           REPORTER'S CERTIFICATION
10      DEPOSITION OF JAMES R. WILHITE
December 18, 2007

11  I, MELISSA GIROUARD, Certified Shorthand Reporter
in and for the State of Texas, hereby certify to the
12  following:

13  That the witness, JAMES R. WILHITE, duly sworn by
me and that the transcript of the oral deposition is a
14  true record of testimony given by the witness;

15  That the deposition transcript was submitted on
_____ to the witness for
16  examination, signature, and return to the offices of Jan
Girouard & Associates by the _____ day of _____,
17  2008.

18  That pursuant to information given to the
deposition officer at the time said testimony was taken,
19  the following includes all counsel for all parties of
record:

20
Mr. Edward Fisher,
21  Attorney for plaintiff, Geraldine Nicholas,
individually and as representative of the estate of
22  James Nicholas, deceased:

23  Mr. Michael J. Muskat,
Attorney for defendant, W.M. Kellog Company,
24  Kellogg, Brown & Root KBR, Inc., and Halliburton;
25

91

1   I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
2   attorneys in the action in which this proceeding was
taken, and further that I am not financially or
3   otherwise interested in the outcome of the action.

4   Further certification requirements pursuant to Rule
203 of the Federal Rules of Civil Procedure will be
5   certified to after they have occurred.

6   Certified to by me on this the 4th day of January,
2008.
7

8   _____
MELISSA GIROUARD, Texas CSR No. 6313
9   Expiration Date: 12/31/09
Jan Girouard & Associates
10  Firm Registration No. 99
550 Fannin Street, Suite 108
11  Beaumont, Texas 77701
(409) 832-2721

12

13      REPORTING FIRM'S FURTHER CERTIFICATION

14  The changes and signature page was/was not returned
to the deposition officer on _____, 2008;

15  If returned, the attached Changes and Signature
16  page contains any changes and the reasons therefor;

17  If returned, the original deposition was delivered
to Mr. Edward Fisher, custodial attorney, for
18  safekeeping on _____.

19  That $_____ is the deposition officer's
charges to Mr. Edward Fisher for preparing the original
20  deposition transcript and any copies of exhibits;

21  That the deposition was delivered in accordance
with Rule 30, Federal Rules of Civil Procedure, and that
22  a copy of this certificate was served on all parties
shown herein and filed with the clerk.

23

24

25

92

1   Certified to by me this _____ day of _____,
2008.
2

3

_____
MELISSA GIROUARD, Texas CSR No. 6313
4   Expiration Date: 12/31/09
Jan Girouard & Associates
5   Firm Registration No. 99
550 Fannin, Suite 108
6   Beaumont, Texas 77701
(409) 832-2721

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT I



# COBRA Enrollment Notice

Statement Date  01–06–2003

```
000103
JAMES NICHOLAS and Family
19 WINTER PLACE
ST JOHN'S NF  A1B 1J5
Canada
```

As a result of your Termination on **January 2, 2003**, your current group health plan coverage ends as listed in the following table. You may choose to remain covered under your current group health plan for up to 18 months. This coverage is provided according to the Consolidated Omnibus Budget Reconciliation Act and is often referred to as COBRA coverage. COBRA coverage is effective as listed below.

| Group Health Plan | Coverage End Date | COBRA Coverage Begin Date |
| --- | --- | --- |
| Medical | 01–31–2003 | 02–01–2003 |
| Dental | 01–31–2003 | 02–01–2003 |

## Enrollment

To enroll for COBRA coverage, you must notify the KBR Benefits Center no later than April 2, 2003 by calling 1–800–459–4788 and speaking to a KBR Benefits Center representative to enroll. If you do not enroll within that time frame, you forfeit your rights to COBRA coverage.

If you do not elect COBRA coverage, your covered spouse and covered dependents have an independent right to elect or decline this coverage.

delivered by **Hewitt**                    0027300073 H9540–000103



COBRA Enrollment Notice                                                                    Page 2

In addition, COBRA coverage may be available for your family for up to a total of 29 months at a higher premium if:

- You, your covered spouse, or your covered dependents (including newborn and newly adopted children) are determined to be disabled as defined by the Social Security Act prior to the qualifying event or during the first 60 days of COBRA coverage, and

- The Social Security Administration's disability determination is received within the disabled individual's 18 months of COBRA coverage, and

- The KBR Benefits Center is notified of the Social Security Administration's disability determination within 60 days of the disabled individual's receipt of a Social Security Disability award.

The KBR Benefits Center must also be notified within 30 days of the date the disability ends.

## Group Health Coverage

Following are the coverage options available to you and the monthly cost of each option for the remainder of the current plan year. The Family Information section at the end of this notice lists dependents currently on file. Only those dependents who were covered prior to the qualifying event may continue coverage under a particular group health plan.

The COBRA prices reflected in this statement are effective for the current plan year. COBRA prices are subject to an adjustment at annual enrollment.

## Medical

| Option | Coverage Category | | | |
| | 1<br>You Only | 2<br>You +<br>Spouse | 3<br>You +<br>Child(ren) | 4<br>You +<br>Family |
|---|---|---|---|---|
| 0 No Coverage | $0.00 | $0.00 | $0.00 | $0.00 |
| 503 $1,000 Ded Med | $205.91 | $473.60 | $370.64 | $658.92 |

Current Coverage Category: 4--You + Family

## Dental

| Option | Coverage Category | | | |
| | 1<br>You Only | 2<br>You +<br>Spouse | 3<br>You +<br>Child(ren) | 4<br>You +<br>Family |
|---|---|---|---|---|
| 0 No Coverage | $0.00 | $0.00 | $0.00 | $0.00 |
| 13 CIGNA Dental PPO | $25.69 | $51.39 | $64.25 | $89.95 |

Current Coverage Category: 4--You + Family



## Events That May Modify Continued Coverage

COBRA coverage may be modified based on plan rules if you experience a family status change. See your Health and Group Benefits Handbook for detailed information on allowable family status changes.

COBRA coverage may also be modified if, during the 18–, 29–, or 36–month continuation period a child is born to the covered employee or placed for adoption with the covered employee. In such case, you must notify the KBR Benefits Center within 31 days of the birth or placement if you wish to cover the new dependent as a qualified beneficiary under COBRA. There may be a higher premium for this additional coverage.

## Coverage Termination

COBRA coverage will end automatically as detailed below:

| Group Health Plan | COBRA Coverage End Date |
|---|---|
| Medical | 07–31–2004 |
| Dental | 07–31–2004 |

In addition, COBRA coverage will end automatically if any of the situations listed below occur.

- KBR stops providing group health benefits.

- Premiums are not paid within 30 days of the due date (with the exception of the initial premium which is due within 45 days of your election date).

- A person eligible for continued benefits subsequently becomes covered under any other group health plan (unless the health plan has an enforceable preexisting condition clause) or becomes entitled to Medicare.

## Billing Information

If you elect COBRA coverage, you will receive an initial bill for the cost of continuing your coverage from the date your coverage ended through the end of the month in which you make your COBRA election. You must submit your initial payment within 45 days of your election date.

Following your initial payment, you will be billed each month. Monthly payments are due on the first day of each month. If you fail to submit monthly payments within 30 days of the due date, your coverage will end retroactive to the last day of the last month for which payment was received. Coverage cannot be reinstated. All valid payments received will be deposited. Any payments deposited after the coverage was dropped will be refunded and will not extend your coverage.



COBRA Enrollment Notice

## For More Information

If you need additional information, call the KBR Benefits Center toll–free at **1–800–459–4788 (outside the U.S., call 847–883–1027)**. KBR Benefits Center representatives are available between **8:30 a.m.** and **5:00 p.m.** Central Time, Monday through Friday. The automated telephone system is available 24 hours a day, Monday through Saturday, and after **12 p.m.** Central time, on Sunday.

*Your Benefits Resources™* is a trademark of Hewitt Associates LLC.



COBRA Enrollment Notice                                                                Page 5

## Family Information

Listed below are the eligible dependents who are currently on file. The Qualified Beneficiary row indicates dependents who are considered qualified beneficiaries. Qualified Beneficiaries have independent COBRA election rights and can elect to continue group health plan coverage for themselves if you choose to decline coverage.

- **Dependent Information**

| | Dependent No. 1 | Dependent No. 2 | Dependent No. 3 |
|---|---|---|---|
| Dependent SSN | 122–76–7797 | 545–53–2768 | 638–18–2362 |
| Name | ALLISON NICHOLAS | GERALDINE NICHOLAS | CHRISTOPHER NICHOLAS |
| Relationship | Child | Spouse | Child |
| Birth Date | 03–01–1989 | 05–30–1956 | 12–27–1984 |
| Gender | Female | Female | Male |
| Full–Time Student Age 19–25 | No | — | No |
| Disabled Dependent | No | — | No |
| Qualified Beneficiary | Yes | Yes | Yes |

0027300073  H9540–000103                                        

# EXHIBIT J

GERALDINE NICHOLAS

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GERALDINE NICHOLAS,          :
INDIVIDUALLY AND AS          :
ADMINISTRATRIX OF THE        :
ESTATE OF JAMES NICHOLAS     :
                             :
VS.                          :  CIVIL ACTION NO. H-07-00657
                             :
M.W. KELLOGG COMPANY,        :
KELLOGG, BROWN & ROOT,       :
KBR, INC., AND HALLIBURTON   :

DEPOSITION OF

GERALDINE NICHOLAS

September 18, 2007                    Houston, Texas

REPORTED BY:  Craig Michael Bechtel

GERALDINE NICHOLAS

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GERALDINE NICHOLAS,             :
INDIVIDUALLY AND AS             :
ADMINISTRATRIX OF THE           :
ESTATE OF JAMES NICHOLAS        :
                                :
VS.                             : CIVIL ACTION NO. H-07-00657
                                :
M.W. KELLOGG COMPANY,           :
KELLOGG, BROWN & ROOT,          :
KBR, INC., AND HALLIBURTON      :


DEPOSITION OF

GERALDINE NICHOLAS


September 18, 2007                    Houston, Texas


REPORTED BY:  Craig Michael Bechtel

GERALDINE  NICHOLAS

**2**

INDEX

PAGE

Appearances................................... 3
Stipulations ................................ 4
Testimony of GERALDINE NICHOLAS
EXAMINATION
  By Mr. Muskat ............................. 5
  By Mr. Fisher ............................ 63
Correction and Signature Page................. 67
Reporter's Certificate Page.................. 69
Reporter's Supplemental Certificate Page....... 72

EXHIBIT INDEX

PAGE

Exhibit No. 1.................................. 20
Exhibit No. 2................................. 26
Exhibit No. 3................................. 32
Exhibit No. 4................................. 36
Exhibit No. 5................................. 37
Exhibit No. 6................................. 38
Exhibit No. 7................................. 39
Exhibit No. 8................................. 42
Exhibit No. 9................................. 42
Exhibit No. 10................................ 42
Exhibit No. 11................................ 42
Exhibit No. 12................................ 47
Exhibit No. 13................................ 48
Exhibit No. 14................................ 49
Exhibit No. 15................................ 49
Exhibit No. 16................................ 51
Exhibit No. 17................................ 52
Exhibit No. 18................................ 63

**3**

A P P E A R A N C E S

COUNSEL FOR PLAINTIFFS:
  Mr. Ed Fisher
  Provost Umphrey
  490 Park Street
  Beaumont, Texas 77704
  409-835-6000
  efisher@provostumphrey.com
COUNSEL FOR DEFENDANTS:
  Mr. Michael J. Muskat
  Muskat, Martinez & Mahoney
  440 Louisiana, Suite 590
  Houston, Texas 77002
  713-987-7851

**4**

1    THE ORAL DEPOSITION OF GERALDINE NICHOLAS was
2    taken by DEFENDANTS before Craig Michael Bechtel, a
3    Certified Shorthand Reporter in and for the State of
4    Texas, in the law offices of Muskat, Martinez & Mahoney,
5    440 Louisiana, Suite 590, Houston, Texas, between the
6    hours of 9:34 a.m. and 12:05 p.m., on September 18,
7    2007, pursuant to Notice and the Federal Rules of Civil
8    Procedure and the following stipulations and waiver of
9    counsel:

10

11        IT IS STIPULATED AND AGREED by and between
12    counsel for the respective parties hereto that all
13    objections are reserved until the time of trial, except
14    those as to the form of the question and/or
15    responsiveness of the answer; that the original
16    transcript of this deposition may be signed by the
17    witness thereon before any notary public or other
18    officer authorized to administer oaths.

**5**

1            GERALDINE NICHOLAS,
2    having been first duly sworn, testified as follows:
3            EXAMINATION
4    BY MR. MUSKAT:
5        Q.  Hi, Ms. Nicholas.  My name is Mike Muskat.  I
6    am representing the defendants in this matter.
7            I have a couple sort of preliminary
8    comments I would like to make.  What I am going to be
9    trying to accomplish today is to get a handle on the
10   facts that you say support your claims in this case.  I
11   am not going to try to trick you.  I am not going to be
12   asking you leading questions unless it's to clarify
13   something you have already said.
14           I hope my questions are clear and, you
15   know, concise.  If you have any issue with understanding
16   them or understanding what I am getting at, please let
17   me know, and I am happy to rephrase.  Today is not about
18   trickery of any kind.  I just simply want to get as much
19   information as I can about the facts that support your
20   claims.
21           Is there any reason this morning that you
22   feel like that you can't give completely clear and
23   accurate testimony?  Are you feeling under the weather,
24   on medications, whatnot?
25       A.  No.

2  (Pages 2 to 5)

GERALDINE  NICHOLAS

**6**

1    Q.  Okay.  Let me start by asking you about
2    documents in the case and documents that your lawyers
3    have given to us.  And I have got some stacks of them
4    here and we will talk about them in a few minutes, but
5    when you were gathering documents to be produced in this
6    case, what did you do to find the documents that you
7    eventually gave to your lawyers?
8        A.  I sat down and took my husband's files, and I
9    compiled them in chronological order and read them and
10   forwarded them on to Provost Umphrey.
11       Q.  You mentioned your husband's files.
12       A.  Uh-huh.
13       Q.  Did he have files that were specific to this
14   issue?  And by this issue, I mean, you know, this issue
15   of his participation in the KBR group life insurance
16   plan, or are the files you are mentioning broader than
17   that?
18       A.  Somewhat broader than that.  Ideally, if there
19   was a file labeled Halliburton, certain issue,
20   whatever -- you have to understand the nature of my
21   husband's illness in that he was always very diligent
22   about the upkeep of his paperwork.  And as his disease
23   progressed, I was able to see the -- you know, that his
24   files weren't as neat and tidy, so to speak.  So when
25   you ask, you know -- I am not sure what you are asking.

**7**

1        Q.  Describe for me, if you can, the universe of
2    documents that were kept in his files that you said you
3    looked through to gather documents for this case.
4        A.  He kept files -- he kept current files under
5    benefits.  Compensation of benefits, he called it, and
6    then for preceding years, files would be boxed and
7    stored in our basement.
8        Q.  For preceding years?
9        A.  Preceding years.  Like for 2002, the files
10   would be in the 2002 box or 2003, same thing, and --
11       Q.  So if I am understanding you correctly, you
12   went down and gathered those boxes from the basement and
13   looked through them to find documents that seemed
14   relevant to --
15       A.  Correct.
16       Q.  -- this life insurance issue?
17       A.  Correct.
18       Q.  Now --
19       A.  And some of those documents were already in a
20   file, because it was an ongoing concern of his.
21       Q.  There was a special file for life insurance
22   issue or something along those lines?
23       A.  Uh-huh.
24       Q.  Just for the court reporter --
25       A.  Yes.

**8**

1        Q.  -- if you can answer yes or no.
2        A.  Yes.  I am sorry.
3        Q.  He can't take down a nod.
4             So to reiterate, there was a special file
5    that was -- that was devoted to KBR Life or M.W. Kellogg
6    life insurance issue or something along those lines?
7        A.  Correct, yes.
8        Q.  Other than documents that may have been
9    exchanged back and forth between either you or your
10   husband and attorneys, were there any documents in those
11   files you looked through that related to his eligibility
12   or lack thereof under the KBR life insurance plan that
13   you did not forward to your attorneys?
14            Maybe another way to put that is:  Do we
15   have everything that existed in his files that related
16   to this issue of his eligibility under the life
17   insurance plan, or are there additional documents that
18   you chose not to gather and forward to your attorneys?
19       A.  Well, if you have everything that I have
20   forwarded to my attorneys, then the answer to your
21   question is, then you have everything that is relevant
22   in terms of documentation that went back and forth
23   between -- I don't know what you are asking me.
24       Q.  Well, maybe as --
25       A.  Are you asking me if I have documents that you

**9**

1    don't have?  Is that what you are asking?
2        Q.  Yes.  Now, I don't know.  Maybe your attorneys
3    didn't produce to us some things that you forwarded to
4    them, and we will figure that out.
5        A.  Yeah, I think --
6        Q.  My question is just documents that -- let's
7    just -- well, for example, let me back up and ask a more
8    specific question.
9             This special file that you say your
10   husband kept --
11       A.  Uh-huh.
12       Q.  -- relating to this issue, other than
13   attorney-client communications that may or may not have
14   been in that file, did you provide your attorneys
15   everything in that file?
16       A.  Gosh, I don't remember, because I just
17   photocopied the -- I took the file and photocopied it
18   and sent it on without giving any thought to do I have
19   every piece of paper, do I have any -- it's possible
20   that there could have been a phone message, you know,
21   that I might have bypassed when I was photocopying, that
22   kind of thing, but --
23       MR. FISHER:  I think his question is more
24   did you intentionally look at a document that was about
25   this and then not provide it because you didn't think it

**3  (Pages  6  to  9)**

GERALDINE  NICHOLAS

## 10

1  was relevant personally or you didn't like the document
2  or something like that?  Was that ever done?
3      A.  No, no, no.
4      Q.  (By Mr. Muskat)  So his file that was specific
5  to this issue, you took that to get it copied and you
6  sent it on to your attorneys.  You may not have gone
7  through the copying to double-check and make sure that
8  everything was actually Xeroxed, but that's the practice
9  you followed?
10     A.  Uh-huh.
11     Q.  Is that right?
12     A.  Uh-huh.  Yes, correct.  Yes.
13     Q.  I wanted to make sure I was understanding you
14  correctly.
15         Now, then, as to documents in other boxes,
16  for example, the 2002 box, am I correct that you went
17  through that box and made an effort to identify any
18  documents that related to the issues in this lawsuit?
19     A.  Yes.
20     Q.  And to the extent you found documents, you
21  provided those to your attorneys?
22     A.  Yes.
23     Q.  Am I right?
24     A.  (Witness moves head up and down.)
25     Q.  Did your husband — let me ask it a different

## 11

1  way:  Do you currently have access to any e-mail
2  accounts that your husband kept, and where I am going
3  with this is just to understand whether or not there
4  might be an any e-mails that he sent or received in the
5  last few years that might be relevant to this case that
6  we don't have.  That's the purpose of my asking the
7  question.
8         So to restate it, do you currently have
9  any access to any e-mail accounts that he kept?
10     A.  Yes.
11     Q.  Have you looked through those e-mail accounts
12  to see if there are any e-mails that relate to the
13  issues in this lawsuit?
14     A.  I have tried to.  He had an old laptop, and it
15  occurred to me while I was traveling here that he may
16  have an archive file on there.  Unfortunately, we
17  haven't been able to open the — the system, but my son
18  figured it out.  And he took a peruse through there and
19  couldn't find any — I asked him to look for an archive
20  file, and he couldn't find anything to do with this
21  issue.
22     Q.  Let me make sure I understand.  An archived
23  file, do you mean a file of e-mail correspondence?
24     A.  Uh-huh.
25     Q.  Or a file?

## 12

1      A.  Yes.
2      Q.  With electronic documents, like Word documents
3  or other documents?
4      A.  I asked him to look for any e-mails that might
5  have gone between my husband and KBR relating to this
6  issue, and he was unable to find anything.
7      Q.  Before your husband's passing, had you-all
8  considered the possibility of filing a lawsuit, this
9  lawsuit, to recover life insurance benefits?
10         I will give you the background as to why I
11  am asking the question.  What I would ultimately like to
12  learn is whether or not you-all ever anticipated that
13  this day would come and set aside documents or talk
14  about particular documents or issues that might arise in
15  the course of a lawsuit like this?  So my original
16  question was:  Had you-all ever considered the
17  possibility of litigation over the issue of entitlement
18  to life insurance proceeds?
19     A.  My husband considered — at the time that this
20  all happened in 2003, his priority was to — was to make
21  right what he felt was wrong.  And at that time, all of
22  the discussions that went on between him and KBR, the
23  energy was focused on let's just get me reinstated to
24  where I was before.
25         At some point later I know that he had

## 13

1  discussions with Bryan Blevins at Provost Umphrey.
2         MR. FISHER:  Those are going to be
3  attorney-client conversations, so we are not going to
4  speak about those.  So just tell the story, but leave
5  that part out.
6      A.  Did we have discussions about anticipated
7  litigation?  I don't remember sitting down and having
8  specific discussions about it.  And I don't know if
9  that's because when you are married to somebody that
10  long, you just read their minds anyway.  You kind of
11  know what their thought process was and vice versa.
12         Did we ever sit down and specifically talk
13  about it?  No.  And we didn't lay out a strategy.  You
14  know, he didn't come to me and say:  Look, this is what
15  you need to do.  This is A, B, C, and D.
16         But there is a lot thing things you don't
17  need to say, because you are married to somebody for
18  30 years.  You read their minds.
19     Q.  Do you believe that he believed that there
20  would be litigation?  Let me ask you again.
21         Although you-all may not have had a
22  specific discussion about the issue, is it your
23  impression that he believed that there would be
24  litigation?
25     A.  Yes.

4  (Pages 10 to 13)

GERALDINE  NICHOLAS

**14**

1  Q.  Over this issue?

2  A.  Yes.

3  Q.  And if I am understanding you correctly, he

4  never came to you and said here are some e-mails and

5  documents that you might find helpful in that litigation

6  or which relate to these issues or whatnot.  Am I right

7  about that?

8  A.  Correct.  He -- but he wouldn't have needed to

9  have done that, because he knew I could navigate my way

10  through his files.

11  Q.  Did you help him maintain those files, or

12  were -- was he the only one who --

13  A.  I helped him maintain those files.

14  Q.  Following your husband's passing, did you

15  contact KBR to ask about life insurance or -- or any

16  other benefits issues?

17  A.  I had to notify KBR of his passing.  Yes, I did

18  contact KBR.

19  Q.  How did you do that?  Was that by phone?  Was

20  that by writing?

21  A.  I asked them if they could locate -- it was

22  done by phone.  I asked them if they could locate the

23  document, the original document that my husband had

24  signed.

25  Q.  Which document are you referring to?  I think I

**15**

1  may know what you are referring to.

2  A.  February 1998.

3  Q.  And what was the response you got?

4  A.  They couldn't locate it.

5  Q.  Did you have any other conversation with

6  anybody at KBR relating to life insurance or the issues

7  in this case?

8  A.  They had a -- a person who called me who, I

9  guess when -- when an employee passes away, there is a

10  certain protocol that -- that is followed.  And I can't

11  tell you what this person's -- I don't remember her

12  name.  But it was her job to make sure that -- proceed

13  from a procedural standpoint that all the proper

14  paperwork is filed upon the death of an employee, and I

15  had some conversations with her about having to provide

16  things like death certificate and that sort of thing.

17  And I think it was her job to ensure that I knew I had

18  access to his 401(k) account, things like that, I think

19  general housekeeping sort of things.

20  Q.  In the course of that conversation, did you

21  talk at all about his or your entitlement to benefits

22  under the life insurance plan?

23  A.  No.  Entitlement, no.

24  Q.  Did you have any discussion about the group

25  life insurance plan at all, and if so, what did you talk

**16**

1  about?

2  A.  She asked me at one point -- she just called me

3  up one day and asked me do you think that there is a

4  life benefit in place.

5  And I told her, no, there is no life

6  benefit in place.

7  Q.  Anything else?

8  A.  No.

9  Q.  I did not see any documents in the documents

10  that were produced by your attorneys relating to any

11  written correspondence between you and KBR following

12  your husband's passing.  Are there any such documents?

13  A.  Not to my knowledge, no.

14  Q.  Hewitt Associates was KBR's outside benefits

15  administrator.  Do you recall speaking to anybody at

16  Hewitt following your husband's passing about benefits

17  issues at all?

18  A.  I believe that the person I was just talking

19  about -- I assumed that she was a KBR employee.  It's

20  possible she could have been a Hewitt.

21  Q.  But at any rate, you didn't make any separate

22  phone calls specifically to somebody who you knew was a

23  Hewitt employee to talk about any benefits issues

24  following his passing?

25  A.  No, I did not.

**17**

1  Q.  Following his passing, did you have any

2  conversations with any of the companies who at one time

3  or another insured the KBR group life insurance plan?

4  John Hancock is one of those companies.  Unum Provident

5  is another of those companies who was the actual insurer

6  of that plan.

7  Did you have any conversations with any of

8  those entities about participation in a life insurance

9  plan or entitlement to life insurance proceeds?

10  A.  No.

11  Q.  Your husband's illness is referenced in the

12  lawsuit in a couple different locations, and I want to

13  ask you a few questions about that.

14  My understanding is he had mesothelioma.

15  Is that right?

16  A.  Yes.

17  Q.  When was that discovered, and how was that

18  discovered?

19  A.  He was diagnosed on January of 1998.  He was

20  presenting with symptoms, cough and chest pain, and it

21  was actually diagnosed by his surgeon.

22  Q.  And was it his belief then or did he come to

23  believe that it was exposure to asbestos that had caused

24  that disease?

25  A.  Yes.

**5  (Pages  14  to  17)**

GERALDINE  NICHOLAS

**18**

1    Q.  And when had he been exposed to asbestos, as
2  best you knew?
3    A.  There were a number of occasions where he could
4  have been exposed to asbestos.  As to when or where,
5  I -- I would have to probably find his notebook and go
6  through his notes.
7    Q.  What did your husband do for M.W. Kellogg?
8  Let's start at the very end when he ceased active
9  employment with them.  What was his position with
10  M.W. Kellogg?
11    A.  He was in their sales and marketing group.
12    Q.  Do you know if he believed that he had been
13  exposed to asbestos at some point during his employment
14  with M.W. Kellogg?
15    A.  I don't know that, if he --
16    Q.  You don't know?
17    A.  I don't know, no.
18    Q.  Now, I assume at some point your husband
19  learned that the disease was considered terminal or he
20  was told that it was terminal.  Is that right?
21    A.  Correct.
22    Q.  Do you recall when that was?
23    A.  When he was diagnosed.
24    Q.  In January of 1998?
25    A.  Yes.

**19**

1    Q.  After the time he left active employment with
2  M.W. Kellogg, was your husband employed by any other
3  companies?
4    A.  After he left M.W. Kellogg?  No, he was not
5  employed by anyone else.
6    Q.  Did he receive disability benefits of any kind
7  from the government, whether that be the U.S. government
8  or a state government or the Canadian government?
9    A.  He received Social Security disability.
10    Q.  From the U.S. government?
11    A.  Yes.
12    Q.  Do you know if he received any other kind of
13  disability payment from government agencies?
14    A.  Not from government agencies.
15    Q.  He received disability benefits of some kind
16  under M.W. Kellogg benefit plans and then KBR benefit
17  plans.  Is that right?
18    A.  Yes.
19    Q.  Long-term disability benefits.  Is that right?
20    A.  Yes.
21    Q.  Do you know if he received disability benefits
22  under any other company plan?
23    A.  No.
24    Q.  I would like to ask you about some of the
25  documents that your attorneys provided to us.

**20**

1    (Nicholas exhibit No. 1 marked.)
2    Q.  Okay.  Ms. Nicholas, we just had a document
3  marked as exhibit 1, and I wanted to ask you some
4  questions about this.  I can tell this is the
5  February 19th, 1998, letter you referenced earlier.
6    Preliminary question, though:  Up at the
7  top right-hand side of the page on the first page of
8  this document, it has in handwriting attachment No. 1.
9  And I was trying to figure out what document that this
10  may have been attached to.  Do you know?
11    A.  Probably it's an attachment to a letter that I
12  would have sent Bryan Blevins.
13    Q.  The fax line up at the top of the page lists
14  November 14th, 2006, 1:36 p.m., James Nicholas.  Is that
15  the time at which you faxed this document to your
16  attorneys?  Am I --
17    A.  I am sorry.
18    Q.  -- interpreting that correctly?
19    A.  Where is this November 14th?
20    Q.  Up at the very top left-hand part of the page.
21    A.  Oh, okay, yeah.  I would have to say yes, just
22  by reading that.  As to whether I actually recollect
23  that that occurred, no.
24    Q.  Do you have any sense as to who else you may
25  have been faxing this document to in mid November of

**21**

1  2006?
2    A.  No.  That would have been going to Bryan
3  Blevins.
4    Q.  These three pages that we are looking at appear
5  to be Xeroxed copies of a fax.  I am assuming you are
6  not in possession of a Xeroxed copy of the original --
7  in other words, a copy, an unfaxed or a not faxed copy.
8  Am I right about that?
9    A.  I have -- I have a copy from which this one
10  originated from.  As to what kind of document it is, if
11  it's a copy of a copy of a -- I couldn't tell you.
12    Q.  Am I right you haven't been able to find in
13  your files or your husband's files page 1 of this
14  document?
15    A.  No.
16    Q.  Did you see this document on or around
17  February 19th, '98, or did you only come to learn of its
18  existence after that date?
19    A.  I came to learn of its existence after that
20  date.
21    Q.  Do you remember about when you first came to
22  know of the existence of this document?
23    A.  It would have been sometime during 2003.
24    Q.  Following the end of your husband's active
25  employment with KBR?

**6  (Pages  18  to  21)**

GERALDINE  NICHOLAS

## 22

1  A.  Correct.

2  Q.  If you will look with me on the first page of

3  this exhibit, top third of the page, there is a line

4  that says long-term disability plan, then there is a

5  full paragraph, and then it looks like at the end of

6  that paragraph, another -- it's very hazy.  Somebody

7  handwrote something in there?

8  A.  Uh-huh.

9  Q.  Do you know whose handwriting that is?

10  A.  That looks like my handwriting.

11  Q.  Do you recall the circumstances under which you

12  wrote something onto this document?

13  A.  No, I don't.  No, I don't.

14  Q.  You don't remember when that may have been?

15  A.  No.

16  Q.  What was -- what is your understanding as to

17  why your husband received this letter?

18  A.  I think he received this letter because he was

19  concerned about his benefits when he went on long-term

20  disability and wanted to ensure that his benefits were

21  secure.

22  Q.  And is your understanding based on a

23  conversation or conversations with your husband?  Is

24  that how you developed that impression of the

25  circumstances under which he received this letter?

## 23

1  A.  Again, you know, it's -- you know, I

2  specifically don't recall sitting down and having a

3  conversation at this point or that point.  And so where

4  does the general overall impression come from?  It would

5  have had to have come from either discussions we had or

6  documents I read or, you know, papers I found in his

7  file, things that he could have said to me, but

8  specifically can I recall sitting down and having

9  discussions?  I can't specifically recall.

10  Q.  And to repeat myself a little bit, I just want

11  to make sure I understand this, though.  It wasn't until

12  sometime in 2003 that you knew that this document even

13  existed.  Is that right?

14  A.  The only thing that I knew existed was that I

15  knew that he -- my husband was very meticulous about how

16  he conducted his affairs.  He was a person that dotted

17  his I's and crossed his T's.  And so because he did

18  that, I -- I didn't really feel the need to participate

19  in certain aspects of things that were related to his

20  employment.

21  And so I mean, it's quite possible that he

22  would have shown this document to me, but I honestly

23  don't recall sitting down and looking at this and going,

24  oh, yes, I remember that document from 1998 and he

25  showed it to me and we read it together.  I don't

## 24

1  remember that.

2  Q.  On the third page of the letter -- it's the

3  third page of what we have -- it is a page 4 on the

4  upper left-hand corner of the actual document itself,

5  but it's signed by somebody named Tashi Theisman.  Have

6  you ever had a discussion with Tashi Theisman?

7  A.  No.  I know who she is, but I don't -- I have

8  never spoken to her.

9  Q.  Other than the fact that she signed this

10  document -- let me ask it a different way.

11  How did you come to know of Tashi

12  Theisman?

13  A.  Well, when I read her name in the document, I

14  wanted to know who she was, so you know, she is

15  supervisor of health and welfare.

16  Q.  So your knowledge of Tashi Theismann comes from

17  the fact that she signed this document.  You haven't had

18  any other conversations with her or any other reason to

19  interact with her, I take it?

20  A.  No, I have never interacted with her, and I

21  never talked to her, no.

22  Q.  Do you know if your husband had any subsequent

23  correspondence with Tashi Theismann about this letter or

24  the subject of this letter?

25  A.  I am not aware of any, and I can't -- I don't

## 25

1  have -- I was hoping there would have been an archived

2  file of e-mails, but there isn't.  So I am not aware of

3  any.

4  Q.  If you will turn to the second page in this

5  three-page packet, Nicholas -- the -- in the first

6  paragraph, the last line, it says reference page 53 of

7  benefit reports for information on conversion of

8  coverage.  Do you see that section?

9  A.  Uh-huh.

10  Q.  Have you seen the document called benefit

11  reports, or do you have a copy of it?

12  A.  No.

13  Q.  Do you know?

14  A.  No.

15  Q.  No to -- I asked you two questions, I guess.

16  No to both?

17  A.  No, I don't have -- I have never seen the

18  benefits reports, and no, I don't have access to it.

19  Q.  Are you in possession of any M.W. Kellogg

20  benefit plan or summary benefit plan?

21  A.  It's quite possible that I might have a

22  benefits booklet left over from a prior year, but I

23  don't know.

24  Q.  So you might have an M.W. Kellogg benefits

25  booklet from a prior year as we -- and as we sit here

7  (Pages 22 to 25)

## 26

1    today, can you think of any other benefit plan or

2    M.W. Kellogg benefit-related document that you might

3    have in your possession?

4       A.  No.

5       Q.  Now, after February 19th, 1998, did your

6    husband ever return to work with M.W. Kellogg?  When I

7    say return to work, I mean active employment, actually

8    performing services for M.W. Kellogg.

9       A.  He was diagnosed in January of '98.  This would

10   have been February.  He continued to -- he set up an

11   office at home, and he continued to visit his office and

12   he -- I don't know what he did specifically there when

13   he was there, but he did occasionally go to his office.

14   And it wasn't -- it wasn't full-time.  It was as he felt

15   the need or as he felt he was able to, and I don't

16   recall, like, how often that was or --

17      Q.  He was receiving treatments of some kind, I

18   take it, at that point?

19      A.  Yes.

20      (Nicholas exhibit No. 2 marked.)

21      Q.  I show you what's been marked as exhibit 2,

22   Ms. Nicholas.  Do you recall where you located this

23   document among your husband's papers?

24      A.  This one?

25      Q.  Yes.

## 27

1      A.  No, I don't remember where I located it.

2      Q.  Had you seen this document before you were

3    gathering documents for this lawsuit?

4      A.  I don't remember.

5      Q.  Do you have any recollection of seeing a copy

6    of this e-mail on or around December 4th, 1998?

7      A.  No.

8      Q.  So if I am understanding you correctly, to the

9    extent you were aware of this before this lawsuit, it

10   would have been after December of 1998 sometime?

11      A.  To the extent that I was -- would you say that

12   again?

13      Q.  I will ask a different question.

14      You don't have a recollection of reviewing

15   this e-mail or consulting with your husband about it in

16   December of 1998.  Am I right about that?

17      A.  Correct.

18      Q.  And you don't remember the precise

19   circumstances under which you became aware that this

20   exists?

21      A.  No, I don't remember the precise circumstances.

22      Q.  About two thirds of the way down the page on

23   the first page of this, you know, there is a paragraph

24   numbered one.  It says we have agreed that you will

25   remain, et cetera, et cetera.

## 28

1      At the bottom of that paragraph, there is

2    some handwriting.  It says:  i.e., need to do STD before

3    1 January, 1998.

4      Do you know whose handwriting that is?

5      A.  That's my husband's handwriting.

6      Q.  And if you will look on the second page of this

7    document, there is a paragraph 9 in the middle of the

8    page, and there is some very hazy handwriting out to the

9    right-hand side of that paragraph.  Any idea whose

10   handwriting that is?

11      A.  That's mine.

12      Q.  Do you know what that says?

13      A.  What it says?  No.

14      Q.  Do you know who --

15      A.  Wrote it?

16      Q.  -- wrote it?

17      A.  No.

18      Q.  What about a little higher on the page,

19   paragraph 7?  There is a question mark on the left-hand

20   side of that paragraph.  Do you know -- did you write

21   that question mark?

22      A.  No, I didn't write that.

23      Q.  Do you have an understanding as to why your

24   husband was negotiating the agreement that's referenced

25   in this e-mail?

## 29

1      A.  Yes.

2      Q.  And what is that understanding?

3      A.  He was trying to secure his benefits.

4      Q.  I assume this was -- I will ask a different

5    question.

6      That understanding you just described to

7    me that he was trying to preserve his benefit, is that

8    understanding based on conversations you had with your

9    husband or documents you reviewed months or years after

10   December 4th, 1998?

11      I mean, another way to ask it is:  Your

12   understanding is not based on your husband coming to you

13   on or about December 4th of 1998 and saying, "Hey, this

14   is what I am doing.  This is why I am doing it"?  Does

15   that make sense?

16      A.  No, because you are asking me to -- to recall

17   on something that happened so long ago.  And impressions

18   that form over a period of eight years, to ask me now,

19   when did the impression first -- what was your first

20   clue, is -- you know, it's -- that's --

21      Q.  That's fair.  That's fair.  You can't recall?

22      A.  You are asking me for something specific and

23   specific recall on a detail that, you know, it's an

24   opinion that forms over many years.  And it's like,

25   well, when did you first start forming this opinion.

8  (Pages  26  to  29)

GERALDINE  NICHOLAS

## 30

1  And I am not going to be able to tell you that it was on
2  February 4th, 1998, at 6:00 p.m.
3      Q.  Perfectly fair.
4      A.  You know, it's just -- this is just an overall
5  impression that evolves.  And did it evolve because I
6  read a document in the file in 2006, or is it a -- is it
7  because conversations that I had -- you know, happened
8  prior to that?  I would have to say the latter because
9  his benefits were always in place, and I knew that was
10  of utmost importance to him.
11      Q.  Up at the top of the first page of this
12  document in the second paragraph of the letter -- of the
13  e-mail, which as best I can tell came from Jim Wilhite
14  and went to your husband, the paragraph reads:  This
15  letter hasn't been easy to construct since your
16  circumstances are unique and different from the other
17  people who are also leaving the company.
18          As we sit here today, do you have any idea
19  what the sentence is referring to, the portion that
20  refers to the other people who are also leaving the
21  company refers to?
22      A.  I don't know who they are, but I can render an
23  opinion.
24          Looking at the time frame that this was
25  happening was the time that Dresser Industries merged

## 31

1  with Halliburton.  And I would think that it was
2  probably -- there were probably a lot of people exiting
3  the company from M.W. Kellogg, and so he was probably
4  referring to in the total pool of everybody that's
5  leaving, you are different because you are sick.  And
6  probably everybody else that's being asked to leave is
7  for that reason, is because we have -- it's a merger and
8  you don't have a job anymore.  That's how I read this.
9      Q.  Do you know, Ms. Nicholas, prior to this
10  date -- and I am asking you again for a -- to recall
11  something that, in all fairness, you may not be able to
12  recall, but I am going to ask the question anyway.
13          Do you know if prior to this date,
14  December 4th, 1998, your husband had threatened or
15  suggested to anybody at M.W. Kellogg that he may pursue
16  legal action against them based on alleged exposure to
17  asbestos?
18      A.  I am not aware that he had made that threat.
19  No, I am not aware of it.
20      Q.  And just to make sure, is this the only e-mail
21  correspondence that you have been able to find in your
22  possession between Jim Wilhite and your husband, period?
23  Is this the only piece of e-mail correspondence that you
24  have been able to find in your possession between Jim
25  Wilhite and your husband?

## 32

1      A.  I know that there were lots of e-mails that
2  went between Jim Wilhite and my husband, but I don't
3  have -- you know, I don't have a file.
4      Q.  And that was my question.
5      A.  Yeah.
6      Q.  They are no longer in your possession?
7      A.  No.  If there are any -- I don't recall any
8  other, but if there are any others, then they would have
9  gone to my attorney and been forwarded you.
10          (Nicholas exhibit No. 3 marked.)
11      Q.  Ms. Nicholas, do you recall where, amongst the
12  files in your house, exhibit 3 was located?  If you
13  can't recall, that's fine.  I was curious.
14      A.  It would have had to have come from one of my
15  husband's files.
16      Q.  Do you recall, was it in the special file
17  relating to KBR or life insurance issues that you
18  mentioned earlier?
19      A.  No.
20      Q.  You don't know, or are you saying it was not in
21  that file?
22      A.  I don't know where it came from.
23      Q.  Before gathering documents for this lawsuit,
24  had you seen a copy of this letter before?
25      A.  No.  I might have seen it, but whether or not

## 33

1  it registered as something I needed to remember because
2  you were going to ask me, no, I don't recall.
3      Q.  And I will ask you, you know, a similar
4  question to the one I asked about the e-mail from
5  December of 1998:  Do you have any recollection of
6  discussing this exhibit your husband in December of 1998
7  or around the time that he signed this letter agreement?
8      A.  No, I don't recall any specific discussions
9  that we had had.
10      Q.  And do you recall around the time frame on
11  which you first became aware of this document?  If you
12  can't recall, that's fine.
13      A.  Well, I was looking at this fax.
14      Q.  Just curious?
15      A.  Attached fax on April 27th, so if I am faxing
16  this document to Greg Cox, then I am assuming that it
17  wasn't in his file.  So I would have probably found this
18  document at some time around this time.
19      Q.  I apologize if this is repetitive of portions
20  of earlier questions, but just so I have it clear in my
21  own mind, do you recall having any discussion with your
22  husband about what is exhibit 3 or what it means or what
23  he thought it meant?
24      A.  Not about this specific document, no.
25      Q.  The date of the document is December 24th,

9  (Pages  30  to  33)

GERALDINE  NICHOLAS

---

**34**

1  1998.  Do you recall whether your husband performed any
2  services at all for M.W. Kellogg after that date?  You
3  had mentioned earlier that you thought after the
4  February '98 letter he may have done some work at home,
5  may have gone into the office from time to time.
6  　　　Do you know if that continued after
7  December 24th, 1998?
8  　　A.  1998 going into '99, we moved in '99.  I was
9  not aware of any services performed after this date.
10  　　Q.  You moved from the Houston area to
11  Newfoundland?
12  　　A.  Yes.
13  　　Q.  Do you know if while in Newfoundland your
14  husband performed any services for either M.W. Kellogg
15  or Halliburton or KBR?
16  　　A.  No, he did not, not that I am aware of.
17  　　Q.  Do you know if your husband had any
18  correspondence with Jim Wilhite after the date of this
19  letter agreement?
20  　　A.  I don't know.
21  　　Q.  Do you know if he had any correspondence with
22  anybody at M.W. Kellogg or KBR about this agreement
23  after it was signed?
24  　　A.  He had many discussions with M.W. Kellogg
25  people.  As to specifically if it was about this

---

**35**

1  document or about, you know, a document prior to it or
2  after it, I don't know, but he had plenty of
3  discussions.
4  　　Q.  Discussions relating to his benefits?
5  　　A.  Uh-huh.
6  　　Q.  And what his benefit package was, is that what
7  you are referring to?
8  　　A.  Yes.
9  　　Q.  On the first page of this document, in
10  paragraph 5, it says on January 1st, 1999, you will be
11  paid a onetime lump sum payment in an amount equal to
12  your current annual based salary and incentive
13  compensation.
14  　　　Do you recall your husband receiving a
15  lump sum payment —
16  　　A.  Yes.
17  　　Q.  — referenced?
18  　　A.  (Witness moves head up and down.)
19  　　Q.  Do you know if he ever received any subsequent
20  severance payments from M.W. Kellogg?
21  　　A.  No.
22  　　Q.  You don't recall, or no, he did not?
23  　　A.  I don't recall, and I don't think he did.
24  　　Q.  After this date — so starting December 25th of
25  1998, up until the time the — until the time your

---

**36**

1  husband learned that he was no longer considered
2  eligible under the group life insurance plan, the KBR
3  group life insurance plan, did you-all pay premiums for
4  the life insurance coverage?
5  　　A.  Yes.
6  　　Q.  As of the time that you were informed he was no
7  longer participating in the plan — I am not sure when
8  that was, although we can figure it out, most likely,
9  after that time, do you recall paying any premiums for
10  the life insurance coverage?
11  　　A.  He received notification of termination of
12  benefits.  The document was dated in January of '03.
13  His benefits were prepaid for January, February, and
14  March of '03.
15  　　Q.  Including life insurance?
16  　　A.  Including life insurance.
17  　　Q.  So, then, subsequent to that, whenever that
18  prepayment was made, do you know if you-all made any
19  further premium payments for life insurance coverage
20  under the KBR group life insurance —
21  　　A.  Not after that prepayment.
22  　　　(Nicholas exhibit No. 4 marked.)
23  　　Q.  If you could take a look at what we marked as
24  exhibit 4, Ms. Nicholas, I assume this is a document you
25  received prior to the time — obviously prior to

---

**37**

1  January 2003, in which you were notified that the
2  benefits had been cut off.  Is that right?
3  　　A.  Uh-huh.
4  　　Q.  Just for the record —
5  　　A.  Yes.  Sorry.
6  　　Q.  On the second page of the document up at the
7  top, there is a row that says — the very first row says
8  optional life insurance.  It lists an annual price and a
9  monthly price.
10  　　　To your recollection, is that monthly
11  price consistent with the monthly premium that you-all
12  had been paying for the group life insurance coverage?
13  　　A.  Yes.
14  　　　(Nicholas exhibit No. 5 marked.)
15  　　Q.  If you could take a look at exhibit 5,
16  Ms. Nicholas, the — I know that the first sentence of
17  this letter says as a result of your termination on
18  January 2nd, 2003, et cetera, et cetera.  Is this letter
19  the first time that you learned that Mr. Nicholas —
20  that your husband's KBR benefits had been cut off?
21  　　A.  Yes.
22  　　Q.  What was your understanding as to why he had
23  received this notice?
24  　　A.  When he received this notice, which would have
25  been later, of course, than the date here, he called the

---

10  (Pages  34  to  37)

GERALDINE NICHOLAS

38

1 KBR benefits people and he was told that there was a
2 terrible mistake and they would fix it, leave it in
3 their hands.
4     Q.  As we sit here today, do you recall him
5 learning any other information about why he had received
6 this notice other than that there had been a terrible
7 mistake?
8     A.  The impression that he got from the
9 conversation with human resources was, oops, that was an
10 accident, paperwork problem.  We will fix it.  Don't
11 worry.  We will take care of it.
12         (Nicholas exhibit No. 6 marked.)
13     Q.  Ms. Nicholas, this exhibit 6, which as best as
14 I can tell is a copy of a printout of an e-mail, is this
15 the format that's in your possession right now?
16     A.  Yes.  It was my husband's way of conserving
17 paper.  He would shrink and put multipages on a page.
18     Q.  So you understand that — or it's your
19 impression that he printed out this e-mail, then shrunk
20 it down, copied it on this page, and preserved it for
21 the records?
22     A.  Yes.
23     Q.  Prior to the time you were gathering documents
24 for this case, do you recall seeing a copy of this
25 e-mail?

39

1     A.  It seems very familiar to me.  I probably did
2 see it.  Again, it's difficult to say.  Yeah, it's
3 familiar because I — you know, I had to put my file
4 together or is it familiar because I saw it then.  I —
5 I think I do recall seeing it then.  My memory is better
6 with — this is more recent.
7         (Nicholas exhibit No. 7 marked.)
8     Q.  Ms. Nicholas, exhibit 7 appears to be a copy of
9 a printed e-mail that originally came from Jim Wagner.
10 Do you know how your husband knew of Jim Wagner or why
11 it was Jim Wagner who was responding to your husband's
12 concerns about his benefits?
13     A.  Because Jim Wilhite was no longer with the
14 company.
15     Q.  And your husband learned that Jim Wagner had in
16 some way replaced —
17     A.  He was the new Jim Wilhite.
18     Q.  Down toward the middle of the page, there is a
19 paragraph of handwriting.  Is that your handwriting?
20     A.  Uh-huh, yes.
21     Q.  Do you recall if you handwrote this note around
22 the time that it's listed at the front of the note,
23 which is 10-7-03, it looks like?
24     A.  Yes.  I would have — just the way I do things,
25 I would have handwritten that note at the time it

40

1 happened.  I would not have recalled that detail at some
2 later date.
3     Q.  Toward the bottom of your handwritten
4 paragraph, it says — this is the fifth line down —
5 also told Wagner in detail about Hartford.
6         Do you recall what that's all about, what
7 the issue with Hartford was?
8     A.  Hartford was the disability insurance company
9 and they were taking issue with Jim being — actually
10 being on disability with a terminal illness, and what it
11 all boiled down to was if you have a terminal disease
12 and you have survived this long, we think you should go
13 back to work.
14         And they sent a person, an investigator,
15 to come and meet with him and interview him, and they
16 subsequently — I won't say asked, because they said it
17 was mandatory that he subject himself to a very lengthy
18 physical by a physician of their choice.  And my husband
19 complied with that.  And the physician wrote a very
20 lengthy report that we were not privy to at the time,
21 but later received a copy through our own physician that
22 basically said that he is unable to work and the issue
23 was resolved.
24     Q.  And so Hartford either resumed or continued?
25     A.  They continued his disability, yeah.  There was

41

1 never any interruption to his disability benefits.  The
2 best I can figure is that they probably have a certain
3 protocol that they follow, and when somebody is on
4 disability for X number of years, they probably have
5 additional forms that need to be filled out and extra
6 boxes that need to be checked.  And I think he just fell
7 into that time frame and somebody had to, you know, look
8 at his case a little closer.  And my husband felt he
9 was — he just felt he was being harassed because it was
10 a very invasive sort of process, having somebody come
11 into your home and ask you questions for two hours.
12         And those discussions that he would have
13 had with Wagner would have been more from a human
14 resources perspective, you know, is this customary, is
15 this appropriate, is this, you know — is this
16 harassment, or is this necessary, those kinds of things.
17     Q.  So other than exhibits 6 and 7, the two e-mails
18 back and forth between Jim Wagner, are you in possession
19 of any other papers or e-mail communications to or from
20 Jim Wagner?
21     A.  If I am in possession of them, you are, as
22 well, so you may have another exhibit further down on
23 e-mail that I don't recall, but I am not — you know, I
24 don't have anything that I haven't forwarded on.
25     Q.  Thanks.  I know the questions seem tiresome,

11  (Pages 38 to 41)

GERALDINE NICHOLAS

42

1  but I appreciate it.

2     MR. MUSKAT: How about if we take a

3  five-minute break?

4     (Recess from 10:42 to 10:58 a.m.)

5     (Nicholas exhibit No. 8 marked.)

6     Q.  (By Mr. Muskat)  I am going to ask you about

7  exhibit 8, after marking exhibit 9.  And they might kind

8  of go together.

9     (Nicholas exhibit No. 9 marked.)

10    Q.  Ms. Nicholas, exhibit 8, a letter from KBR,

11 Martin Eichler, dated October 16, 2003, and then

12 exhibit 9 is a copy of an e-mail that your husband sent

13 to Jim Wagner raising the issue of being reinstated for

14 under the life insurance plan.

15       Do you know -- other than exhibit 9, do

16 you know if your husband made any other written response

17 to KBR following receipt of exhibit 8, the October 16,

18 2003, letter to Martin Eichler?

19    A.  I don't know.

20    Q.  I take it exhibit 9 is all that you have been

21 able to locate in the files that --

22    A.  If that's what you see, yes.

23    (Nicholas exhibit Nos. 10 and 11 marked.)

24    Q.  Exhibit 11, Ms. Nicholas, consists of five

25 pages.  The first page is just kind of a half page.  Is

43

1  that the way the document looks in your files at home,

2  do you know, or is this -- was this a copying error

3  perhaps, subsequent copying error?  It appears to me to

4  be the copy -- it looks like there is something below

5  the last line.  Do you have the same document?  It's

6  dated July, question marks, 2004.  It's "draft" across

7  the top.

8     A.  Yeah.

9     Q.  If you compare it to the next page --

10    A.  Uh-huh.

11    Q.  -- within exhibit 11 --

12    A.  Oh -- it looks like it's --

13    Q.  It appears to be a copy, perhaps, a copy of the

14 next page in exhibit 11.  I am just trying to figure

15 out, you know, what -- what's going on here.  Did you

16 just happen to have a -- this first page in your files,

17 or is it screwed up by the copier?

18    A.  I think it is a copy screw-up, because they are

19 both -- they are both labeled attachment No. 10, page 1

20 of 2, and if -- if it were a separate document, then it

21 would be attachment No. something else.

22    Q.  Okay.  So then the second and third page within

23 exhibit 11 -- let me ask you about those pages.  The

24 first page is marked draft?

25    A.  Uh-huh.

44

1     Q.  Date says July, question mark, question mark,

2  2004.  Do you know if there was ever a final version of

3  this letter that was created and sent to Martin Eichler?

4     A.  I don't think so.  I think that my husband got

5  to the draft stage and didn't get beyond it.

6     Q.  And why is that your impression of things at

7  this point in time?

8     A.  What wasn't apparent to me at the time that it

9  was happening that became apparent to me when I reviewed

10 the file was that the trend that I saw as I did -- the

11 pattern that I saw emerging as I reviewed the file in

12 chronological order was that my husband was very --

13 seemed to be very -- and true to his personality,

14 meticulous about how he did things and thoughtful and

15 whatnot.  And as time progressed and his disease

16 progressed, perhaps not less thoughtful, but less

17 meticulous because he would start something and be

18 unable to finish it.

19    Q.  So if I am understanding you correctly, your

20 impression was -- is, that he started this letter, but

21 just because of his -- the progression of his disease --

22    A.  Yeah.

23    Q.  -- simply did not see it through to the end and

24 send it to KBR.  Am I understanding you correctly?

25    A.  Correct.  And it was very -- he was in a lot of

45

1  pain.

2     Q.  It's possible that a final draft was created

3  and sent, or do you believe that there was no final

4  draft?

5     A.  I don't think there was because I think that if

6  there was a final draft sent, I would have seen -- I

7  would have seen -- physically seen something in the

8  file.  It's possible, but I don't think.

9     Q.  If you will look at the second page of the

10 letter, it's the third page of exhibit 11 down at the

11 bottom.  It says very truly yours, James E. Nicholas,

12 and then there is 2 ccs and a bcc.  I am familiar with

13 Jim Wagner, first cc.  Do you know who Ken Allan is?

14 Who is the second cc?

15    A.  Ken Allan would have been a KBR employee.  He

16 was, I believe, like, vice-president of worldwide sales.

17    Q.  Somebody that your husband had known from his

18 days at M.W. Kellogg?

19    A.  My husband would have worked in his

20 organization.

21    Q.  And then the bcc, do you know who Phil Tevis

22 is.

23    A.  Phil Tevis was an executive with Dresser, had

24 been a Kellogg person prior to his promotion at Dresser.

25 And he is also a close personal friend.

12  (Pages 42 to 45)

GERALDINE NICHOLAS

## 46

1     Q. Not somebody who is in HR or benefits, but on
2 the operator business side of things like your husband?
3     A. Yes.
4     Q. Do you happen to know where Phil Tevis is
5 today? Do you have his current contact information?
6     A. Uh-huh, I do. Yes.
7     Q. Do you know if he is still employed by KBR?
8     A. No.
9     Q. He is not?
10     A. No, and was not at that time.
11     Q. The third full paragraph on the second page
12 starts with a sentence that says I feel it is KBR's
13 responsibility to encourage John Hancock to reinstate my
14 life insurance since KBR terminated me in error.
15     Do you know if your husband ever contacted
16 John Hancock directly about the potential reinstatement
17 of his life insurance?
18     A. No.
19     Q. You don't know or —
20     A. No, he did not contact them.
21     Q. Okay. I believe that Unum Provident is an
22 insurer that was the successor to John Hancock as the
23 insurer of the KBR group life insurance program. Do you
24 know if your husband ever — let me ask: Did your
25 husband ever contact, to your knowledge, Unum Provident

## 47

1 about the reinstatement of his life insurance?
2     A. No, because he didn't know who they were.
3     Q. After January of '03, which is when I
4 understand your husband got the notice about his
5 employment being ended and the life insurance being cut
6 off, do you know if he received any kind of a conversion
7 notice from KBR or from any insurance company that
8 talked about converting to an individual life insurance
9 policy?
10     A. No, he did not.
11     Q. Do you know if he ever pursued that option with
12 KBR or any life insurance company? What I mean is
13 inquired about the possibility of converting to an
14 individual life insurance policy?
15     A. No, he did not, because he was told he was
16 going to be reinstated initially, so he didn't feel the
17 need to do anything.
18     (Nicholas exhibit No. 12 marked.)
19     Q. Ms. Nicholas, as best I can tell, this is an
20 e-mail that your husband received providing him with
21 some input and advice about his situation from Phil
22 Tevis. Do you know if there is — if your husband
23 responded to this e-mail or had any subsequent written
24 correspondence with Mr. Tevis about his situation?
25     A. I don't have any specific recall of subsequent

## 48

1 e-mails.
2     Q. Do you recall your husband having one or more
3 conversations with Mr. Tevis seeking his, you know,
4 input or advice as to how to handle the situation?
5     A. He probably did have discussions with him.
6     (Nicholas exhibit 13 marked.)
7     Q. Exhibit 13, Ms. Nicholas, is a copy of a letter
8 from Halliburton's in-house lawyer. Had you seen this
9 letter before gathering documents for this case?
10     A. Yes, I think I did.
11     Q. Do you recall when this letter first came to
12 your attention?
13     A. Well, you can look at the date. Probably
14 around that time of the date of this letter, I would
15 say.
16     Q. Do you know if your husband, after the date —
17 after receiving this letter — let me start over.
18     After he received this letter, do you know
19 if your husband had any subsequent correspondence with
20 anybody at KBR or Halliburton about his participation in
21 the group life insurance plan?
22     A. I don't know.
23     Q. After he received this letter, do you know if
24 your husband contacted John Hancock or any other insurer
25 directly about participating in KBR's group life

## 49

1 insurance plan?
2     A. No, he did not contact them.
3     Q. Do you know if he contacted John Hancock or any
4 other insurer about attempting to convert to an
5 individual policy after he received this letter?
6     A. No, he did not.
7     (Nicholas exhibit No. 14 marked.)
8     Q. Ms. Nicholas, is this the only letter you
9 personally recall sending to Jim Wagner or anybody else
10 at KBR about insurance matters?
11     A. I don't know. I don't think I would have — I
12 would have — I don't think I would have discussed any
13 other insurance matters with him, other than the direct
14 reimbursement of medical premiums.
15     Q. So am I correct you don't recall having any
16 other verbal or written correspondence with Jim Wagner
17 about anything other than reimbursement of some of the
18 bills?
19     A. I think that if there had to be discussion, I
20 think my husband would have had that discussion.
21     (Nicholas exhibit No. 15 marked.)
22     Q. Ms. Nicholas, this appears to be a copy of a
23 brochure booklet of some kind handed out by Halliburton.
24 Is that your handwriting in the top right-hand corner of
25 the first page?

13 (Pages 46 to 49)

GERALDINE  NICHOLAS

50

1     A.  Yep.
2     Q.  And it has the date 1-6-2003 on it.  As best
3  you can recall, is that the date that you or your
4  husband received this brochure?
5     A.  No.  That was the date of the COBRA
6  announcement.  That document was dated 1-6, so I was
7  cross referencing.
8     Q.  There is a bunch of pages stapled together
9  here.  But as best I can tell in the packet of stapled
10  pages, it's just the first two pages that are taken from
11  this Halliburton benefits 2000 booklet or brochure.  Do
12  you know if at any time you had the whole booklet or
13  brochure?
14     A.  Never had the whole booklet.  This is what came
15  in the mail.  This was a photocopy of what came in the
16  mail.
17     Q.  So you received -- all of the pages that are a
18  part of exhibit 15, you received attached together in
19  the mail?
20     A.  Yes.
21     Q.  Do you know -- subsequent to the time you
22  received these documents, do you recall your husband
23  receiving any other brochures, pamphlets, booklets,
24  summaries that described his benefits through KBR or
25  Halliburton?

51

1     A.  No.  There were a number of documents that came
2  in around this time frame.  The first one was the COBRA,
3  and the COBRA came addressed to James Nicholas and
4  family, and a separate COBRA letter came addressed to me
5  and family.  I remember this one, Since You Are Leaving,
6  but there were no -- I don't recall books or, you know,
7  that sort of thing coming, no.
8     (Nicholas exhibit No. 16 marked.)
9     Q.  Ms. Nicholas, these are copies of your
10  responses to the document requests that we served.  And
11  these were sent to us, I think, several weeks ago.  I
12  would just like to walk through a couple of them and
13  make sure I understand the response and what documents
14  may or may not exist.
15     Under No. 5, request No. 5, that's a
16  request for all calendars, daytimers, journals, diaries,
17  notes, or other documents from 1998 to the present which
18  were maintained, written, or created by James Nicholas
19  or plaintiff, which is you, or on the behalf, which
20  contain any information which relates to plaintiff's
21  claim in this lawsuit.
22     Response is plaintiff has not been able to
23  locate any responsive documents in this.  Plaintiff will
24  supplement if necessary.
25     As we sit here right now, are you aware of

52

1  any of these kinds of documents that may be in your
2  possession, calendars, daytimers, journals, diaries, or
3  notes that relate to the claims in the lawsuit?
4     MR. FISHER:  I have some notes she just
5  gave me this morning.  There are some privileged
6  communications written down on there, so I just need to
7  look at them, redact them, and I will forward those to
8  you as soon as I have a chance to read over them and
9  redact it.
10     MR. MUSKAT:  Let's go off the record.
11     (Recess from 11:22 to 11:23 a.m.)
12     Q.  (By Mr. Muskat)  I think I will hold off on
13  asking any more questions about the document requests
14  until we have a chance to see those.  There just doesn't
15  seem to be any point of going through here without
16  seeing what she supplemented.
17     MR. FISHER:  A lot of it is just kind of a
18  note, a recap of conversations, you know, call logs from
19  so-and-so today, here is what they say.  It's just that
20  kind of stuff.  Then there is some spoke with my
21  attorney, here what is she said.  So I need to get that
22  out.
23     MR. MUSKAT:  Sure.
24     (Nicholas exhibit No. 17 marked.)
25     Q.  (By Mr. Muskat)  Ms. Nicholas, this is a copy

53

1  of your amended lawsuit.  And I had some questions about
2  some of the allegations in here.  Let me start with
3  page 7, paragraph 23.  The first sentence in that
4  paragraph -- I will just read it for the record -- says
5  as detailed above, defendants made material
6  representations of fact which were false.  Defendants
7  knew that these representations were false or made them
8  recklessly without knowledge of their truth or falsity.
9     Can you tell me the facts that make you
10  believe that the representations that were referenced
11  earlier in the complaint were knowingly false or
12  recklessly made?
13     MR. FISHER:  Object to the form.
14     You can answer.
15     THE WITNESS:  I am sorry?
16     MR. FISHER:  I said you can answer.
17     A.  Well, let me take my time and read this so that
18  I know what I am talking about.
19     Q.  (By Mr. Muskat)  Take all the time you need.
20     MR. FISHER:  You can start on page 3.
21     MR. MUSKAT:  I don't know if this will
22  address your objection, but instead of trying to
23  rephrase that sentence as I did, let me just restate my
24  question, which is what are the facts that underlie the
25  first sentence in paragraph 23.

14  (Pages 50 to 53)

GERALDINE  NICHOLAS

**54**

1    MR. FISHER:  Again, I will have the same
2  objection as to the form of the question.  I guess the
3  basis is that I think it's overbroad.  I think tell me
4  everything you have to support your case is too broad of
5  a question.
6    Q.  (By Mr. Muskat)  Just so the record is clear, I
7  now realize I am talking about the second sentence in
8  paragraph 23, not the first sentence.  I understand your
9  objection will still apply, but just to make that clear.
10    A.  What is your question again?
11    Q.  I want to know the facts that provide the basis
12  for the second sentence in paragraph 23, which is that
13  defendants knew that these representations were false or
14  made them recklessly without knowledge of their truth or
15  falsity?
16    A.  My understanding of the agreement that my
17  husband had with his employer was that when he went on
18  medical leave, he felt it necessary to preserve his
19  benefits -- i.e., his medical benefits and his life
20  insurance benefits.  And he was assured that this --
21  those benefits would remain in place as long as he met
22  the requirements of his disability.  That was his
23  understanding.
24    In addition to that, he also knew that he
25  had had asbestos exposure and that in exchange for his

**55**

1  agreeing not to ever sue his employer, he traded that
2  for what he considered a very valuable asset, and that
3  valuable asset was his medical benefits and life
4  insurance.
5    Q.  Do you believe that Jim Wilhite or others at
6  KBR who made that agreement that we reviewed on
7  December 24th of '98 or Tashi Theismann, who sent the
8  letter in February of '98 -- do you believe they lied
9  knowingly, misrepresented facts knowingly to your
10  husband or lied to your husband at the time that they
11  sent those letters?
12    A.  I think they were doing their job.  They
13  were -- I don't --
14    MR. FISHER:  Form of the question.
15    Go ahead.  I just want to interpose an
16  objection.
17    A.  I don't know that they were setting out to -- I
18  think that they were doing their job, and everybody had
19  come to agreement.  I think the problem happened in
20  2003.
21    Q.  (By Mr. Muskat)  As opposed to in 1998?
22    A.  I don't know.  I can't -- I can't speak for
23  what -- I can't speak for their motives or what they
24  were thinking.  I --
25    Q.  And that was what I was getting at, and that's

**56**

1  the purpose of my question, was to understand whether
2  you had any reason to believe that those two individuals
3  or anybody else at KBR lied to your husband in 1998 or
4  knowingly made misrepresentations to him in that time.
5    MR. FISHER:  Form.
6    Go ahead.
7    A.  I have no reason to believe that, but then how
8  would I be in a position to be able to judge that?  I
9  didn't talk to them.  I didn't deal with them.  I
10  didn't....
11    Q.  (By Mr. Muskat)  Okay.
12    A.  I think that if my husband had felt that he was
13  being lied to or misrepresented, I think that he would
14  have done something about it.  I don't think that he
15  would have signed anything.
16    Q.  This paragraph 23 that references fraud and the
17  inducement, what is the relief that you are seeking for
18  this claim?
19    A.  I don't understand the question.
20    MR. FISHER:  You don't have to know the
21  answer.
22    A.  I don't know.
23    MR. FISHER:  No one would expect you to
24  know.
25    Q.  (By Mr. Muskat)  Okay.  Paragraph 29 it states

**57**

1  that -- this is one of the examples of your
2  specification of the relief that you are seeking in the
3  case -- states that you are seeking past and future
4  injury to feelings and mental anguish.  I wanted to ask
5  you about that, just as part of my process in gathering
6  the facts behind your claims.  Can you describe for me
7  the -- with some specificity the mental anguish that you
8  are referencing here in the paragraph?
9    A.  My husband worried a lot about his family, and
10  it was mental anguish for him.  He was a good provider
11  and he wanted to continue to be a good provider and he
12  worried a lot about how life would be for us after his
13  death.
14    It provides anguish for me on a couple of
15  different levels, one because I realized how difficult
16  this was for him and having to go through all these
17  documents was a -- was a reminder of how difficult a
18  process that was for him, you know, to look at -- to
19  look at his handwriting or to read a memo and knowing --
20  and having the knowledge of -- of how I knew that he --
21  how his thought processes were and his sense of
22  responsibility to his family.
23    I know that this caused him a lot of worry
24  and -- and in terms of anguish for myself, having that
25  knowledge causes me anguish and I have to -- I have to

15  (Pages  54  to  57)

GERALDINE NICHOLAS

**58**

1  carry on now alone and I have to worry about these
2  things.
3      Q.  Thank you.  Let me ask you about just some of
4  these names that have come up in these documents.
5      Jim Wilhite, since filing this lawsuit,
6  have you or any of your attorneys spoken with Jim
7  Wilhite?
8      A.  I have spoken to Jim Wilhite.
9      Q.  How many times?
10     A.  I know there was one time I talked to him.  I
11  think two times.
12     Q.  Can you tell me about when that was, when those
13  times were?
14     A.  It would have been -- it would have been late
15  2006, I think.
16     Q.  What did you discuss with Jim Wilhite?
17     A.  Discussed the letter of agreement with Tashi
18  Theismann, just about the -- the whole process of the --
19     Q.  Of the --
20     A.  -- of the -- this case, things that we have
21  talked about today.
22     Q.  What did Jim Wilhite have to say about all of
23  that?
24     A.  He said that none of the benefits that -- that
25  the benefits that Jim was receiving before his

**59**

1  termination were customary and were nothing was out of
2  the ordinary.  In other words, that's what -- that was
3  the standard policy that the company provide those
4  benefits for people who went on disability.
5      Q.  Did he say anything else that you remember?
6      A.  That's just the overall impression that comes
7  to mind of that -- those discussions with him.  As to
8  specifics, no, I don't recall.
9      Q.  Did you talk to him about whether or not he
10  believed that KBR broke a promise or broached an
11  agreement with your husband?
12     A.  Yes, I got the impression that he felt that KBR
13  was responsible for their -- you know, what they had
14  done, that they terminated him in error and....
15     Q.  So your recollection is that Jim Wilhite during
16  this conversation suggested he believed your husband
17  should have been able to participate in the group life
18  insurance plan?
19     A.  Yes.
20     Q.  After the time that he did?
21     A.  Yes.
22     Q.  Did you talk to Mr. Wilhite about potentially
23  being a witness in the case?
24     A.  Yes.
25     Q.  What did he tell you?

**60**

1      A.  He said yes, he would be.
2      Q.  I assume you still have contact information for
3  Mr. Wilhite?
4      A.  Uh-huh, yes.
5      Q.  Do you know where he is employed right now?
6      A.  I have a phone number, but I don't recall the
7  name of the employer.
8      Q.  How did you track Mr. Wilhite down?  Did
9  somebody else assist you?
10     A.  Peoplefind on the Internet.
11     Q.  You said you had two conversations with him?
12     A.  Yes.
13     Q.  Did you discuss different things in those
14  conversations, one versus the other, or --
15     A.  He was going to try to locate Tashi Theismann,
16  and he -- I believe the second phone call he was just
17  calling back to say that he knew where she was working.
18     Q.  Did you -- when you had this conversation with
19  Mr. Wilhite, a couple conversations with Mr. Wilhite,
20  did you forward him any documents, for example, the
21  December 24th, 1998, agreement that he signed?
22     A.  No.
23     Q.  So to the best of your knowledge, he was having
24  this conversation with you without having seen any of
25  the documents that we just reviewed?

**61**

1      A.  Correct.
2      Q.  And he provided you with Tashi Theismann's work
3  phone number?
4      A.  I have her phone number.  I think it's because
5  I googled her in peoplefind.  I don't think that he
6  provided me with that, but I think that second
7  conversation he was saying that he knew where she was
8  and that if I needed to talk with her or -- that he was
9  just letting me know that he knew where she was.
10     Q.  Have you spoken with Tashi Theismann?
11     A.  No.
12     Q.  Have you or -- do you know if your attorneys
13  have spoken with either Mr. Wilhite or Ms. Theismann
14  outside of your presence?
15     MR. FISHER:  We are going to object to the
16  this and instruct her not to answer.  The only way she
17  would know that is if I spoke to her about speaking with
18  him.  So I --
19     MR. MUSKAT:  I don't want to know the
20  content of any conversations, you know, but I think it's
21  a legitimate question to ask if she knows that you have
22  spoken with them.
23     MR. FISHER:  I am going to instruct her
24  not to answer that.  I will tell you I haven't.  So
25  there is your answer, but I am not going to let her

16  (Pages 58 to 61)

GERALDINE  NICHOLAS

## 62

1  answer any of your attorneys done this.  I will instruct
2  her not to answer that for work product and
3  attorney-client privilege.
4      Q.  (By Mr. Muskat)  Okay.  Have you spoken with
5  Jim Wagner in the last year?
6      A.  No.
7          MR. FISHER:  Now if those people told her
8  they spoke to me, that's fair game.
9      Q.  (By Mr. Muskat)  In the last year, have you
10  spoken with Martin Eichler?
11      A.  No.
12      Q.  Robert Hader?
13      A.  No.
14      Q.  Do you know if your husband spoke with Jim
15  Wilhite or Tashi Theismann any time in 2006 before he
16  passed away?
17      A.  He did not speak to Tashi Theismann.  It's
18  possible that he talked to Jim Wilhite during the same
19  time that I talked to Jim Wilhite.  It's very possible.
20  I don't recall.  He was very ill at that time.  I don't
21  recall that he did, but it's possible he might have
22  said, hi, Jim how are you, kind of thing, but I don't
23  recall.
24      Q.  So your conversations with Jim Wilhite were
25  before your husband passed away?

## 63

1      A.  Yes.
2      Q.  Do you know if in 2006 your husband spoke with
3  Jim Wagner?
4      A.  In 2006, no, I am not aware that he spoke to
5  Jim Wagner.
6      Q.  Martin Eichler?
7      A.  No.
8          MR. MUSKAT:  Let's go off the record.
9          (Recess from 11:50 a.m. to 12:01 p.m.)
10          (Nicholas exhibit No. 18 marked.)
11      Q.  (By Mr. Muskat)  Ms. Nicholas, exhibit 18 is a
12  fax that I received this morning from your attorney's
13  office that contains a signed verification page for your
14  interrogatory responses.  And my question is just
15  simply:  Are the responses you gave to the
16  interrogatories true and correct?
17      A.  Yes.
18          MR. MUSKAT:  I pass the witness.
19              EXAMINATION
20  BY MR. FISHER:
21      Q.  Ms. Nicholas, I want to show you — you were
22  shown a portion of the plaintiff complaint, the
23  complaint that we drafted on your behalf.  Do you
24  remember that?
25      A.  Yes.

## 64

1      Q.  I am going to read you portions of the
2  defendant's response in this case and ask you some
3  questions about that.  This is their answer to your
4  complaint:  Defendants deny that the agreement promised
5  they would continue to provide life insurance benefits
6  to Mr. Nicholas indefinitely or until age 65.
7          Do you believe that to be a truthful
8  statement?
9      A.  No.
10      Q.  All right.  Do you understand that this is a
11  answer on behalf of the M.W. Kellogg Company and
12  Halliburton?  I was just clarifying what he was.  I said
13  this is Halliburton's answer to — it's a Halliburton
14  answer.
15          MR. MUSKAT:  Ed, can we break for just a
16  second for me to get a copy of the answer if you are
17  going to ask more questions?
18          MR. FISHER:  It's not much.  It's going to
19  be very short, and I will hand it to you after I am
20  done.
21      Q.  (By Mr. Muskat)  Now, you were asked previously
22  as to whether or not you believe Mr. Wilhite or Tashi
23  Theismann were being untruthful or lying at the time
24  they wrote the letter to your husband or the contract
25  explaining the benefits that he would keep.  Do you

## 65

1  remember that testimony?
2      A.  Yes.
3      Q.  All right.  When faced with those letters
4  versus the answer that Halliburton has filed in this
5  case that there was no right to insurance, what is your
6  assumption at that point with respect to whether or not
7  he was being dealt with honestly at the time those
8  letters were sent?
9      A.  Well, as far as I would like to believe that he
10  was being dealt with honestly, I can't — I can't see
11  how Halliburton could make that response and say he is
12  not entitled when the representation that was made back
13  in 1998 was that he was entitled to his life insurance
14  benefits.  So if you are asking me who is lying, then I
15  don't know.  I — you know, there is a lie somewhere.
16      Q.  Okay.  Because you can't — when reading the
17  February letter versus the answer they provide, one
18  conferring the benefits of life insurance, one saying
19  you never had it, either the answer is wrong or the
20  letter is wrong?
21      A.  One or the other, yes.
22      Q.  And if the letter is wrong?
23      A.  Then, yes, he was lied to, I guess, if the
24  letter — if the letter is wrong, yeah, he — yes.
25          MR. FISHER:  Nothing further.

**17  (Pages 62 to 65)**

GERALDINE  NICHOLAS

---

**66**

1      MR. MUSKAT: Nothing further. Thank you
2  for your time.
3      I just wanted to put on the record at the
4  end of the deposition that we have been told that there
5  are some additional documents that are responsive to our
6  document requests but that we don't yet have and
7  depending on the content of those documents, we are
8  reserving the right to request that this deposition be
9  reconvened.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**68**

1  true and correct, except as noted herein.
2
3      GERALDINE NICHOLAS
4
5  THE STATE OF _____)
6  COUNTY OF _____)
7      Before me, _____, on this
   day personally appeared GERALDINE NICHOLAS, known to me
8  (or proved to me under oath through _____)
   (description of identity card or other document) to be
9  the person whose name is subscribed to the foregoing
   instrument and acknowledged to me that they executed the
10  same for the purposes and consideration therein
   expressed.
11
      Given under my hand and seal of office this
12  _____ day of _____, _____.
13
14
      NOTARY PUBLIC IN AND FOR
15  THE STATE OF _____
16
17
18
19
20
21
22
23
24
25

---

**67**

1      CORRECTIONS AND SIGNATURE
2  PAGE  LINE    CHANGE        REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24      I, GERALDINE NICHOLAS, have read the foregoing
25  deposition and hereby affix my signature that same is

---

**69**

1      IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
2              HOUSTON DIVISION
3  GERALDINE NICHOLAS,      :
   INDIVIDUALLY AND AS      :
4  ADMINISTRATRIX OF THE    :
   ESTATE OF JAMES NICHOLAS :
5                           :
   VS.          : CIVIL ACTION NO. H-07-00657
6                           :
   M.W. KELLOGG COMPANY,    :
7  KELLOGG, BROWN & ROOT,   :
   KBR, INC., AND HALLIBURTON :
8
9
10      REPORTER'S CERTIFICATION
11  DEPOSITION OF GERALDINE NICHOLAS
12        SEPTEMBER 18, 2007
13
14      I, Craig Michael Bechtel, Certified Shorthand
15  Reporter in and for the State of Texas, hereby certify
16  to the following:
17      That the witness, GERALDINE NICHOLAS, was duly
18  sworn by the officer and that the transcript of the oral
19  deposition is a true record of the testimony given by
20  the witness;
21      That the deposition transcript was submitted on
22  _____ to the witness or to the attorney
23  for the witness for examination, signature and return to
24  me by _____;
25

---

**18  (Pages  66 to 69)**

GERALDINE  NICHOLAS

**70**

1    That the amount of time used by each party at
2  the deposition is as follows:
3    Mr. Michael J. Muskat - 02:09
4    Mr. Ed Fisher - 00:03
5    That pursuant to information given to the
6  deposition officer at the time said testimony was taken,
7  the following includes counsel for all parties of
8  record:
9    Mr. Ed Fisher, Attorney for Plaintiff
10    Mr. Michael J. Muskat, Attorney for Defendants
11    I further certify that I am neither counsel
12  for, related to, nor employed by any of the parties or
13  attorneys in the action in which this proceeding was
14  taken, and further that I am not financially or
15  otherwise interested in the outcome of the action.
16    Further certification requirements will be
17  certified to after they have occurred.
18
19
20
21
22
23
24
25

**72**

1      FURTHER CERTIFICATION
2
3    The original deposition/correction sheet
4  was/was not returned to the deposition officer on
5  _____.
6    If returned, the attached Changes and Signature
7  page contains any changes and the reasons therefor;
8    If returned, the original deposition was
9  delivered to _____, Custodial Attorney;
10    That the deposition was delivered and that a
11  copy of this certificate was served on all parties shown
12  herein on _____.
13    Certified to by me this _____ day of
14  _____, _____.
15
16
17
    Craig Michael Bechtel, Texas CSR 6462
18  Expiration Date:  12-31-08
    Independent Reporting, Incorporated
19  Firm Registration No. 95
    13101 Northwest Freeway, Suite 210
20  Houston, Texas 77040
    (281)469-5580
21
22
23
24
25

**71**

1    Certified to by me this _____ day of
2  _____, _____.
3
4
5
6
    Craig Michael Bechtel, Texas CSR
7  Expiration Date:  12-31-08
    Independent Reporting, Incorporated
8  Firm Registration No. 95
    13101 Northwest Freeway, Suite 210
9  Houston, Texas 77040
    (281)469-5580
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**19  (Pages  70  to  72)**

69

1            IN THE UNITED STATES DISTRICT COURT

            FOR THE SOUTHERN DISTRICT OF TEXAS

2                 HOUSTON DIVISION

3   GERALDINE NICHOLAS,       :

    INDIVIDUALLY AND AS       :

4   ADMINISTRATRIX OF THE     :

    ESTATE OF JAMES NICHOLAS   :

5                         :

    VS.                   : CIVIL ACTION NO. H-07-00657

6                         :

    M.W. KELLOGG COMPANY,     :

7   KELLOGG, BROWN & ROOT,    :

    KBR, INC., AND HALLIBURTON :

8

9

10              REPORTER'S CERTIFICATION

11         DEPOSITION OF GERALDINE NICHOLAS

12             SEPTEMBER 18, 2007

13

14      I, Craig Michael Bechtel, Certified Shorthand

15 Reporter in and for the State of Texas, hereby certify

16 to the following:

17      That the witness, GERALDINE NICHOLAS, was duly

18 sworn by the officer and that the transcript of the oral

19 deposition is a true record of the testimony given by

20 the witness;

21      That the deposition transcript was submitted on

22 _October 1, 2007_____ to the witness or to the attorney

23 for the witness for examination, signature and return to

24 me by _October 31, 2007_____;

25

GERALDINE NICHOLAS

70

1    That the amount of time used by each party at

2    the deposition is as follows:

3        Mr. Michael J. Muskat - 02:09

4        Mr. Ed Fisher - 00:03

5    That pursuant to information given to the

6    deposition officer at the time said testimony was taken,

7    the following includes counsel for all parties of

8    record:

9        Mr. Ed Fisher, Attorney for Plaintiff

10       Mr. Michael J. Muskat, Attorney for Defendants

11   I further certify that I am neither counsel

12   for, related to, nor employed by any of the parties or

13   attorneys in the action in which this proceeding was

14   taken, and further that I am not financially or

15   otherwise interested in the outcome of the action.

16       Further certification requirements will be

17   certified to after they have occurred.

18

19

20

21

22

23

24

25

GERALDINE NICHOLAS

71

1      Certified to by me this _28th_ day of

2  _September_ , _2007_ .

3

4

5

6  _____

7  Craig Michael Bechtel, Texas C
   Expiration Date:  12-31-08
   Independent Reporting, Incorporated
8  Firm Registration No. 95
   13101 Northwest Freeway, Suite 210
9  Houston, Texas 77040
   (281)469-5580

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

73

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GERALDINE NICHOLAS,          :
INDIVIDUALLY AND AS          :
ADMINISTRATRIX OF THE        :
ESTATE OF JAMES NICHOLAS     :
                             :
VS.                          : CIVIL ACTION NO. H-07-00657
                             :
M.W. KELLOGG COMPANY,        :
KELLOGG, BROWN & ROOT,       :
KBR, INC., AND HALLIBURTON   :


DEPOSITION OF

GERALDINE NICHOLAS

VOLUME 2


December 13, 2007                    Houston, Texas


REPORTED BY:  Craig Michael Bechtel

GERALDINE NICHOLAS (VOLUME II)

**74**

### INDEX

PAGE

1  Appearances...................................... 75
2  Stipulations.................................... 76
3  Testimony of GERALDINE NICHOLAS
4  EXAMINATION
5  By Mr. Muskat .............................. 77
6  Correction and Signature Page................. 133
7  Reporter's Certificate Page.................. 135
8  Reporter's Supplemental Certificate Page....... 138

### EXHIBIT INDEX

PAGE

Exhibit No. 19................................ 79
Exhibit No. 20................................ 82
Exhibit No. 21................................ 94
Exhibit No. 22................................ 100
Exhibit No. 23................................ 104
Exhibit No. 24................................ 112
Exhibit No. 25................................ 120
Exhibit No. 26................................ 121
Exhibit No. 27................................ 124

**76**

1  THE ORAL DEPOSITION OF GERALDINE NICHOLAS was
2  taken by DEFENDANTS, via telephone, before Craig Michael
3  Bechtel, a Certified Shorthand Reporter in and for the
4  State of Texas, in the law offices of Muskat, Martinez &
5  Mahoney, 440 Louisiana, Suite 590, Houston, Texas,
6  between the hours of 9:34 a.m. and 11:13 a.m., on
7  December 13, 2007, pursuant to Notice and the Federal
8  Rules of Civil Procedure and the following stipulations
9  and waiver of counsel:
10
11  IT IS STIPULATED AND AGREED by and between
12  counsel for the respective parties hereto that all
13  objections are reserved until the time of trial, except
14  those as to the form of the question and/or
15  responsiveness of the answer; that the original
16  transcript of this deposition may be signed by the
17  witness thereon before any notary public or other
18  officer authorized to administer oaths.

**75**

### APPEARANCES

1  COUNSEL FOR PLAINTIFFS:
2    Mr. Ed Fisher, via telephone
3    Provost Umphrey
     490 Park Street
4    Beaumont, Texas 77004
     409-835-6000
5    efisher@provostumphrey.com
6  COUNSEL FOR DEFENDANTS:
     Mr. Michael J. Muskat
7    Ms. Stephanie Parente
     Muskat, Martinez & Mahoney
8    440 Louisiana, Suite 590
     Houston, Texas 77002
9    713-987-7851

**77**

1  GERALDINE NICHOLAS,
2  having been first duly sworn, testified as follows:
3  EXAMINATION
4  BY MR. MUSKAT:
5  Q. Hi, Ms. Nicholas. This is Mike Muskat
6  speaking. You and I met during your first deposition
7  here in Houston. I think during that deposition we
8  talked about the importance of — for the court
9  reporter's purposes, the importance of letting each
10  other finish our sentences, me letting you finish your
11  answers to questions and you letting me finish my
12  questions before you answer. And I think that's
13  particularly important today now that we are on the
14  telephone, when it's even more difficult, I think, to
15  avoid talking over each other. So if you would, try to
16  keep that in mind. I will, too.
17  Are you having any difficulties hearing me
18  or the court reporter over the phone?
19  A. I can hear you, yes. You are fine.
20  Q. Okay. Is anybody with you in the room where
21  you are sitting right now?
22  A. No.
23  Q. And do you have in front of you the stack of
24  documents that your counsel produced on October 18th of
25  this year?

2 (Pages 74 to 77)

78

1  A.  Yes, I do, the 46 pages.
2  Q.  Great.  Those are the documents that I will be
3  asking you about today.  So I just wanted to make sure
4  that you were looking at them, too.
5  A.  Okay.
6  Q.  Let me go ahead and start by asking you
7  questions about that stack of documents, and I apologize
8  if my questions come a little out of order or at least
9  the question about the documents are not in the order
10  that you have them.  I will try my best to identify the
11  document that I am talking about so that we can make
12  sure that we are both talking about the same thing.
13      The first document I wanted to ask you
14  about is one that is in handwriting.  And it says
15  1-22-07 at the upper left-hand corner, and the way it's
16  been copied, it's been copied horizontally on the page.
17  And then underneath the date it starts with, I believe,
18  Jamie.
19      Do you see that document?
20  A.  Yes.  I have it.
21  Q.  Okay.  First, is this your handwriting on this
22  page?
23  A.  Yes, it is.
24  Q.  Okay.  And before we go any further, I am going
25  to have the court reporter mark this document as

79

1  exhibit 19.  We are going to pick up where we left off
2  from the last deposition.
3      Did you make these notes on January 22nd,
4  2007?
5      (Nicholas exhibit No. 19 marked.)
6  A.  I don't remember if it was on that date, but my
7  normal way of doing things is I will date a document on
8  the day I have the discussion.
9  Q.  Does -- do the notes on this document reflect a
10  telephone conversation that you had, then, on
11  January 22nd?
12  A.  Correct.
13  Q.  Am I reading the name right?  Is that Jamie?
14  A.  Uh-huh.
15  Q.  Just for the court reporter, could you say yes?
16  A.  Yes.
17  Q.  Thank you.  And Jamie was somebody with KBR?
18  A.  Correct.
19  Q.  Am I -- tell me if I am reading your
20  handwriting correctly.
21      After Jamie, it says Jamie, dash, KBR
22  called, wanted to know if I had any questions/concerns
23  re: life benefits.
24      Did I read that correctly?
25  A.  Yes, you did.

80

1  Q.  And then it said:  I said yes.  She asked if I
2  had rec'd a beneficiary notice, period.
3      Did I read that correctly?
4  A.  Yes, received, rec is received a beneficiary
5  notice.
6  Q.  Had you received a beneficiary notice?
7  A.  No.
8  Q.  Let me ask, as a general matter, do you recall
9  whether the notes that are on this page about this
10  telephone conversation reflected all or nearly all of
11  what you discussed with Jamie, or is it just excerpts of
12  the conversation, as best you can recall?
13  A.  I don't have any specific recall of any other
14  things that she and I discussed.
15  Q.  Okay.  The next sentence -- and tell me if I am
16  reading this correctly -- appears to say:  Sometimes the
17  system does that in error, period.
18      Is that right?
19  A.  Uh-huh, yes.
20  Q.  Okay.  Am I correct in understanding, then,
21  that that was something that Jamie told you, that she
22  said something to the effect of you received a -- you
23  may have received a beneficiary notice in error?
24  A.  Yes.
25  Q.  Did you respond to that in any way?

81

1  A.  I don't remember.
2  Q.  Tell me if I am reading the remainder of this
3  page correctly:  Kept asking me the same question:  Do
4  you think there is a life benefit in place, question
5  mark?  I said no.
6      Did I read that correctly?
7  A.  Yes, you read that correctly.
8  Q.  Okay.  And why did you say -- why did you tell
9  Jamie that no, that you did not think there was a life
10  benefit in place?
11  A.  Because Halliburton said there was no life
12  benefit in place.  But there should have been, but she
13  didn't ask me that.
14  Q.  And when you say Halliburton said there was no
15  life benefit in place, I assume you were referring to
16  the communications that went back and forth between your
17  husband and the company in 2003 and 2004?
18  A.  Correct.
19  Q.  Okay.  Let me move on to another page in the
20  stack of documents.  And this page is, again, in
21  handwriting, and at the upper right-hand corner of the
22  page, it's got the No. 3 and then it's been circled?
23  A.  Yes, I have it.
24  Q.  Do you see that page in front of you?
25  A.  Entitled dispute resolution?

3  (Pages 78 to 81)

GERALDINE  NICHOLAS (VOLUME II)

82

1    Q.  Yes.  I am going to have the court reporter
2    mark that page and then the following two pages and the
3    next page has got a 4 in the upper right-hand corner and
4    the following page has a 5.
5        (Nicholas exhibit No. 20 marked.)
6    A.  Will all three pages be exhibit 20?
7    Q.  Yes.  Again, this is your handwriting.  Is that
8    right?
9    A.  Correct.
10    Q.  And the date, which is in the upper left-hand
11    corner of the page, is January 10th, 2007.  Is that the
12    date on which you had the conversation that's reflected
13    in these notes?
14    A.  Yes.
15    Q.  Do you recall whether you made the notes on the
16    same day or at a later time?
17    A.  I don't specifically recall if I -- if it was
18    that day, but again, how I normally date my work papers
19    is the date of the conversation.
20    Q.  I assume you spoke with this person by
21    telephone?
22    A.  Yes.
23    Q.  And again, up in the upper left-hand corner of
24    the page, it seems to say, MGR, then the name Janet.
25        Is that right?

83

1    A.  Yes.
2    Q.  Do you recall, was this Janet Hill at KBR?
3    A.  I don't remember her last name.  I wrote
4    manager because she was the manager.
5    Q.  How did you learn her name?
6    A.  I don't remember how I learned her name.
7    Probably somebody at KBR gave me her name and number.
8    Q.  Did you initiate this phone call?
9    A.  I did.
10    Q.  And why did you call Janet?
11    A.  Because I wanted to just gather some
12    information.
13    Q.  Gather information of what kind?
14    A.  Gather information in terms of perform -- of --
15    just things relevant, that I felt were relevant to this
16    case.
17    Q.  You had a discussion, I assume -- and we will
18    walk through these notes in some more detail in a
19    second, but I assume this conversation centered around
20    the KBR dispute resolution program.  I mean, is that
21    right?
22    A.  Yes.
23    Q.  And what prompted you to contact Janet to
24    discuss the dispute resolution program?
25    A.  I don't remember what prompted me, other than I

84

1    was just looking for information and would have called
2    the Pope in Rome if I felt that he had something
3    relevant to say.
4        You know, I don't -- I don't recall my
5    exact thought process at the time, except that at the
6    time I must have thought it appropriate to call Janet,
7    so I did.
8    Q.  How did you learn about the dispute resolution
9    program?
10    A.  I don't remember.  I -- I just had so much
11    information that I was juggling at the time that -- that
12    I don't have any specific recall about a lot of these
13    things.
14    Q.  Okay.  Was your conversation with Janet on
15    January 10th the first conversation you had with anybody
16    at KBR about their dispute resolution program?
17    A.  Probably.  I don't recall having any
18    discussions prior to that, and I don't really recall
19    having -- I don't really recall having any of those
20    discussions with people, with people at KBR.  It just --
21    Q.  You are saying prior to your phone call with
22    Janet?
23    A.  Uh-huh.
24    Q.  Just for the court reporter, Ms. Nicholas,
25    could you say yes?

85

1    A.  Yes.
2    Q.  Okay.  Thank you.  Let me ask you kind of a
3    general question about your notes on these three pages.
4    As I read through here, I got the impression that what
5    you had written down were Janet's answers to questions
6    that you were asking.  Is that how you made these notes,
7    or was there some other method you were following here
8    in deciding what to put down on the page?
9    A.  No.  It was a -- it was just questions that
10    were just running through my mind and being prompted by
11    things that Janet was saying that would have prompted me
12    to ask the next question.  I don't have any specific
13    recall that I had notes in front of me or anything and
14    that, you know, I had a -- I had a form to follow.  I
15    just -- it was just a conversation that -- that evolved.
16    Q.  Okay.  And the way -- if I am understanding you
17    correctly, the way the conversation evolved was
18    basically you asking her questions about the program and
19    her giving you information and you writing down some or
20    all of the information that she was giving you?
21    A.  Correct.
22    Q.  That's correct?
23    A.  Yes.
24    Q.  Okay.  If you could just drop to the bottom of
25    this first page, there is a -- on my copy at least,

**4  (Pages  82  to  85)**

GERALDINE NICHOLAS (VOLUME II)

86

1  there is a black mark sort of at the bottom. It kind of
2  looks like maybe a piece of tape or something was stuck
3  on the page or something like that.
4       Do you have that on your copy, too?
5  A.  I do.
6  Q.  Do you know what that is?
7  A.  No, I don't.
8  Q.  Did you give the originals of these documents
9  to your counsel?
10  A.  No.
11  Q.  Do you still --
12  A.  I did not.
13  Q.  Do you still have the originals?
14  A.  I should have it. And as we are speaking, I am
15  looking.
16  Q.  Okay. Great, great. I don't think, you know,
17  this is too big of a deal. Just in case in the course
18  of walking through these documents there was something
19  that we couldn't interpret because of those marks, I
20  just wanted to see if the originals might still exist.
21  And on this --
22  A.  Okay. I have the original.
23  Q.  Okay. Could you read what the sentence there
24  says in full at the bottom of page 3? I think it starts
25  with does.

87

1  A.  Yes.
2       Does not pass judgment.
3  Q.  Okay. Thanks. Let me ask you to -- if I
4  could, to turn to the next page, the one that says 4
5  circled in the top right-hand corner of the page.
6  A.  Yes.
7  Q.  Toward the bottom of that page, it is --
8  appears to be the second to last line of handwriting, as
9  I read this, this says his decision is binding.
10      Do you see that sentence?
11  A.  Yes.
12  Q.  Did I read that correctly?
13  A.  Yes.
14  Q.  Is that something that Janet said? In other
15  words, did she say something to the effect of the
16  arbitrator's decision in a matter is binding? Am I
17  understanding that note correctly?
18  A.  Yes. That would be my interpretation of it. I
19  did not -- I hadn't -- I had no knowledge of anything
20  when I talked to her, so that would have -- that would
21  have been something that she would have said.
22  Q.  Do you recall about how long your conversation
23  with Janet lasted?
24  A.  No, I don't.
25  Q.  If you would, Ms. Nicholas, turn to the next

88

1  page, the one that's got a 5 circled in the upper
2  right-hand corner.
3  A.  Yes.
4  Q.  Toward the top of that page, there is a -- a
5  sentence that appears to read: Did Jim sign an
6  agreement to agree to arbitration, question mark.
7       Do you see that sentence?
8  A.  I do.
9  Q.  Did I just read that correctly?
10  A.  Yes, you did.
11  Q.  Is that a question that Janet asked you, or was
12  that just a note you were making to yourself?
13  A.  That probably would have been a question that
14  she asked me.
15  Q.  Do you remember the context of the conversation
16  that prompted that question?
17  A.  No, I don't.
18  Q.  Do you recall answering the question, and you
19  know, telling Janet whether or not you believed that he
20  signed an agreement to arbitrate?
21  A.  If I had -- no, he -- at that time, I did not
22  know he had signed an agreement. And that's probably
23  why the question was there, because it was a question
24  that obviously we had discussed and didn't know the
25  answer to.

89

1  Q.  Ms. Nicholas, these three pages we just talked
2  about, the ones marked 3, 4, 5, at the top right-hand
3  corner, that are now exhibit 20, are these the only
4  notes of your conversation with Janet Hill?
5  A.  Yes.
6  Q.  Do you have any other conversations with her
7  in --
8  A.  Could I ask you to hold just for one second?
9  Q.  Oh, sure, sure.
10  A.  Hang on.
11      MR. FISHER: I am not rushing you by any
12  means. I wanted to know, for scheduling, how long you
13  think you are going to go.
14      MR. MUSKAT: I have a phone call that I
15  have got to make around lunchtime --
16      THE WITNESS: Sorry about that. Go ahead.
17      MR. MUSKAT: -- around the lunch hour, so
18  my goal is to make sure I am done by then. And I think
19  I will be able to be done by then.
20      MR. FISHER: Okay.
21  Q.  (By Mr. Muskat) You are back, Ms. Nicholas?
22  A.  Yes, I am.
23  Q.  Okay. I think I was in the middle of asking
24  whether or not you ever spoke to Janet Hill at any other
25  time.

5 (Pages 86 to 89)

GERALDINE  NICHOLAS (VOLUME II)

90

1   A. No.
2   Q. Did you have any conversations with anybody at
3   KBR about the dispute resolution program after this
4   conversation with Janet Hill?
5   A. I don't recall that I did.
6   Q. And after having this conversation with her,
7   why did you not proceed to use the dispute resolution
8   program?
9   A. First of all, I didn't know at that time if my
10  husband had signed anything, and secondly, I -- I
11  really -- even though I wrote all this down, where --
12  until I went back and read it again, I really don't have
13  a lot of recall as to specific time. And in January of
14  '07, I didn't comprehend a whole lot of what was going
15  on. I -- I found myself, you know, involved in this,
16  and I really didn't know what direction I was taking.
17  It was just a lot of information.
18  Q. You said that you didn't know if your husband
19  had signed anything?
20  A. Correct.
21  Q. At some point did you learn or come to believe
22  that he had signed something that would allow you to use
23  the dispute resolution program?
24      MR. FISHER: Mike, let me interpose an
25  objection there. Can we distinguish between the term

91

1   dispute resolution, arbitration, and mediation? In
2   these notes, all three of those terms are used, and they
3   have three different meanings to her.
4       MR. MUSKAT: That's fair.
5       MR. FISHER: I don't think you are getting
6   the answer you want when you just say dispute
7   resolution.
8       MR. MUSKAT: That's fair.
9       MR. FISHER: I don't want to clean up at
10  the end of the deposition and you have to ask questions
11  again.
12      MR. MUSKAT: That's fair. Thanks for
13  pointing that out.
14      MR. FISHER: Sure.
15  Q. (By Mr. Muskat) Let me change my question,
16  Ms. Nicholas.
17      The note up here on page 5 says did Jim
18  sign an agreement to agree to arbitration. And I think
19  you said you -- you don't know whether he had signed
20  anything, and so let me rephrase my question.
21      At some point did you come to believe one
22  way or the other that he had signed an agreement to
23  arbitrate?
24  A. Yes.
25  Q. Okay. And when was that, and under what

92

1   circumstances?
2   A. It would have been the spring of '07 sometime.
3   It could be as late as the month of May.
4   Q. And how did you come to believe that -- well,
5   let me back up.
6       I assume you are saying during that time
7   period you came to believe that he did sign an agreement
8   to arbitrate. Is that right?
9   A. Yes.
10  Q. What caused you to believe that in that time
11  frame?
12  A. I found a document in his file.
13  Q. And what document was that?
14  A. It was a letter agreement he signed dated
15  December of '98.
16  Q. Is this the letter agreement dated
17  December 24th, 1998?
18  A. Correct.
19  Q. And you -- you said you found that document in
20  his file during --
21  A. Yes.
22  Q. -- this time period. Is that the first time
23  that you had ever seen that document?
24  A. The original was in the file. I could have
25  seen a copy of it prior to that, but I actually did find

93

1   the original.
2   Q. So when you found the original in this
3   spring 2007 time frame, are you saying that you may have
4   seen that document or at least a copy of that document
5   before?
6   A. Yes.
7   Q. Do you know when you first saw the document or
8   a copy of it?
9   A. No, I couldn't tell you when.
10  Q. And just to clarify or to make sure that I
11  understand your testimony, are you saying that sometime
12  in the spring of 2007, as late as May of 2007, that you
13  saw this document and observed that there was an
14  arbitration provision in it. Is that right?
15  A. Yes and no. I found the document in the spring
16  of 2007. As to when I actually read it and comprehended
17  what was in it, I can't really tell you when that was.
18  It would have been at the earliest at that point or some
19  later date. Had I known it would be important, I would
20  have noted it.
21  Q. When you say spring of 2007, what particular
22  time frame are you referring to?
23  A. It would have been sometime before -- I had the
24  original document copies -- certified copies made on May
25  the 25th. So I know that it was sometime prior to

6  (Pages 90 to 93)

94

1 May 25th, but not a whole lot sooner than that. I guess
2 spring up here is different than spring over there.
3    Q.  That's for sure.
4    A.  The ground fog here in May --
5    Q.  I don't think we have a spring.
6    A.  No.
7    Q.  Okay, Ms. Nicholas. I am going to turn to
8 another document, and this one has got the No. 11 in the
9 upper right-hand corner circled.
10    A.  No. 11 in upper right-hand corner, okay. I
11 have it.
12    Q.  And on the left-hand side up at the top it's --
13 it seems to say 11-14-06, a.m. Is that the one you are
14 looking at?
15    A.  Yes.
16       MR. MUSKAT:  Okay. We will have this
17 marked as exhibit 21.
18       (Nicholas exhibit No. 21 marked.)
19    Q.  (By Mr. Muskat)  As best I can tell,
20 Ms. Nicholas, this is notes of a conversation you had
21 with Jim Wilhite. Is that right?
22    A.  Yes.
23    Q.  And I am guessing -- will you please correct me
24 if I'm wrong -- the conversation was on November 14th,
25 of '06, the a.m.?

95

1    A.  Yes.
2    Q.  Is this the first time that you had spoken with
3 Jim Wilhite?
4    A.  Oh, gosh, I don't remember.
5    Q.  A couple --
6    A.  Yes and no. Yes, in this -- yes, it could have
7 been the first conversation we had, or it could have
8 been the second conversation. I don't know.
9    Q.  Just below his name, it says -- seems to say
10 to me:  Call into Tashi.
11       Do you see that?
12    A.  Yes.
13    Q.  That's what suggested to me that perhaps you
14 had spoken with him before.
15    A.  It's very possible.
16    Q.  And I assume that this conversation that's
17 reflected in these notes is by telephone?
18    A.  Yes.
19    Q.  Do you remember if you called him or he called
20 you?
21    A.  It would have been me or my husband initiating
22 the call to him. It could have been him returning our
23 call. But the call would have been initiated on this
24 end.
25    Q.  I was going to ask you if anybody else was on

96

1 this call that you recall?
2    A.  My husband could have been. Judging from the
3 date, 11-14, he wasn't in great shape. So his -- the
4 participation that he would have had would have been
5 very limited and very diminished.
6    Q.  Do you know if Jim Wilhite had anybody in his
7 office or on his end of the phone?
8    A.  I don't think so. I never got the impression
9 that he did.
10    Q.  Do you remember how long this call lasted?
11    A.  Not long.
12    Q.  What do you mean by not long?
13    A.  Not long meaning it could have been 10 minutes.
14 It can have been 15, but it probably wasn't any longer
15 than that.
16    Q.  Do you recall if you tried to record everything
17 or almost everything that you-all were discussing?
18    A.  I don't know.
19    Q.  About one-third of the way down the page, there
20 is -- it appears to say suggestions, colon.
21       Do you see that?
22    A.  Suggestions? Yes.
23    Q.  And please tell me if I am reading the next
24 portion of this correctly. It appears to me to say:
25 You have the No. 1 and then say ask Unum if Jim was sent

97

1 letter and if he was on any list.
2       Is that right?
3    A.  Yes.
4    Q.  Could you recall, was that a suggestion that
5 Jim was making to you?
6    A.  Yes.
7    Q.  And did you ever do that? Did you ever call --
8    A.  No.
9    Q.  -- Unum?
10    A.  No.
11    Q.  About the middle of the page, there is a
12 paragraph that starts Wilhite, and then it says WCB.
13       Do you see that?
14    A.  Yes.
15    Q.  Would you mind just reading that paragraph?
16    A.  "Wilhite will call back when he talks to Tashi
17 and Michelle. He will not contact KBR because there is
18 probably a red flag on Jim's file. Michelle may still
19 know people there."
20    Q.  What did you understand Jim to be meaning when
21 he said that there is probably a red flag on Jim's file?
22    A.  What I understood that to mean is that because
23 there had been prior corresponding -- correspondence
24 exchanged between Jim Nicholas and KBR, that his file at
25 this point was probably marked sensitive.

98

1     Q.  The next paragraph seems to start:  Asked if he

2  would corroborate Jim's story, and he said yes, for what

3  it may be worth, since he only remembers

4  generics/procedural stuff.

5       Did I read that right?

6     A.  Yes.

7     Q.  When you reference corroborating Jim's story,

8  what did you mean by Jim's story?

9     A.  That Jim had an agreement that he was entitled

10  to his benefits, which included life insurance.

11     Q.  And then at the bottom of the paragraph, it

12  talks about since he, presumably meaning Jim Wilbite,

13  only remembers generic/procedural stuff.

14       What did you understand him to mean when

15  he said he only remembered generic and procedural stuff?

16     A.  That he didn't have -- he didn't have specific

17  recall as to on December 24th, 1998, he -- that was the

18  date of the letter that he -- you know, that he signed.

19  He didn't have specific recall on things like that or

20  intimate recall, but that he remembered Jim's case and

21  he remembered the agreement and that -- that that was

22  all pretty standard and regular and that that's what was

23  generic and procedural about it.

24     Q.  And did he tell you that he believed that KBR

25  was not honoring that agreement in this situation?

99

1     A.  Yes, he -- I got the impression that he was of

2  that opinion.

3     Q.  At the bottom of the page, Ms. Nicholas, there

4  is a sentence -- at the very bottom of the page, there

5  is a sentence that says:  Wilhite left in 2000 and the

6  rest of it kind of gets cut off on my copy, and there is

7  also a piece of tape over a portion of it.

8       Could you just read what -- starting

9  there, could you read from there to the bottom of the

10  page?

11     A.  He says -- says Wilhite left in 2000 -- and I

12  can't read the next word -- Halliburton and -- and

13  was -- and then much.

14     Q.  Do you have anything underneath that?

15     A.  I don't.  Do you?

16     Q.  Yes.  On my copy there appears to be one more

17  line underneath that.

18     A.  What does yours say?

19     Q.  Mine appears to say -- and before I read it, I

20  guess I should ask.

21       Do you happen to have the original of this

22  page in -- I am looking as we speak.  Wilhite -- I have

23  the original.

24     A.  I am looking as we speak.  Wilhite -- I have

25       Wilhite left in 2000 because, BC,

100

1  Halliburton was autocratic, much for the same reasons we

2  are having difficulties.

3     Q.  Is there anything else below that on the page?

4     A.  No.

5     Q.  Okay.  Let me move to a different document.

6  This one is the one that's got a 12 circled in the upper

7  right-hand corner, and we will mark that as exhibit 22.

8  Do you see that document, Ms. Nicholas?

9     A.  I do.

10       (Nicholas exhibit No. 22 marked.)

11     Q.  Am I interpreting this correctly to say that

12  you had another telephone call with Jim Wilbite on

13  November 14th at about 5:00 p.m.?  Is that what the

14  notation at the top of the page suggests?

15     A.  Correct.

16     Q.  Do you recall whether you called Jim, or he

17  called you?

18     A.  I don't remember.

19     Q.  Do you remember if anybody else was on the

20  call?

21     A.  No, I didn't get the impression that there was.

22     Q.  If you would go about a third of the way down

23  the page, there are -- there is a list of sorts with

24  several dashes, and there is a dash and then a paragraph

25  that starts they viewed Jim's letter as standard and

101

1  normal for benefits to continue as long as he remains on

2  disability unless he is 65, at which time he qualifies

3  for Medicare so they discontinue benefits.

4       Do you see that notation?

5     A.  Yes, I do.

6     Q.  Did I just read that correctly?

7     A.  Yes.

8     Q.  That suggests to me that at the time you had

9  this conversation with Jim Wilbite you had sent him or

10  he had seen the February 1998 letter about benefits from

11  M.W. Kellogg.  Do you think I am right in that

12  assumption or --

13     A.  No.

14     Q.  No?

15     A.  No, I don't recall sending him any -- any

16  copies of any letters.

17     Q.  Okay.

18     A.  Any -- any discussions we would have had on

19  those letters were discussions that we had via

20  telephone.

21     Q.  And so, then, am I right that their comment

22  about the letter, where they say they view it as

23  standard and normal, et cetera, et cetera, those were

24  comments that were based on either/or your description

25  of the letter or their recollection of the letter, as

102

1 far as you know?
2     A.  Or both, yes.
3     Q.  In other words, you had not --
4     A.  I would have read the letter.  I would have
5 read the letter to him.
6     Q.  You had it, and you may have read the letter to
7 him?
8     A.  Oh, yeah.
9     Q.  During that phone call or a previous phone
10 call?
11     A.  At some point, probably a previous one, because
12 of the way they viewed Jim's letter, because they
13 weren't in on the conversation that I had with Wilhite.
14 So he would have gone back and discussed it with them.
15     Q.  A little below the halfway point on the page,
16 there is a note in somewhat smaller handwriting that
17 seems to say:  Phil added, colon, want to know if Jim's
18 name was on list that went over from Halliburton.
19         Do you see that sentence?
20     A.  Yes.
21     Q.  Was that referring to Phil Tevares?
22     A.  Yes.
23     Q.  Was he on the call?
24     A.  No.
25     Q.  So do you know why he was being referenced

103

1 there?
2     A.  Probably a conversation I had had with Phil
3 Tevares at some point.
4     Q.  So --
5     A.  I don't recall that Phil was ever involved in
6 any conversations, because first of all, I don't know
7 how to make a conference call, so I would not have been
8 able to -- that's beyond my technical realm.  I wouldn't
9 know how to patch Phil in.
10     Q.  So, then, to the best of your recollection,
11 this notation was just kind of a note to yourself based
12 on some other conversation that you had had with Phil?
13     A.  Yes.
14     Q.  Okay.  Let me move to a different page.  And
15 then this one has got a 2 in the upper right-hand corner
16 which is circled.
17     A.  So are we --
18     Q.  We are done --
19     A.  Are we continuing to advance forward in the --
20 okay, yes.
21     Q.  Now we are probably moving backward in your
22 stack, or we are moving closer to the top of the stack.
23 I had just wanted -- I shuffled these things a little
24 bit because I was trying to get them in some kind of
25 chronological order.

104

1     A.  Okay.  What's the first written word in the
2 page?
3     Q.  It's horizontal, the one I am looking at, and
4 said Jim Wilhite 1-17-07, called back?
5         (Nicholas exhibit No. 23 marked.)
6     Q.  When you get there, we will mark this as 23.
7 Have you found that yet, Ms. Nicholas?
8     A.  I am sorry.  It's marked what?
9     Q.  This is exhibit 23.
10     A.  Okay.
11     Q.  Could you read the first two lines of this
12 page, the ones underneath Jim's name and the 1-17-07
13 called back notation?
14     A.  Okay.
15     Q.  The sentence --
16     A.  They --
17     Q.  Go ahead.
18     A.  "They, dash, legal, don't know what he is.
19 They speak in generic terms.  They don't look at it with
20 precision like HR, human resources."
21     Q.  The first part of that, it says they, legal,
22 don't know what he is.
23         What is that referring to?
24     A.  This was a discussion that we had about -- that
25 Jim was called many different things, like disabled

105

1 retiree, and I didn't know what that was.  And so I was
2 asking Wilhite for his -- in his expertise in this area,
3 if that had any significance.
4     Q.  Okay.  And by the way, the 1-17-07 note up at
5 the top of the page, does that suggest that this was a
6 conversation you had with Wilhite on January 17th?
7     A.  Yes.
8     Q.  In the middle of this page, it appears to say
9 just a euphemism and then disabled retiree in
10 parentheses.
11         Do you see that?
12     A.  Yes.
13     Q.  Did I just read that correctly?
14     A.  Yes.
15     Q.  Do you recall whether you had forwarded Jim
16 Wilhite documents before this phone call that referred
17 to your husband as a disabled retiree, or do you recall
18 whether that was just a term that you had remembered
19 that you conveyed to Jim over the phone?
20     A.  It was a term that I conveyed to him over the
21 phone.
22     Q.  Excuse me.  At any time in your correspondence
23 with Jim Wilhite, did you send him documents for him to
24 take a look at?
25     A.  No.

9  (Pages  102  to  105)

106

1    Q.  It appears to me that this is the last page in
2    this stack of documents that reflects a conversation
3    with Jim Wilhite. So my question is:  Did you ever have
4    any subsequent conversations with him, either where you
5    didn't take notes or you no longer are in possession of
6    the notes?
7        A.  I would have kept the notes that I had
8    subsequent conversations with him.  If this is the last
9    in the note, then that's the last.
10    Q.  Then that's the last conversation you had with
11    him?
12        A.  I am thinking if I had talked to him after
13    that.
14            Yes, I did, because I asked him if he
15    could be -- if he would -- if he could be deposed.
16    Q.  Do you recall when that was?
17        A.  It would have been -- it would have been close
18    to the time frame that my deposition took place.  That
19    was in September.
20    Q.  And do you recall whether you created any notes
21    of that conversation?
22        A.  I don't know.  September.  I may not have,
23    because I was on the road when I called him.
24    Q.  Okay.  Other than that conversation, do you
25    recall any other conversation with him after this

107

1    January 17th conversation?
2        A.  After that, yes, I did talk to him, but I can't
3    remember what it was for.  I think I was trying to
4    locate -- who was I trying to locate?  Someone that had
5    something to do with this case from KBR, probably
6    somebody on that list, that I saw a list of people.  I
7    am looking at the list.  I asked him if he knew how to
8    get ahold of Ken Allen.
9        Q.  And that was in a separate telephone
10    conversation?
11        A.  Separate from the one in September, yes.
12    Q.  Do you recall creating any notes of that
13    conversation?
14        A.  No, I don't.  I am looking.  I am not seeing
15    anything -- I am not seeing anything here.
16    Q.  Okay.  So, then, other than the September phone
17    call about being a witness and then the conversation
18    about Ken Allen's whereabouts, do you recall any other
19    conversations you had with Jim Wilhite since
20    January 17th?
21        A.  I am looking.
22            Oh, I asked him if he knew where Jim
23    Wagner was.  I do have a note here, 10-24.
24    Q.  Could you just read everything that's in the
25    note?

108

1        A.  "Jim Wilhite, left a message, do you have a
2    number for Jim Wagner?"
3    Q.  Is that all?
4        A.  Yep.
5    Q.  Do you recall whether he ever returned the
6    call?
7        A.  Yes, he did.  I remember that he did, but my
8    notes are sketchy.  Yes.  He -- he e-mailed me, and he
9    gave me Jim Wagner's contact information.
10    Q.  Are you looking at that e-mail now, or are you
11    looking at a printout of that e-mail?
12        A.  I am.  I am looking at the e-mail.
13    Q.  Other than -- other than this stack of
14    documents, Ms. Nicholas, that we are talking about today
15    and which your lawyer has produced on October 18th, are
16    there any other notes that you have -- and I want to be
17    specific about -- about the kind of notes I am talking
18    about here.
19            I am excluding notes of any conversations
20    in which your attorneys were involved or conversations
21    with your attorneys, but just notes of conversations
22    that you yourself have had with potential witnesses in
23    the case or with people at KBR or other entities about
24    the case.
25            Are you in possession of any such notes

109

1    that have not been produced to us?
2        A.  I am looking.  I read you the one from Jim
3    Wilhite: Do you know -- do you have a number for Jim
4    Wagner?
5            No, I don't -- I don't have anything else.
6    I don't have any other phone conversations.
7            I had a discussion with Phil Tevares, but
8    other than personal stuff, I relayed stuff to him
9    that -- of discussions that I had with my attorneys, so
10    I don't think I want to pass that along.  But I don't
11    see anything else in here.
12    Q.  To make sure I understand that correctly,
13    Ms. Nicholas, you are saying that there are notes of a
14    conversation you had with Phil Tevares?
15        A.  Correct.  There is an e-mail I sent to Phil
16    Tevares.
17    Q.  And that e-mail references conversations you
18    had with your attorneys?
19        A.  Correct.
20    Q.  So back to the -- let me just sort of separate
21    this between handwritten notes and e-mails.
22            As far as handwritten notes of
23    conversations that you have had with other people about
24    this case, excluding conversations with your attorneys
25    or your attorney or your attorneys were involved, is the

10  (Pages 106 to 109)

GERALDINE  NICHOLAS (VOLUME II)

## 110

1  10-24-07 note about Jim Wilhite which you read a few
2  minutes ago the only such note that exists that -- that
3  hasn't been given to us yet, to your knowledge?
4      A.  Correct.
5      Q.  And let's shift to e-mails.  You have
6  referenced an e-mail that you received from Jim Wagner,
7  and I will tell you, we don't have that, haven't seen
8  that yet.
9      A.  No.  It was an e-mail I received from Jim
10  Wilhite.
11     Q.  I am sorry.  Jim Wilhite.  I misspoke.
12     A.  Too many Jims.
13     Q.  Yeah, there are a lot of Jims.
14        Okay.  So there is an e-mail from Jim
15  Wilhite which you referenced?  And you have also
16  referenced an e-mail that you sent to Phil Tevares.
17        Are there any other e-mails that you have
18  sent or received -- and again, this is excluding e-mails
19  involving your attorneys that you haven't produced to us
20  that reflect communications with witnesses or other
21  people about this case.
22     A.  The only e-mail that I have is the one from
23  Wilhite giving me Wagner's information.  The other
24  e-mail is one to Phil Tevares, but it's talking about
25  attorney stuff.  And there is one to -- the one from Jim

## 111

1  Wilhite, I also asked him if he had contact information
2  for Ken Allen.
3      Q.  So there is an e-mail --
4      A.  No.  It's -- let me back up.
5        During my phone conversation with Jim
6  Wilhite, I asked him if he knew where Wagner was.  I am
7  looking for a note in my file to ask him approximately
8  when I asked him if he had a contact number for Ken
9  Allen, because I obviously asked him for it at some
10  point, because I am referencing it in this e-mail,
11  saying my e-mail to him said:  Was wondering if you had
12  a chance to locate Wagner's contact information.  I
13  called the number you gave me for Ken Allen, but didn't
14  get through.
15        So he obviously provided a number for me.
16     Q.  So there is an e-mail to Wilhite and also one
17  from Wilhite?
18     A.  Uh-huh, yes.
19     Q.  Okay.  Then other than those two e-mails and
20  the Phil Tevares e-mail we talked about a few minutes
21  ago, are there any other e-mails to or from other people
22  about this case excluding e-mails with your attorneys?
23     A.  There is an e-mail from Phil Tevares.  He was
24  replying to my e-mail to him about the stuff -- that
25  attorney stuff that was discussed.

## 112

1      Q.  Do you have your -- are you looking at your
2  e-mails --
3      A.  These are hard copies that are actually put in
4  my file.
5      Q.  Anything else?
6      A.  Nope.  The page is blank after that.
7      Q.  Is it possible that there are e-mails that were
8  sent or received that you have not yet printed, which
9  are still on your computer?
10     A.  Possible; however, unlikely, because I normally
11  print stuff and just put it in a hard file.
12     Q.  All right.  Let me move on to another document
13  in the stack, Ms. Nicholas.  And this is one that has
14  a 6 in the upper right-hand corner.  We will mark this
15  as -- exhibit 24.
16        (Nicholas exhibit No. 24 marked.)
17     A.  I am sorry.  What page?
18     Q.  It has a 6 which is circled in the upper
19  right-hand corner.  In the left-hand side it says Phil -
20  phone?
21     A.  I have it.
22     Q.  This will be exhibit 24.  And am I reading this
23  right to say that these are notes of a telephone
24  conversation you had with Phil Tevares on January 10th,
25  2007?

## 113

1      A.  Yes.
2      Q.  And right below Phil's name it says Gary -
3  talked to.  Gary called Phil before leaving town.
4        Did I read that right?
5      A.  Correct.
6      Q.  Is that Gary Carlson at KBR?
7      A.  Yes.
8      Q.  Below that sentence, it appears to me to say:
9  Not getting fair hearing.  My side not heard.
10        Do you recall, was that Phil's comment
11  about this situation, or was he relaying Gary's comment
12  about the situation?
13     A.  I don't know.
14     Q.  Okay.  The next sentence says:  Told him about
15  advocate program dispute resolution.
16        Who was telling whom about the dispute
17  resolution program?
18     A.  Probably Gary telling Phil.
19     Q.  And then your note is that Phil is telling you
20  that Gary told him about the dispute resolution program.
21        Am I understanding that right?
22     A.  Yes.  And I -- I think that dispute resolution
23  means that internal Halliburton dispute resolution team
24  that they have.
25     Q.  Right.  The team that Janet Hill was a part of?

11  (Pages 110 to 113)

GERALDINE  NICHOLAS (VOLUME II)

### 114

1    A.  Yes.

2    Q.  Is that what you mean?

3    A.  Yes.

4    Q.  And then closer to the middle of the page,

5  there is a phone number.  It says 713-753-5383, and then

6  it says dispute resolution.  And under the phone number,

7  it says Clinton Dr., Clinton Drive.

8    A.  Yes.  That's probably where I got the number.

9    Q.  For Janet Hill?

10   A.  Yes.

11   Q.  So am I interpreting this correctly that Phil,

12  during this phone conversation, provided you with that

13  phone number and about — and some reference to the

14  dispute resolution program?

15   A.  Correct.  It seems like it.

16   Q.  The next line, right in the middle of the page,

17  as best I can tell, says something like Phil says she,

18  alligator mouth hummingbird brain.

19      Does that look right?

20   A.  Yes.

21   Q.  What's that a reference to?

22   A.  References Jo Johnston.

23   Q.  That was Phil's comment about her?

24   A.  Yes.

25   Q.  The next line, it says — it's got a phone

### 115

1  number, it looks like, 800-947-7658, Eicher -- can you

2  read the next word?

3    A.  Gave.

4    Q.  Eichler gave for number.

5      Did I read that right?

6    A.  Yes.

7    Q.  That appears to me to be the 1-800 number for

8  the dispute resolution program.  Does that — does that

9  sound familiar to you?

10   A.  Probably.  I don't know.

11   Q.  Okay.  Do you know — I mean, you made this

12  note.

13      Where -- do you remember where the

14  information came from that you used to make this note?

15   A.  Probably Phil.

16   Q.  From Phil?

17   A.  Probably – either from Phil or probably from

18  Gary.  I don't know.

19   Q.  Do you remember in our — in your first

20  deposition, Ms. Nicholas, we briefly reviewed a document

21  that was from Martin Eichler to your husband dated

22  March 11th, 2004, that told him that he would not be

23  eligible to participate in a life insurance plan?

24      Do you remember that document?

25   A.  I remember the document.

### 116

1    Q.  I will represent to you that that document at

2  the bottom — toward the bottom of the document, it

3  lists that number for the dispute resolution program and

4  directs your husband to the dispute resolution program

5  if he wants to take the issue further.

6      Is it possible that that is where this

7  information came from that's reflected in your notes?

8    A.  Possibly, yes.

9    Q.  Do you think that that's probable or — I mean,

10  does that ring any bells with you, or is it just a

11  possibility?

12   A.  Can I make a statement here?

13   Q.  Sure.

14   A.  It's difficult for me to remember these

15  specifics.  When I read my notes, you know, I didn't

16  say, yeah, that jogs my memory.  This brings nothing to

17  my memory.  The one thing I can say about my state of

18  mind on January 10th and in and around that time period

19  was that I didn't connect the dots in anything at that

20  time in my life.  And although I was struggling to put

21  together facts and gather information to see what my

22  rights were, I can honestly say that I – I really was

23  not comprehending a whole lot of stuff back then.

24   Q.  The next line in this — in the page,

25  Ms. Nicholas, appears to me to say what — what it is

### 117

1  and what entitled to.

2      Does that look right?

3    A.  What it is and what entitled to, yes.

4    Q.  Do you know what that is a reference to?

5    A.  Probably a reference to the line that came

6  before it.

7    Q.  Regarding the number for the dispute resolution

8  program?

9    A.  That number, yes.

10   Q.  At the bottom — the very bottom of the page,

11  Ms. Nicholas, there are a couple lines that look to me

12  to read how do you keep bias out of system, and then

13  there is two hash marks, which I guess mean how do you

14  get fair discovery.

15      Did I read that right?

16   A.  Yes.

17   Q.  Okay.  What were those comments about, to your

18  recollection?

19   A.  I probably thought -- and I still do think

20  this -- that with reference to internal dispute

21  resolution -- and I looked at dispute resolution as an

22  internal thing that happened within the confines of

23  Halliburton.  I always had a concern that there would be

24  bias and that -- that the facts wouldn't be fairly

25  presented.

**12  (Pages 114 to 117)**

GERALDINE  NICHOLAS (VOLUME II)

118

1  Q.  And so these are -- correct me if I'm wrong.
2  These are just -- these notes sort of reflect your
3  questions or concerns about the -- the program?  Am I
4  understanding that right?
5  A.  Yes.
6  Q.  Were they comments that Phil Tevares made, or
7  were they kind of your reactions and thoughts?
8  A.  It could have been -- it could have been
9  thoughts that Phil had.  They were certainly thoughts
10  that I had.  The -- clearly the intent that we would
11  have security of all benefits was always something that
12  Phil -- that Phil kept going back to.
13  Q.  And your concerns about -- potential bias in
14  the dispute resolution program and getting fair
15  discovery, are those reasons why you chose not to
16  further pursue addressing this case within the dispute
17  resolution program?
18  A.  Well, first --
19  MR. FISHER:  I object to form of that
20  question.
21  Q.  (By Mr. Muskat)  Go ahead.
22  A.  We are talking about two different things.  I
23  keep getting the impression that when you say dispute
24  resolution, what I think of dispute resolution is in the
25  context of what we are talking about on these pages, is

119

1  Janet Hill's internal group.  Her salary is paid by
2  Halliburton, and she reports to a special board made up
3  of Halliburton employees.  That's what I am defining
4  here as dispute resolution.
5  Q.  Right.  I am glad you raised that point.  Let's
6  make sure we are on the same page about that term.
7  That's what I am referring to, too.  I am
8  referring to the internal program that was implemented
9  by Halliburton to resolve disputes.  I believe we are on
10  the same page about that when I use that term.  And so
11  that is my question, and I am just talking about
12  utilizing that internal program.
13  Am I understanding you correctly that
14  fears about bias and fear about getting fair discovery
15  were reasons why you chose not to try to resolve this
16  dispute within that program?
17  MR. FISHER:  I will object to the form.
18  Q.  (By Mr. Muskat)  You can go ahead,
19  Ms. Nicholas.
20  A.  Okay.  I am sorry.
21  THE WITNESS:  Ed, what -- what are you
22  saying?
23  MR. FISHER:  I am just objecting to the
24  way he is wording the question, but it's okay for you to
25  answer it.

120

1  THE WITNESS:  Okay.
2  A.  Yeah, I felt there was -- I felt there was
3  nothing that she said to me that made me feel like she
4  was biased one way or the other, but just the whole
5  format of how they are structured made me feel like they
6  were or potentially could be.
7  Q.  (By Mr. Muskat)  Let's move on to a different
8  document, if we could.  And this one that I am looking
9  at is -- has got a No. 10 in the upper right-hand
10  corner, and we will mark this as exhibit 25.
11  (Nicholas exhibit No. 25 marked.)
12  Q.  Do you see that document, Ms. Nicholas?
13  A.  Is this 11-14, Phil Tevares?
14  Q.  That's it.  Just one quick question about this
15  page.  In the first paragraph there, tell me if I am
16  reading this right.  It looks like it says:  He will --
17  on the -- starting on the second line of the paragraph,
18  he will -- tonight or tomorrow will tell Carlson that a
19  friend will contact to request a copy of his file, CB to
20  give feedback.
21  A.  Yes.
22  Q.  And requesting a copy of his file, is that a
23  reference to your husband's file?
24  A.  Correct.
25  Q.  Did you ever get a copy of any file regarding

121

1  your husband from KBR before you filed this lawsuit?
2  A.  No.
3  Q.  Okay.  Let me go to another document,
4  Ms. Nicholas.  This one has got a No. 7 in the upper
5  right-hand corner, and we will mark this.
6  (Nicholas exhibit No. 26 marked.)
7  A.  Are you moving forward in the package?
8  Q.  Well, I guess that's right.  I am backtracking
9  a little bit here, again, kind of trying to go in some
10  sort of chronological order through certain --
11  A.  Is it Phil Tevares?
12  Q.  Yes.  It says 1-2-07, Phil Tevares?
13  A.  Yes.
14  Q.  Sort of in the top third of the page, there is
15  a couple lines that appear to me to say:  Why carry LI
16  back -- I can't just read it after that.  Can you read
17  those two lines?
18  A.  "Why carry LI, because ill, couldn't prove
19  insurability."
20  Q.  What is that a reference to?
21  A.  A discussion that Phil and I would have had,
22  and it gets off -- Phil always would go back to the --
23  always the intent was to preserve the benefits, and
24  that's why you carry life insurance.  And that's why it
25  was still valuable, the asset was so valuable to Jim,

13  (Pages 118 to 121)

GERALDINE  NICHOLAS (VOLUME II)

**122**

1  because he was ill and he couldn't prove insurability

2  anywhere else.  And that's what made that asset so

3  valuable.

4      Q.  Okay.  Then moving down the page, there is some

5  notes in the middle of the page that start 9-98 merger,

6  and then kind of at the bottom of that little section,

7  off to the right-hand side it looks like it's maybe

8  somebody's name, C. Ables, or something along those

9  lines.

10          Do you see that word?

11      A.  I do.

12      Q.  What is that?

13      A.  I don't know.  That means nothing to me.

14      Q.  Okay.  Then at the very bottom of the page --

15  or toward the bottom, there is -- it says something to

16  the effect of companies have disclaimer, and then there

17  is a line.  And then it seems to say Gary is not a brave

18  soul.

19          Is that Phil's comment?

20      A.  Yes.

21      Q.  And do you recall what prompted him to make

22  that comment?

23      A.  No.

24      Q.  The next part of the line there seems to say no

25  one went through resolutions.  Did I read that

**123**

1  correctly?

2      A.  Yes.

3      Q.  Do you know what that's a reference to?

4      A.  No, I don't know.  Maybe something to do with

5  the merger.

6      Q.  And then could you just read for me the last

7  two sentences on this page?  I have got one of those

8  pieces of tape in the middle of the page and can't read

9  it.

10      A.  No one went through resolutions.  Perhaps maybe

11  he is referring to -- I don't know.

12      Q.  Okay.  Well, that's okay.

13      A.  Dispute resolutions?  I don't know.

14      Q.  Okay.  That's fine.  The very bottom of the

15  page, where it says conversion is the key, I have got a

16  piece of tape over those couple of lines, could you just

17  read what those two lines say?

18      A.  I don't know, but I will look and see if I have

19  the original.  This is 1-2-07, conversion is the key,

20  KBR is claiming that they honored their obligation re:

21  11-5-02 letter from Unum Provident.  KBR will not take

22  the moral position.

23          That was the next page.

24      Q.  Is that a comment that Phil made?

25      A.  Yes.

**124**

1      Q.  And then the next line:  They will look at

2  hassle factor and cost to pursue this or look at

3  embarrassment factor.

4          Is that -- did I read that right?

5      A.  Yes.

6      Q.  Are those Phil's comments?

7      A.  Yes.

8      Q.  Okay.  Let's make that a part of -- let's mark

9  that second page.  It's the page that's got an 8 at the

10  top right-hand corner.  Let's also make that a part of

11  exhibit 26 so that exhibit 26 will be two pages.  The

12  one with a 7 and the one with an 8.

13          Let me shift gears to a different document

14  now, and I am not sure if -- where it is in your stack,

15  but it is a printout of an e-mail from your husband to

16  Jim Wilhite dated December 22nd, 1998, and it's got some

17  handwriting on it.  Just let me know when you find that,

18  and we will mark it as exhibit 27.

19          (Nicholas exhibit No. 27 marked.)

20      Q.  Those two pages, because it's two pages of a

21  printout.

22      A.  I am not finding it.  What is it -- it's an

23  e-mail?

24      Q.  It's a printout of an e-mail.  It says Lotus cc

25  mail from James Nicholas up at the top left-hand corner.

**125**

1      A.  What comes right before it, and what comes

2  right after it?

3      Q.  That's the first thing on the first page, is

4  that little band at the top that says Lotus cc mail, and

5  then underneath it, there is a little information block

6  that says author, colon, James Nicholas and KHNT010M.

7  And then there is some more information, the date,

8  12-22-98, 11:54 a.m.  Then it goes into a full blown

9  e-mail a little bit lower on the page.

10      A.  Do you know how far down the stack it is?

11      Q.  It was in the stack that I received.  In the

12  order in which I received the documents, it was probably

13  about two thirds into the stack.

14      A.  12-22-98?

15      Q.  That's it.

16      A.  I have it.

17      Q.  Great.  That's exhibit 27.  And is this a

18  document that you printed out, or did you find it like

19  this, a printed out copy?

20      A.  Found it.

21      Q.  And the handwriting on this page, is that your

22  husband's handwriting?

23      A.  Yes.

24      Q.  Did you ever review this document with him?

25      A.  I don't remember.

**14  (Pages 122 to 125)**

GERALDINE  NICHOLAS (VOLUME II)

126

1   Q.  So as we sit here right now, you don't have any
2   recollection of walking through the different points
3   that are being made in this e-mail or discussing this
4   e-mail in any respect, I take it?
5   A.  We talked about a lot of stuff.
6   Q.  If you don't remember, that's fine.
7   A.  I don't remember.
8   Q.  I was wondering if you could help me try to
9   decipher some of the comments on here -- just a few of
10   them, not all of them.
11       About in the middle of the page, there is
12   a -- there is an asterisk, and then it says:  During
13   STD, will the cost of these benefits be deducted from my
14   check, et cetera, et cetera?
15       Do you see that typewritten paragraph?
16   A.  Yes.
17   Q.  Okay.  And then out to the right of that
18   paragraph, there appears to be -- you know, there is
19   some handwriting and it kind of works its way down the
20   page.  It looks like maybe the first word -- and it's
21   right underneath a 50 percent figure?
22   A.  Yes, same dollars --
23   Q.  Okay.  Do you know what the remaining said?
24   A.  It looks like a 4, a No. 4, 4 pay lump LTD
25   rate, then there is a -- who to pay to, how much,

127

1   regular pay for something -- I don't know what the next
2   word is.
3   Q.  Maybe lawyer time?  I don't know.
4   A.  Longer time, longer time?
5   Q.  Okay.
6   A.  Don't know.
7   Q.  If you go to the next page, which is the end of
8   the e-mail, there is also some handwriting on that page,
9   and I was wondering if you might have any idea as to
10   what it says.  It looks like the first couple of lines
11   start with LTD, and then there is an arrow.
12       MR. FISHER:  Yeah.  I am sorry.
13   A.  LTD pay employee sub, probably subsidy,
14   subsidized rate, and then a squiggle mark, by
15   Halliburton.
16   Q.  (By Mr. Muskat)  Okay.  Then the line below
17   that, do you have any idea?
18   A.  Rate pay now without LTD cost.
19   Q.  And then the next line?
20   A.  Part-time job, 15 to 20 hours per day,
21   salary -- sal -- don't know -- salesman, zero
22   disqualified to do anything else.
23   Q.  It looks like that may have been some kind of
24   reference to whether or not he could have a part-time
25   job and still qualify for disability payments.  Is that

128

1   anything you-all -- you-all discussed, to your
2   recollection?
3   A.  Yes, he talked about that, but he was never
4   well enough to work.
5   Q.  And then the next line down, it looks like 2/3.
6   Do you see that?  Do you have any idea what that says?
7   A.  Two thirds year, y-r -- I don't know --
8   assessed disabled from any work versus sales and then an
9   arrow, other.
10   Q.  And --
11   A.  Probably a continuation of him assessing any
12   options he has to work.  He wanted to work; he just
13   couldn't.
14   Q.  Okay.  I am -- I am getting near the end of my
15   questions here.  I just wanted to shift to one other
16   section of these pages here, and this is a page that --
17   in the top center of the page, it is a -- I believe it's
18   in your handwriting.  It says chronological inventory of
19   my file.
20   A.  Yes.
21   Q.  Do you see that page?
22   A.  Yes.
23   Q.  And this all seems pretty self explanatory, but
24   I just wanted to clarify when you use the term my file,
25   was that a special file that you were keeping of some

129

1   sort, or what -- what was the universe of documents you
2   were referring to when you used the term my file?
3   A.  My file meaning that I was at this point
4   starting to put together a file from documents and
5   papers that seem to be in different places.
6       MR. MUSKAT:  Let's -- if it's okay with
7   you-all, I am going to leave the room for a few minutes
8   and collect my thoughts and see if there is anything
9   else I want to ask.
10       MR. FISHER:  Okay.
11       MR. MUSKAT:  You know, I will maybe just
12   take five minutes or so, and then come back on the phone
13   here.
14       MR. FISHER:  We will just wait on the
15   line.
16       (Recess from 10:57 to 11:08 a.m.)
17   Q.  (By Mr. Muskat)  Ed and Ms. Nicholas, I am
18   back.  Are you guys ready to proceed?
19       MR. FISHER:  Yes.
20   A.  Yes.
21   Q.  (By Mr. Muskat)  Just a few more questions, and
22   then I will be done.
23       Ms. Nicholas, I wanted to return to
24   something we were discussing, you know, a few minutes
25   ago about the distinction in the use of the terms

15 (Pages 126 to 129)

GERALDINE  NICHOLAS (VOLUME II)

130

1　dispute resolution program versus just using the term
2　arbitration. And I guess the best way for me to ask it
3　is for -- for what your -- how you distinguish between
4　those two terms and what they mean to you.
5　　A.　As they mean to me today, because with what
6　they meant to me in January was something -- as I
7　mentioned before, I don't think I was fully
8　comprehending all the information I was gathering,
9　but -- but what dispute resolution means --
10　　Q.　You faded out. Our line went out right around
11　the time that you were saying that it means -- you know,
12　you were talking about January of this year, and what
13　they may have meant to you or not meant to you then.
14　　　　Could you start over at that point?
15　　A.　Okay. Dispute resolution in the context of
16　those notes that we were talking about earlier meant
17　dispute resolution within -- within Halliburton.
18　　Q.　And what does arbitration mean to you as we sit
19　here right now, and how was it different?
20　　A.　Arbitration -- well, the dispute resolution
21　doesn't mean anything different per se to me now,
22　because that still is dispute resolution that happens
23　within Halliburton. Arbitration is -- is a step beyond
24　that. It's external to Halliburton.
25　　Q.　So the -- the distinction in your mind is that

131

1　one -- in both situations, the duty is resolved by an
2　arbitrator, but in the dispute resolution program,
3　that's a program that is -- that is implemented by
4　Halliburton versus arbitration is something that is not
5　internal to Halliburton. Is that --
6　　A.　Correct.
7　　Q.　Is that the way to put it?
8　　A.　Yes.
9　　Q.　Okay. And -- and please correct me here. I do
10　not want to put words in your mouth about this, but I am
11　trying to understand that in January of '07, you were
12　not excited by the possibility of proceeding through the
13　Halliburton dispute resolution program, because you had
14　some concern about the fairness of that program. Is
15　that --
16　　A.　Correct.
17　　Q.　Okay. But I take it that at some point you
18　learned that there was a -- there was an opportunity to
19　arbitrate -- or you felt like you wanted to arbitrate
20　this dispute outside of the Halliburton dispute
21　resolution program. Is that right?
22　　A.　Correct.
23　　Q.　Okay. And as a matter of fact, that's what you
24　are seeking to do right now, is to have this case sent
25　to arbitration but not in the Halliburton dispute

132

1　resolution program. Is that right?
2　　A.　Correct.
3　　Q.　Okay. So -- if I am understanding you
4　correctly, the -- you know, the -- what you want to do
5　is send the case to arbitration, not in the dispute
6　resolution program, on the basis of an arbitration
7　clause that is in that December 24th, 1998, agreement
8　that we talked about.
9　　　　Am I understanding that correctly?
10　　A.　Yes.
11　　Q.　Okay. And am I understanding your testimony
12　from earlier today correctly that that agreement -- you
13　believe that you noticed that arbitration provision in
14　that agreement sometime in the spring of 2007?
15　　A.　Yes.
16　　Q.　And was it at that time that you began to
17　perceive that there was a difference between -- in your
18　mind, between arbitration and you know -- versus the
19　dispute resolution program?
20　　A.　Yes.
21　　　　MR. MUSKAT:　Thank you very much for your
22　time today, Ms. Nicholas.
23　　　　I will pass the witness, Ed.
24　　　　MR. FISHER:　We will reserve our questions
25　for the time of trial or arbitration.

133

1　　　　　　CORRECTIONS AND SIGNATURE
2　PAGE  LINE   CHANGE      REASON
3　_____
4　_____
5　_____
6　_____
7　_____
8　_____
9　_____
10　_____
11　_____
12　_____
13　_____
14　_____
15　_____
16　_____
17　_____
18　_____
19　_____
20　_____
21　_____
22　_____
23　_____
24　　　　I, GERALDINE NICHOLAS, have read the foregoing
25　deposition and hereby affix my signature that same is

16　(Pages 130 to 133)

### 134

1  true and correct, except as noted herein.

2

3  _____
   GERALDINE NICHOLAS

4

5  THE STATE OF _____ )

6  COUNTY OF _____ )

7      Before me, _____, on this
   day personally appeared GERALDINE NICHOLAS, known to me

8  (or proved to me under oath through _____)
   (description of identity card or other document) to be

9  the person whose name is subscribed to the foregoing
   instrument and acknowledged to me that they executed the

10 same for the purposes and consideration therein
   expressed.

11

       Given under my hand and seal of office this

12 _____ day of _____, _____.

13

14 _____
       NOTARY PUBLIC IN AND FOR

15     THE STATE OF _____

16

17

18

19

20

21

22

23

24

25

### 135

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS

2                  HOUSTON DIVISION

3  GERALDINE NICHOLAS,     :
   INDIVIDUALLY AND AS     :

4  ADMINISTRATRIX OF THE   :
   ESTATE OF JAMES NICHOLAS :

5                          :

   VS.          : CIVIL ACTION NO. H-07-00657

6                          :

   M.W. KELLOGG COMPANY,   :

7  KELLOGG, BROWN & ROOT,  :
   KBR, INC., AND HALLIBURTON :

8

9

10         REPORTER'S CERTIFICATION

11      DEPOSITION OF GERALDINE NICHOLAS

12           December 13, 2007

13

14      I, Craig Michael Bechtel, Certified Shorthand

15 Reporter in and for the State of Texas, hereby certify

16 to the following:

17      That the witness, GERALDINE NICHOLAS, was duly

18 sworn by the officer and that the transcript of the oral

19 deposition is a true record of the testimony given by

20 the witness;

21      That the deposition transcript was submitted on

22 _____ to the witness or to the attorney

23 for the witness for examination, signature and return to

24 me by _____;

25

### 136

1      That the amount of time used by each party at

2  the deposition is as follows:

3      Mr. Michael J. Muskat - 01:28

4      That pursuant to information given to the

5  deposition officer at the time said testimony was taken,

6  the following includes counsel for all parties of

7  record:

8      Mr. Ed Fisher, Attorney for Plaintiff

9      Mr. Michael J. Muskat and Ms. Stephanie

10 Parente, Attorneys for Defendants

11      I further certify that I am neither counsel

12 for, related to, nor employed by any of the parties or

13 attorneys in the action in which this proceeding was

14 taken, and further that I am not financially or

15 otherwise interested in the outcome of the action.

16      Further certification requirements will be

17 certified to after they have occurred.

18

19

20

21

22

23

24

25

### 137

1      Certified to by me this _____ day of

2  _____, _____.

3

4

5

6  _____

   Craig Michael Bechtel, Texas C_____

7  Expiration Date: 12-31-08

   Independent Reporting, Incorporated

8  Firm Registration No. 95

   13101 Northwest Freeway, Suite 210

9  Houston, Texas 77040

   (281)469-5580

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**17 (Pages 134 to 137)**

GERALDINE  NICHOLAS (VOLUME II)

138

1          FURTHER CERTIFICATION

2

3       The original deposition/correction sheet

4   was/was not returned to the deposition officer on

5   _____

6       If returned, the attached Changes and Signature

7   page contains any changes and the reasons therefor;

8       If returned, the original deposition was

9   delivered to _____, Custodial Attorney;

10      That the deposition was delivered and that a

11  copy of this certificate was served on all parties shown

12  herein on _____.

13      Certified to by me this _____ day of

14  _____, _____.

15

16

17   _____

      Craig Michael Bechtel, Texas CSR 6462

18   Expiration Date:  12-31-08

      Independent Reporting, Incorporated

19   Firm Registration No. 95

      13101 Northwest Freeway, Suite 210

20   Houston, Texas 77040

      (281)469-5580

21

22

23

24

25

**18  (Page 138)**

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GERALDINE NICHOLAS,                              §
INDIVIDUALLY AND AS                              §
ADMINISTRATRIX OF THE ESTATE                     §
OF JAMES NICHOLAS,                               §
                                                 §
                    Plaintiff,                   §
                                                 §
v.                                               §    CIVIL ACTION NO. H-07-00657
                                                 §
M.W. KELLOGG COMPANY,                            §
KELLOGG, BROWN & ROOT,                           §
KBR, INC., AND HALLIBURTON,                      §
                                                 §
                    Defendants.                  §

## DECLARATION OF ROBERT HAYTER

Pursuant to 28 U.S.C. § 1746, I declare as follows:

      1.     I, Robert Hayter, am over the age of twenty-one and competent to make this Declaration, and I have personal knowledge of the truth of its contents.

      2.     From August 1999 to January 2005, I was in-house counsel for Halliburton Co. specializing in employee benefits and executive compensation matters. Based on this role, I have knowledge of the welfare benefits plans offered by Halliburton and its subsidiaries and of certain actions taken by the plan administrator of the Halliburton welfare benefits plans.

      3.     Following the Dresser-Halliburton merger and until January 1, 2003, eligible KBR employees were covered by the Halliburton Welfare Benefits Plan. On January 1, 2003, eligible employees in KBR's engineering, technical, and administrative job classifications (which included James E. Nicholas, a former M.W. Kellogg employee) became covered by the KBR Welfare Benefits Plan (the "KBR Plan").

1

4.     In the Fall of 2002, just prior to the rollout of the KBR Plan, I and others within Halliburton observed that there were employees who had been on medical leaves of absence for more than twenty-four months but who nonetheless continued to participate in the Halliburton Plan at active employee rates. James E. Nicholas was one of these employees. Because the KBR Plan allowed participation at active employee

rates for only twenty-four months of medical leave, Mr. Nicholas' continuing participation in the KBR Plan was inconsistent with its terms. On January 2, 2003, just after the KBR Plan took effect, KBR terminated Mr. Nicholas' coverage.

5.     In mid-2003, I learned that Mr. Nicholas had requested that he be reinstated as a participant under the KBR Plan. The only document provided by Mr. Nicholas in connection with the request was two pages of what appeared to have originally been a four-page letter dated February 19, 1998 from a benefits specialist at M.W. Kellogg to Mr. Nicholas. Attached to this Declaration as Attachment 1 is a true and correct copy of the two pages that Mr. Nicholas provided. I learned that Mr. Nicholas interpreted the letter to have promised him participation in the M.W. Kellogg benefits plans at active employee rates until age 65 or his disability ended, and that Mr. Nicholas believed that this alleged promise entitled him to continued participation in the KBR Plan, as he was not yet 65 and said he was still disabled. I relayed Mr. Nicholas' request, and the partial letter dated February 19, 1998, to Martin Eichler, KBR's Director of Benefits and the person to whom the Halliburton Benefits Committee (who was the Administrator of the KBR Plan) had delegated authority to make benefits determinations. I then worked with Mr. Eichler to reach a decision regarding the claim.

2

6.      Although it was clear to me and Mr. Eichler that the terms of the KBR

Plan which allowed participation at active employee rates for only twenty-four months of

medical leave disqualified Mr. Nicholas from continued participation in the Plan, and that

the boilerplate statements about the M.W. Kellogg plan contained in the portion of the

February 19, 1998 letter we had been provided had no legal effect on the terms of the

KBR Plan, we nonetheless agreed that we would reinstate Mr. Nicholas' coverage under

the KBR group medical and dental plans at active employee rates because Mr. Nicholas

was ill and it was not prohibitively expensive for KBR to keep him covered by those

plans, consistent with his expectations.  We agreed that we were able to make this

exception to the KBR Plan terms because the constituent medical and dental plans were

self-funded by KBR (i.e., no third-party insurer funded benefits) and the costs of Mr.

Nicholas' continued coverage would be assumed solely by Mr. Nicholas and KBR.  Mr.

Eichler memorialized this decision in a letter to Mr. Nicholas dated October 16, 2003.  A

true and correct copy of that letter is attached to this Declaration as Attachment 2.

7.      Subsequently, Mr. Nicholas made a specific request to be reinstated to

coverage under the KBR group life insurance plan as well.  Unlike the medical and dental

plans, the group life plan was funded by a third-party insurer, not KBR.  KBR's contract

with the insurer stated, as did the KBR Plan itself, that employees on medical leaves of

absence would be covered for a maximum of twenty-four months.  A true and correct

copy of that contract is attached to this Declaration as Attachment 3.  (See page

"EMPLOYEE-3" of the contract.)  Thus, although Mr. Eichler and I had been able to

assist Mr. Nicholas by making an exception to the KBR Plan terms with respect to the

self-funded medical and dental coverage, we agreed that we were unable to make a

3

similar exception with respect to the group life insurance coverage.   Mr. Eichler

explained this decision in a letter to Mr. Nicholas dated March 11, 2004.  A true and

correct copy of that letter is attached to this Declaration as Attachment 4.

        8.     On or shortly after October 1, 2004, Mr. Eichler forwarded to me a letter

he had received from Bryan O. Blevins, a Provost Umphrey attorney representing Mr.

Nicholas.   A true and correct copy of that letter is attached to this Declaration as

Attachment 5.  On behalf of Mr. Nicholas, Mr. Blevins made another request that Mr.

Nicholas be permitted to participate in the KBR group life insurance plan. On October 7,

2004, I responded to Mr. Blevins and described the reasons why KBR would not

accommodate the request.  A true and correct copy of my October 7, 2004 letter is

attached to this Declaration as Attachment 6.    After I sent the October 7, 2004 letter, I

received no additional correspondence from Mr. Nicholas or anyone representing him.

        9.     I am aware that the Plaintiff in this matter has produced a severance

agreement between James Nicholas and M.W. Kellogg dated December 24, 1998.   The

first time I had ever seen that document was during discovery in this case; neither Mr.

Nicholas, his attorney, nor anyone else purporting to represent Mr. Nicholas or the

Plaintiff forwarded that document to me at any time.

        10.   Also attached to this Declaration are true and correct copies of the

following documents:

        ●   The Summary Plan Description of the Halliburton Welfare

Benefits Plan effective as of January 1, 2000 (see Attachment 7);

        ●   The Summary Plan Description of the KBR Welfare Benefits Plan

effective as of January 1, 2003 (see Attachment 8);

4

- The KBR Welfare Benefits Plan effective January 1, 2003 (see Attachment 9).

I declare under penalty of perjury that the foregoing is true and correct.

Case 4:07-cv-00657   Document 19-6   Filed 02/22/2008   Page 5 of 5

Signed this 19th day of February, 2008, in Houston, Texas.

ROBERT HAYTER